## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

SCOTT FUQUA,

     Plaintiff,

vs.                                No. CIV 23-0685 JB/LF

SANTA FE COUNTY SHERIFF'S OFFICE,
CORPORAL CHRISTOPHER ZOOK
DEPUTY JACOB MARTINEZ, and DEPUTY
LEONARDO GUZMAN,

     Defendants.

## **MEMORANDUM OPINION**[1]

**THIS MATTER** comes before the Court on (i) Defendants Zook, Martinez, and Guzman's

Motion to Dismiss in Lieu of an Answer, filed August 31, 2023 (Doc. 3)("First MTD");

(ii) Defendants Zook, Martinez, and Guzman's Motion to Dismiss Plaintiff's First Amended

Complaint in Lieu of an Answer, filed November 30, 2023 (Doc. 24)("Second MTD"); and (iii) the

Plaintiff's Motion to Amend Style of Case, filed December 8, 2023 (Doc. 26)("Style Motion").

The Court held hearings on November 16, 2023, and May 23, 2024.  See Clerk's Minutes at 1,

filed November 16, 2023 (Doc. 25); Clerk's Minutes at 1, filed May 23, 2024 (Doc. 37).  The

primary issues are: (i) whether the First Amended Civil Complaint for Damages and Petition for

---

[1]On September 10, 2024, the Court entered an Order denying the Defendants Christopher Zook, Jacob Martinez, and Leonardo Guzman's Motion to Dismiss in Lieu of an Answer, filed August 31, 2023 (Doc. 3), denying the Defendants Zook, Martinez, and Guzman's Motion to Dismiss Plaintiff's First Amended Complaint in Lieu of an Answer, filed November 30, 2023 (Doc. 24), and granting the Plaintiff's Motion to Amend Style of Case, filed December 8, 2023 (Doc. 26). See Order at 1 (Doc. 40)("Order").  In the Order, the Court states that it would "issue at a later date, however, a Memorandum Opinion more fully detailing its rationale for this decision."  Order at 1 n.1.  This Memorandum Opinion is the promised opinion.

the Appointment of a Personal Representative Under the Wrongful Death Act for the Estate of Jason Roybal, filed November 16, 2023 (Doc. 20)("First Amended Complaint"), plausibly alleges that the Defendants violated Jason Roybal's Constitutional rights and are not entitled to qualified immunity when they shoot and kill him when he exits his vehicle after brandishing a BB gun at them, drops the BB gun, and turns away from them to flee; and (ii) whether the Plaintiff may amend the case's caption to drop the Santa Fe County Sheriff's Office and replace it with Santa Fe County. The Court concludes that: (i) the First Amended Complaint states an excessive-force claim under 24 U.S.C. § 1983 for a violation of the Fourth Amendment of the Constitution of the United States' protections against unreasonable seizures, because it alleges that each Defendant shoots Roybal when he is unarmed and non-threatening; and (ii) the Plaintiff may amend the case's caption, because he inadvertently did not do so when he filed the First Amended Complaint. Accordingly, the Court: (i) denies the First MTD; (ii) denies the Second MTD; and (iii) grants the Style Motion.

### **<u>FINDINGS OF FACT</u>**

The Court emphasizes that it knows it cannot and should not make findings of fact when ruling on a motion to dismiss. The Court is not certain what to do with this motion, when all parties want the Court to look at the videos, but also cannot agree to convert the motion to a motion for summary judgment. In the analysis' final section, the Court will say what it sees, and say how it would apply summary judgment principles in the excessive-force context to what the videos depict. Accordingly, the following findings of fact <u>do not factor</u> into the Court's motion-to-dismiss analysis and holding. Instead, the Court intends these findings of fact to preview its thinking at the summary judgment stage.

1.      On June 24, 2021, in Santa Fe, New Mexico, Santa Fe County Sheriff's Department

Deputy Leonardo Guzman pulls behind Roybal's truck in his police vehicle and turns on his emergency lights. See Leonardo Guzman Dashcam Video at 0:14 (not dated), lodged October 6, 2023 (Doc. 13), as Exhibit A to the First MTD ("Guzman Dashcam").

2.      Guzman attempts to initiate a traffic stop, because he knows that Roybal "had outstanding warrants." Second MTD at 3.

3.      Roybal does not pull over, and, instead, swerves the truck across the double yellow line and into the lane for oncoming traffic. See Guzman Dashcam at 0:32.

4.      Guzman follows Roybal for roughly seventy seconds, at which point Roybal stops his truck, puts the truck in reverse, and begins to drive backwards towards Guzman in the opposite lane. See Guzman Dashcam at 1:52-2:27.

5.      Santa Fe County Sheriff's Department Deputy Jacob Martinez, who is also driving his police vehicle, rendezvous with Guzman as Roybal is driving away from Guzman in reverse and as Guzman is turning his car around to continue pursuing Roybal. See Jacob Martinez Dashcam Video at 0:17 (not dated), lodged October 6, 2023 (Doc. 13), as Exhibit C to the First MTD ("Martinez Dashcam").

6.      Soon after, Santa Fe County Sheriff's Department Corporal Christopher Zook arrives at the scene in his police vehicle, approaching from the opposite direction, and joins the Roybal pursuit. See Martinez Dashcam at 0:35.

7.      The three officers follow Roybal's truck for around three minutes before Roybal stops the truck heading southeast on Siler Road before Rufina Street. See Christopher Zook Dashcam Video at 2:25 (not dated), lodged October 6, 2023 (Doc. 13), as Exhibit B to the First MTD ("Zook Dashcam").

8.      At first, all three police vehicles are behind Roybal's truck, but Zook drives his

vehicle across the street into a business' parking lot and positions himself so that he is slightly behind, but parallel to, the driver's side of Roybal's truck. See Zook Dashcam at 3:10.

9.    The below daytime photo depicts the vehicles' positions.[2] See Aerial Photo (not dated), filed September 22, 2023 (Doc. 6-2).



10.    Roybal's truck is roughly twenty feet from Guzman's car, the car closest to the truck in the middle of the turn lane. See Aerial Photo.

11.    Roybal's truck is roughly thirty feet from Martinez' car, the car in the same lane as Roybal's truck and to the right of Guzman's car. See Aerial Photo.

12.    Roybal's truck is roughly fifty feet from Zook's car, which is parked across the street in a parking lot diagonal to the truck. See Aerial Photo.

13.    About six seconds after Zook has stopped his car, Roybal leans out of the truck's driver's-side window holding a BB gun, fires a projectile from the BB gun behind him, in the direction of Martinez' and Guzman's patrol cars, and then ducks below the truck's windows. See

---

[2]The Aerial Photo shows four police vehicles and Roybal's truck, but the parties lodged videos that correspond to three officers, Zook, Guzman, and Martinez. The record does not reflect, and the parties have not specified, to whom the fourth police car -- positioned furthest to the left in the Aerial Photo -- belongs.

Zook Dashcam at 3:16; Martinez Dashcam at 4:27.

14.     Roybal fires the BB gun in order to injure or frighten the officers.

15.     When Roybal fires, Guzman is standing by the driver's-side door of Guzman's car, see Leonardo Guzman Lapel Cam at 6:40 (not dated), lodged October 6, 2023 (Doc. 13), as Exhibit D to the First MTD ("Guzman Lapel"), Martinez is standing by the driver's-side door of Martinez' car, see Jacob Martinez Lapel Cam at 4:19 (not dated), lodged October 6, 2023 (Doc. 13), as Exhibit E to the First MTD ("Martinez Lapel"), and Zook is standing by the driver's-side of Zook's car, see Christopher Zook Lapel Cam at 3:13 (not dated), lodged October 6, 2023 (Doc. 13), as Exhibit F to the First MTD ("Zook Lapel").

16.     After Roybal fires, Guzman, whose car is behind and to the left of the truck, moves around the back of his car to the right brake light, and fires at least three rounds at Roybal from behind his patrol car.  See Guzman Lapel at 6:40-6:42.

17.     After Roybal fires, Martinez, whose car is directly behind Roybal's truck, but further back than Guzman's car, fires at least ten rounds at Roybal.  See Martinez Lapel at 4:21.

18.      After Roybal fires, Zook, whose car is nearly parallel to Roybal's truck in the parking lot across the street, fires at least four rounds at Roybal.  See Zook Lapel at 3:16.

19.     After Guzman fires from the right-rear of his car, he moves back around to the driver's side, and fires at least seven rounds at Roybal from behind his driver's-side door.  See Guzman Lapel at 6:47.

20.     Approximately five seconds after the last audible gunshot, Roybal exits the truck. See Zook Dashcam at 3:32.

21.     Roybal does not make any hostile motions as he exits the truck.  See Zook Dashcam at 3:32.

22.     Roybal drops the BB gun after he exits the truck.  See Zook Dashcam at 3:31;
Martinez Dashcam at 4:39.

23.     After Roybal drops the BB gun, Martinez begins to fire four rounds at Roybal.  See
Zook Dashcam at 3:31; Martinez Dashcam at 4:39.

24.     As Martinez shoots at Roybal, Guzman moves around from the rear passenger side
of his car to the driver's side, behind the open door.  See Guzman Lapel at 6:54.

25.     Approximately one second after Martinez begins to shoot at Roybal, Zook begins
to fire at least four rounds at Roybal.  See Zook Dashcam at 3:32.

26.     Approximately one second after Zook begins to shoot at Roybal, Roybal turns away
from the three officers and begins to run.  See Zook Dashcam at 3:33.

27.     Roybal, as he exits the truck, does not face Guzman or Martinez.  See Zook
Dashcam at 3:33.

28.     Roybal does not run toward Zook, Martinez, or Guzman.  See Zook Dashcam at
3:33.

29.     There are no visible gunshot wounds on Roybal when he drops the BB gun.  See
Martinez Dashcam at 4:38.

30.     Guzman is moving from one side of the car to the other when Roybal drops the BB
gun and does not see Roybal drop the BB gun.  See Guzman Lapel at 6:54.

31.     Martinez' dashcam captures Roybal's BB gun falling to the ground.  See Martinez
Dashcam at 4:39.

32.     Zook's Dashcam captures Roybal's BB gun falling to the ground.  See Zook
Dashcam at 3:33.

33.     Approximately three seconds after Martinez shoots at Roybal, Guzman begins to

fire at least three rounds at Roybal through the driver's-side window of Guzman's car.  <u>See</u> Guzman Lapel at 6:56.

34.    The officers continue shooting at Roybal for approximately three seconds, between when Roybal drops the BB gun and when he falls to the ground.  <u>See</u> Zook Dashcam at 3:36.

<b><u>PROCEDURAL BACKGROUND</u></b>

The Defendants removed the Civil Complaint for Damages and Petition for the Appointment of a Personal Representative Under the Wrongful Death Act for the Estate of Jason Roybal, dated June 23, 2023, First Judicial District, County of Santa Fe, State of New Mexico, filed August 17, 2023 (Doc. 1-1)("Complaint"), to federal court on August 17, 2023.  <u>See</u> Notice of Removal at 1, filed August 17, 2023 (Doc. 1).  The removal is predicated on federal-question jurisdiction.  <u>See</u> Notice of Removal at 1.  In the Complaint, the named Plaintiff, Scott Fuqua, petitions "the Court for an Order appointing" Fuqua "as Personal Presentative" of Roybal's estate "solely under the New Mexico Wrongful Death Act, NMSA § 41-2-3, as amended."  Complaint at 1.  Fuqua alleges two causes of action: (i) Defendant County of Santa Fe Sheriff's Office negligently hired, trained, and supervised Defendants Zook, Martinez, and Guzman, <u>see</u> Complaint ¶14, at 4; and (ii) the Defendants[3] "violated the Plaintiff's Fourteenth Amendment right to bodily integrity under the law," <u>id.</u> ¶ 35, at 5.  The second count does not specify the source of the cause of action.  <u>See</u> Complaint ¶ 15, at 4 (describing Count 2 as a claim for "Fourteenth Amendment Right to Bodily Integrity and Fourth Amendment Right to be Free From Excessive Force").  The Complaint also does not specify whether Fuqua sues the Defendants in their individual or official

---

[3]The Court refers to the three individual-capacity defendants as "the Defendants."  The Plaintiff has not served the County of Santa Fe Sheriff's Office, and the motions to dismiss are not brought on the County of Santa Fe Sheriff's Office's behalf.

capacities.  See Complaint at 1.

The Complaint's factual allegations are as follows:

> 8.    Upon information and belief on June 24, 2021, Corporal Christopher Zook, Deputy Jacob Martinez and Deputy Leonardo Guzman were involved in a automobile pursuit with the purported aim of investigating possible criminal activity;
>
> 9.    During the course of Corporal Christopher Zook, Deputy Jacob Martinez and Deputy Leonardo Guzman's investigation it was determined that Jason Roybal had active warrants and was in possession of a stolen motor vehicle;
>
> 10.    The chase culminated in Corporal Christopher Zook, Deputy Jacob Martinez and Deputy Leonardo Guzman discharging their firearms and striking and killing Jason Roybal;
>
> 11.    The fatal shot and or shots were discharged as Mr. Roybal was unarmed and fleeing law enforcement on foot.

Complaint ¶¶ 8-11, at 3.

### 1.    **The First MTD.**

The First MTD asks the Court to dismiss the Plaintiff's claims with prejudice, or, "in the alternative," grant the Defendants qualified immunity.  First MTD at 1.  According to the First MTD, the four paragraphs of factual allegations in the Complaint "do not constitute a plausible claim for excessive force under the Fourth Amendment and do not constitute a plausible claim for negligence by defendants."  First MTD at 3.  Additionally, the Defendants assert that the Complaint "does not meet this Circuit's requirement for pleading plausible claims against the individuals by describing what each of them is alleged to have done," because the United States Court of Appeals for the Tenth Circuit holds that a 42 U.S.C. § 1983 plaintiff "must show that the defendant, acting under color of state law, 'personally participated in the alleged violation.'"  First MTD at 3 (quoting Robertson v. Las Animas Cnty. Sheriff's Dept., 500 F.3d 1185, 1193 (10th Cir. 2007)).

The First MTD further quotes the Tenth Circuit in <u>Matthews v. Bergdorf</u>, 889 F.3d 1136, 1144 (10th Cir. 2018), which states that the Complaint "must isolate the allegedly unconstitutional acts of each defendant; otherwise the complaint does not provide adequate notice as to the nature of the claims against each and fails for that reason."  First MTD at 3 (quoting <u>Matthews v. Bergdorf</u>, 889 F.3d at 1144).  The Defendants maintain that "the Plaintiff provided no allegation isolating the conduct of any movant."  First MTD at 6.  "The Complaint would need to describe conduct taken by each individual actor, as opposed to cumulative actions, then based on the individual acts illustrate a plausible claim."  First MTD at 5.

Next, the Defendants turn to their qualified immunity argument, stating: "[T]here is no clearly established law which would place the defendants on notice that their conduct was a constitutional violation."  First MTD at 6.  They do not offer any caselaw to support this contention.  They conclude by stating that the "Plaintiff has offered the most threadbare version of the facts, omitting known and material facts."  First MTD at 3.

   2. <u>**The Response to the First MTD**</u>.

The Plaintiff's Response to Motion to Dismiss, filed September 22, 2023 (Doc. 6)("First MTD Response"), begins by stating that the Defendants "say shooting an unarmed man in the back is a reasonable use of force."  First MTD Response at 1.  The Plaintiff requests that the Court grant the Plaintiff leave to file an amended complaint so that the Plaintiff can "meet the objections raised by Defendant and to more clearly set forth his claims in Federal Court, following the removal of this case."  First MTD Response at 1.  The Plaintiff asserts that, after a car chase, Roybal "fled his vehicle on foot unarmed, but he was shot in the back and killed by three Defendants.  The video which reflects the chase and the killing will be lodged with the Court promptly."  First MTD Response at 2.  According to the Plaintiff, the proposed amended complaint "sets out the facts of

the shooting and describes the individual responsibility and liability of each of the officers.  It also deletes the Santa Fe County Sheriff's Department and substitutes Santa Fe County as the entity Defendant."  First MTD Response at 2.

The Plaintiff contends that the qualified immunity standard does "not even apply at this stage of the proceeding," because the Defendants "have not filed a Motion for Summary Judgment nor provided any evidence to support a dismissal."  First MTD Response at 2.  According to the Plaintiff, Graham v. Connor, 490 U.S. 386 (1989)("Graham"), governs all excessive force claims, and the "question in any claim arising out of the violation of the 4th amendment, including an excessive force claim, is whether the actions of the officers were reasonable."  First MTD Response at 3.  The Plaintiff contends that courts do "not grant summary judgment in excessive force cases based on qualified immunity or otherwise when the moving party has not 'quieted all disputed issues of material fact.'"  First MTD Response at 3 (quoting Allen v. Muskogee, 119 F.3d 837, 840-42 (10th Cir. 1997)).

Additionally, the Plaintiff asserts that there are three factors from Graham that govern excessive-force cases: (i) "the severity of the crime at issue"; (ii) "whether the suspect posed an immediate threat to the safety of the officers or others;" and (iii) "whether he was actively resisting or attempting to evade arrest by flight."  First MTD Response at 3 (citing Graham, 490 U.S. at 396).  Based on these factors, the Plaintiff maintains that "the jury could certainly find the force used by the agents to have been greater than that reasonably necessary to effect a lawful seizure."  First MTD Response at 3.  As to the first factor, the Plaintiff asserts that "the crime which the officers reasonably could have suspected Mr. Roybal of committing was vehicular theft, a nonviolent property crime."  First MTD Response at 3.  As to the second factor, the Plaintiff asserts that "the officers could not have had reason to fear for their safety or the safety of others," because

Roybal "was clearly fleeing unarmed on foot."   First MTD Response at 3.   As to the third factor, the Plaintiff asserts that "Roybal was not resisting arrest by any physical confrontation with the officers," because the "officers had no reason to believe he was armed when he was fleeing, and he was certainly not shooting back at them"; the video "shows him dropping a BB gun as he exited his truck."  First MTD Response at 3.  Finally, the Plaintiffs contend that, the Estate of Larsen ex rel. Sturdivant v. Murr, 511 F.3d 1255, 1259 (10th Cir. 2008)("Estate of Larsen"), factors also confirm that "[d]eadly force was not justified in this instance."  First MTD Response at 4.  The Estate of Larsen factors, asserts the Plaintiff, are that Roybal was unarmed, made no hostile motions towards the officers, was not in close proximity to them, and intended to flee.  See First MTD Response at 4.

The Plaintiffs attach the Affidavit of Samuel Ruyle (dated September 21, 2023), filed September 22, 2023 (Doc. 6-2)("Ruyle Aff."), to the First MTD Response.  The Ruyle Aff. attaches as Exhibit 1 "the video of a pursuit of Jason Roybal and the shooting of Mr. Roybal, in the back, while he was fleeing unarmed on foot."  Ruyle Aff. ¶ 2, at 1.  The Ruyle Aff. asserts that the "video was produced by the Santa Fe County's Sheriff's Department in response to an IPRA request."  Ruyle Aff. ¶ 3, at 1.  The Ruyle Aff. also attaches six pages of photographs "depicting the scene of the shooting," which also are produced "pursuant to an IPRA request."  Ruyle Aff. ¶ 5, at 1.  The Plaintiff lodges "videos depicting the pursuit of Jason Roybal and the shooting of Mr. Roybal in the back while he was fleeing" on September 25, 2023.  Plaintiff's Notice of Lodged Videos at 1 (Doc. 8).

**3.    The MTD Reply.**

In the Defendants Zook, Martinez, and Guzman's Reply in Support of Their Motion to Dismiss, filed October 6, 2023 (Doc. 12)("First MTD Reply"), the Defendants characterize the

Complaint as containing "even less than threadbare recitals against" the Defendants and failing to state a claim. First MTD Reply at 1. The Defendants also contend that the Plaintiff "has offered law that addresses broad concepts of law" and that the Plaintiffs cases "do not clearly establish the law for this case." First MTD Reply at 2. Moreover, the Defendants contend that the Court should deny the Plaintiff's request to amend his Complaint. See First MTD Reply at 2. They argue, first, that the Plaintiff does not comply "with Rule 7.1, by seeking approval from the Defendants prior to bringing the motion to the Court." First MTD Reply at 2. Second, they reiterate that they "oppose the motion" to amend "on futility grounds." First MTD Reply at 2. They also argue that the "proposed amended complaint . . . incorporates video of the events preceding and surrounding the shooting at issue, making the video subject to consideration at the motion to dismiss phase." First MTD Reply at 2. Then, they declare that they "are providing independent copies of the videos," which, according to the Defendants, "depict the decedent pointing a gun at officers, and possibly firing, from his vehicle with what appears to be a semi-automatic pistol, then exiting his vehicle and charging towards a civilian occupied vehicle after pointing his gun at the officers." First MTD Reply at 2. The Defendants maintain that "those facts support the grant of qualified immunity." First MTD Reply at 2. Finally, the Defendants state, in a footnote, that Roybal "dropped his weapon as he exited his vehicle; however, that is very difficult to see on the video because the events occurred in near total darkness and happened very quickly; however, a review of the video clearly shows him exit the vehicle with the gun." First MTD Reply at 3 n.1. The Defendants lodge three dashcam videos and three lapel videos with the Court on October 6, 2023. See Notice of Lodging of Exhibits A-F In Support of Defendants Zook, Martinez, and Guzman's Reply In Support of Their Motion to Dismiss at 1, filed October 6, 2023 (Doc. 13)("Defendants' Lodging").

4.       **The Joint Status Report and Provisional Discovery Plan**.

In the Joint Status Report and Provision Discovery Plan, filed November 13, 2023 (Doc. 19)("JSP"), the parties stipulate that the "law governing this case is the Federal Civil Rights Act (42 U.S.C. § 1983) and New Mexico Tort Claims Act." JSP at 2. The parties indicate that the trial will be a bench trial. See JSP at 7. They also indicate that settlement is unlikely. See JSP at 7.

5.       **The November 16, 2023, Hearing**.

At the November 16, 2023, hearing, the Court asks the Plaintiff if he wants to change his complaint. See Draft Tr. at 3:15-16 (taken November 16, 2023)("Nov. 16 Tr.")(Court).[4] The Plaintiff answers by acknowledging "that the sheriff's office was not the proper defendant, the County should have been." Nov. 16 Tr. at 3:17-19 (Perrin). The Plaintiff also states that,

> in responding to the motion . . . even though it was not . . . a summary judgment motion, it seemed that the Court couldn't really perhaps have all the information it needed unless we lodged the videos, and then the defense did the same thing, so I think it would be appropriate to convert it to a summary judgment motion, give us a chance to do some discovery, and then come back and see where we are.

Nov. 16 Tr. at 3:22-4:6 (Perrin). In response, the Defendants state that they "disagree." Nov. 16 Tr. at 4:9 (Huss). The Court notes, however, that if the Complaint includes only four sentences of factual allegations, "then I can't really look at those videos because they aren't referenced anywhere in the Complaint." Nov. 16 Tr. at 5:6-7 (Court). The Court continues, stating: "They've identified . . . the three officers. They say there was a pursuit. And then they determine that it was a stolen car, active warrants, and they discharged their firearms and killed him, and he was unarmed and fleeing. That states a claim . . . ." Nov. 16 Tr. at 5:16-21 (Court).

---

[4]The Court's citations to the draft transcript of the hearing refers to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

The Defendants disagree with the Court, stating: "I don't think you can omit all of the known material facts from your complaint and state what I think [Ashcroft v.] Iqbal[, 556 U.S. 662 (2009)("Iqbal"),][5] would call a threadbare--". Nov. 16 Tr. at 5-7 (Huss).  The Court responds, stating, "Iqbal doesn't put an obligation for you to plead all of the facts . . . . [Y]ou may want it to be more robust, so you can file a motion to dismiss on a more robust complaint.  But I think this one is okay." Nov. 16 Tr. at 6:8-19 (Court).  The Defendants acknowledge the Court's inclination and note that "the Response says by the way . . . we're now going to include the videos." Nov. 16 Tr. at 23-24 (Huss).  The Court states: "I'm going to deny your motion to dismiss . . . . Now, what do you want to do, they've got a motion to amend on the table . . . ." Nov. 16 Tr. at 7:16-21 (Court).  The Defendants respond that they do not oppose the motion to amend, but that they renew their motion to dismiss, and do not want the Court to convert their motion to dismiss to a motion for summary judgment.  See Nov. 16 Tr. at 7:22-8:3 (Huss).  According to the Defendants, because "the videos are referred to in the complaint, you can consider them without converting." Nov. 16 Tr. at 8:2-3 (Huss).

The Court and the Defendants discuss the videos' contents, and, as to the Defendants' theory that Roybal was running towards a civilian car when the Defendants shoot him, the Court states: "So if I look at that and that's what I determine, that there is no car to be seen, he's not running towards any car, then why are they shooting him in the back." Nov. 16 Tr. at 10:24-11:2 (Court).  In response, the Defendants argue: "You're talking about an incident that happens over a course of only a few seconds after he points a gun at them . . . . [Y]ou can't point a gun at the

---

[5]Iqbal, along with the earlier case Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), announces a heightened pleading standard in federal court that does away with the any-set-of-facts test from Conley v. Gibson, 355 U.S. 41 (1957).  See Iqbal, 556 U.S. at 678.

police and then object to the use of deadly force." Nov. 16 Tr. at 11:3-11 (Huss). As to qualified

immunity, the Defendants also contend that "there is no case that's sufficiently similar to this

incident." Nov. 16 Tr. at 11:22-24 (Huss). The Court, however, notes that "the law has shifted

you know pretty dramatically in qualified immunity. If it's outrageous conduct, then you don't

have to look for a specific case." Nov. 16 Tr. at 11:25-12:3 (Court). The Defendants respond that

"there is nothing that would make this clearly established, and I don't think in light of the gun

being pointed out the window that this is sufficiently clear that anybody would know that using

force when they still think he's armed." Nov. 16 Tr. at 12:18-25 (Huss). The Defendants contend

that the lapel cameras show that "this is still a hot scene," and the Officer Defendants "are still

concerned for officer safety at that point." Nov. 16 Tr. at 13:6-11 (Huss).

Furthermore, the Defendants maintain that,

> under Iqbal, it's plaintiff's obligation to tell us . . . that we could weigh the
> Graham factors. I know that the Court has already ruled that those four bare
> facts are enough to state a plausible claim, but I think that what the standard
> really would require is that you state enough that the court could do the
> balancing.

Nov. 16 Tr. at 13:16-25 (Huss). The Defendants go on to state:

> Under that all of the Larson factors are in our favor, and the immediacy of the
> threat posed, which the Tenth Circuit tells us is the most important one is in our
> favor, and finally was he actively resisting. I think what the video shows, he's
> trying to drive away, his car is breaking down, he's not obeying commands, and
> now he's fleeing, I think that is actively resisting for purposes of Larson . . . .

Nov. 16 Tr. at 15:3-11 (Huss). The Defendants conclude by stating:

> [T]he circumstance that qualified immunity is designed to address is not to
> second-guess . . . but to look at, as you pointed out, would anybody know that,
> under these circumstances, the deadly force has to storage [sic], oh, wait, he's
> running away, he might not have a gun, there were just people down the road,
> but let's stop because we don't know if he still has a gun.

Nov. 16 Tr. at 15:25-16:7 (Huss).

- 15 -

In response, the Plaintiff first argues that the Court should grant him leave to amend his Complaint.  See Nov. 16 Tr. at 16:25-17:2 (Perrin).  The Plaintiff states: "The Court has denied the motion to dismiss as it currently stands.  Let's get that complaint filed, convert this into a motion for summary judgment, and then conduct some discovery.  Our case, of course, lies on those moments after he got out of the vehicle . . . ."  Nov. 16 Tr. at 17:2-9 (Perrin).  The Court grants the Plaintiff's motion to amend and instructs the Defendants to file another motion for qualified immunity.  See Nov. 16 Tr. at 11-23 (Court).

**6.    The Second MTD.**

After the Plaintiff files his First Amended Complaint, the Defendants file their Second MTD.  The First Amended Complaint does not drop or add any defendants, and the Second MTD points out that the Santa Fe County Sheriff's Office "has not been served and cannot be served because it is not a jural entity."  Second MTD at 1 n.1.  The Second MTD contends that the "Plaintiff's Complaint completely glosses over the fact that Mr. Roybal intentionally presented himself as armed and dangerous during his encounter with law enforcement."  Second MTD at 2.  According to the Defendants, the allegation "that officers somehow knew that Mr. Roybal was unarmed is a conclusory allegation that is directly contradicted, and the allegation goes straight to the reasonableness of the deputies' actions under the circumstances."  Second MTD at 2.

Next, the Second MTD describes the case's facts before turning to qualified immunity.  See Second MTD at 3-4.  According to the Second MTD, federal courts "'are particularly deferential to the split-second decisions police must make' in situations involving deadly threats."  Second MTD at 10 (quoting Estate of Smart by Smart v. City of Wichita, 951 F.3d 1161, 1177 (10th Cir. 2020)).  The Second MTD cites cases from the United States Courts of Appeals for the Fourth, Seventh, Eighth, Ninth, and Eleventh Circuits for the proposition that "suspects simply brandishing

or threatening officers with a firearm justify the use of deadly force." Second MTD at 10. The Second MTD also describes a Kansas district court case awarding qualified immunity to a police officer who shoots a man as the man flees with a gun in his hand. See Second MTD at 12 (citing Davis v. McCarter, 569 F.Supp. 2d 1201 (D. Kan. 2008)(Robinson, J.)). The Second MTD concludes by stating that "the Graham factors overwhelmingly support a finding of qualified immunity." Second MTD at 14.

### 7.    **The Second MTD Response.**

The Plaintiff, in his three-page Second MTD Response, contends that the Second MTD makes the same arguments that the First MTD makes, and, accordingly, that the Court should deny the Second MTD. See Second MTD Response at 1. The Plaintiff also contends that, because the "Defendants now go all in on the video evidence," rule 12(d) of the Federal Rules of Civil Procedure "converts this into a Motion for Summary Judgment." Second MTD Response at 1. Thus, the Plaintiff argues that he should have the opportunity to conduct discovery. See Second MTD Response at 2.

### 8.    **The Second MTD Reply.**

In the Second MTD Reply, the Defendants argue that the Court need not convert the Second MTD into a motion for summary judgment, because "the videos lodged with this Court by both parties" are a "matter of public record." Second MTD Reply at 2. The Second MTD Reply notes that the Plaintiff obtained the videos through a public records request. See Second MTD Reply at 2. It also asserts that police officers "faced with an armed individual should not be forced to sit idly by, waiting to see if the weapons used by such suspects are indeed genuine." Second MTD Reply at 4. Finally, the Second MTD maintains that the Plaintiff has not grappled with qualified immunity's second prong, because the Plaintiff "has not directed the Court to any case clearly

establishing the law that applies to the facts at issue." Second MTD Reply at 5.

**9.** __The May 23, 2024, Hearing.__

At the May 23, 2024, hearing, the Court again asks: "Do I consider" the videos, "or do I just do the Complaint?" Transcript of Hearing at 3:1-3 (taken May 23, 2024), filed November 7, 2024 (Doc. 49)("May 23 Tr.")(Court). The Court goes on to state: "If you want me to convert this to a summary judgment, I will consider the tapes. If you don't want me to convert this to a summary judgment, then I won't consider the tapes, and then we'll just look at the complaint." May 23 Tr. at 4:5-9 (Court). The Defendants respond: "My fear of that is this -- I thought about that as well, Your Honor -- my fear is of that is if I say I want you --," to which the Court responds: "Well, I know why you fear it, but you've got to do something . . . . You've got to make up your mind whether you want me to consider those tapes or not." May 23 Tr. at 10-16 (Huss)(Court). The Defendants next state: "I think you could consider them at Rule 12, because they're public documents, they've been lodged by both sides, nobody disputes their authenticity. They're public records that form the core basis of the conduct described in the complaint. I think you could consider them without conversion." May 23 Tr. at 17-23 (Huss). Subsequently, the Court asks the Plaintiff: "Do you want me to consider on this motion those videos?" May 23 Tr. at 5:11-12 (Court). The Plaintiff responds: "We do not, Your Honor. We think this should be converted to a motion for summary judgment . . . . I think we are entitled to certain discovery on this . . . ." May 23 Tr. at 5:13-14 (Perrin). The Court responds: "If you don't want me to consider the tapes, then probably, you survive the motion to dismiss . . . But I am probably going to grant him a stay for discovery." May 23 Tr. Tr. at 5:18-6:1 (Court).

The Plaintiff explains that, if he were to file a rule 56(d) affidavit, he would ask for discovery about the officers' training, which "serves as an explanation source for the fact that

they're shooting a man who has dropped what he had, and is being shot in the back." May 23 Tr.

Tr. at 7:13-19 (Perrin). The Plaintiff agrees with the Court, however, that "training and those

things" do not "have a lot to do" with "whether these officers have qualified immunity." May 23

Tr. at 7:20-25 (Court; id. at 8:1-2 (Perrin). Furthermore, the Plaintiff notes that he has "not thought

of this as a Monell[v. Department of Social Services, 436 U.S. 658 (1978)("Monell",][6] case." May

23 Tr. at 9:11-12 (Perrin).

The Court returns to the issue of the tapes and asks the parties if the First Amended

Complaint mentions the tapes. See May 23 Tr. at 9:17-21 (Court). The Defendants respond that

the First Amended Complaint does not refer to the tapes. See May 23 Tr. at 9:22-25 (Huss). The

Court asks: "But I just can't -- on a 12(b)(6) -- consider any public record, can I?" May 23 Tr. at

10:7-14 (Court). In response, the Defendants state:

> But there are cases out there that say -- although I don't want to overstate what
> they say -- I mean, I think it depends -- you can't just -- for example, let's say
> you had a document-intensive case, but one of the defendants was the
> government, you can't bring in the entire government file, and say: Hey, look,
> these are all public records; therefore, we don't need summary judgment.
>
> But what you do find is courts in isolated scenarios, where there is a
> document or a compact package of documents that are clearly public records,
> and then you have the judicial notice can be taken at any time in the proceedings
> language come out of the Rules of Civil Procedure.

May 23 Tr. at 10:18-11-7 (Huss).

The Court and the parties next discuss what the video shows. The Defendants agree with

the Court that "as soon as" Roybal is "at least one step away" from the truck, "he doesn't have the

gun." May 23 Tr. at 14:1-2 (Huss). The Defendants also agree with the Court that "[t]here is a

---

[6]Monell holds that 42 U.S.C. § 1983 applies to municipalities, but limits the scope of municipality liability, such that municipalities are only liable for their own unconstitutional policies rather than their employees' unconstitutional actions. See Monell, 436 U.S. at 691.

gap in between what I'd call the two volleys of fire.  So the one where they fire at the occupied vehicle, we'll call that volley 1.  He steps out; the gun falls to the ground.  He takes a couple of steps away, and you have volley 2." May 23 Tr. at 14:10-15 (Huss).  The Court asks: "So what is the justification for shooting him once he's out of the vehicle without a gun?"  May 23 Tr. 14:16-18 (Court).  The Defendants respond: "[T]hey don't know that he doesn't have the gun.  This is a dark incident.  These cameras record this better than what the human eye would have seen that night.  This was in a dark area . . . .  It happens very fast.  He's just pointed a gun at an officer." May 23 Tr. at 14:20-15:1 (Huss).  In response to the Court's question about the cameras' ability to capture images better than the human eye at night, the Defendants state that the cameras "capture more light.  But I can't point you to a piece of evidence that would say that at this point." May 23 Tr. at 15:6-8 (Huss).  According to the Defendants, the officers are justified in shooting Roybal the second time, because "he's moving towards" another car, and the officers "know he's armed.  They know that he's been pointing a gun at officers, and he's going to leave and enter the public." May 23 Tr. at 16:1-8 (Huss).

Subsequently, the Plaintiff makes his argument regarding qualified immunity.  He asserts that the Tenth Circuit has several cases "that are very close to on point . . . .  And I think it's real important to think about . . . the distance between the officers and the perpetrator; whether the officers are actually in immediate danger; whether the perpetrator is closing on the officers; or whether he's running away from them." May 23 Tr. at 17:7-12 (Clark).  Furthermore, the Plaintiff clarifies that bullets did not hit Roybal in the truck's cab: "There is no blood.  When you look at the scene photographs, there is no blood in the cab." May 23 Tr. at 17:21-23 (Clark).  Then, the Plaintiff asserts that Roybal drops the BB gun "as he's getting out of the cab" and then "immediately flees in the opposite direction." May 23 Tr. at 18:14-15 (Clark).  Moreover, the

Plaintiff maintains that "[t]here is nothing to suggest that he's running toward some other vehicle. There is nothing to suggest any other vehicle was involved." May 23 Tr. at 19:19-23 (Clark). The Plaintiff states that the BB gun

> is clearly visible -- from the officer standing under the cover -- by the tree . . . . The other two officers were . . . behind their car doors, or at least near their cars. But the 7:00 vantage point was one officer who does engage, who does discharge his weapon, could clearly see the gun on the ground.

May 23 Tr. at 20:6-13 (Clark). Furthermore, the Plaintiff disputes that "these cameras are better than the human eye" and contends that "there is nothing to suggest that this was an unlit area." May 23 Tr. at 20:14-20 (Clark).

In response to the Court's question about the length of time between Roybal leaving the cab and running away, the Plaintiff states: "It's generally a fluid motion. He gets out, drops the weapon, and then runs away. And so there is very little time lag. A second, maybe." May 23 Tr. at 22:21-24 (Clark). The Plaintiff reiterates, however, that Roybal "never turns around. And that's really important," because there are qualified immunity cases "where someone is reaching, perhaps, for something that turned out to be a cellphone. The courts have found that, if someone reaches into their pocket, turns out to be a cellphone, that officer could still have perceived a reasonable threat, even if it turned out not to be a weapon." May 23 Tr. at 23:7-16 (Clark). Nonetheless, asserts the Plaintiff, Roybal "never turned back. He never looked back . . . . [T]here is not going to be an argument . . . that he still presented some sort of threat because he's either armed or reaching for something that could have been a weapon. His hands are clearly visible." May 23 Tr. at 23:17-24 (Clark). The Plaintiff also asserts that Roybal "never reaches inside his waistband." May 23 Tr. at 24:1 (Clark).

Regarding the Defendants' theory that Roybal was running towards a civilian car, the

Plaintiff states that the car is "at least 100 yards" away.  May 23 Tr. at 26:9 (Clark).  According to the Plaintiff, the car "is not something that the officers deemed even remotely important enough at the scene to factor into any of their reports."  May 23 Tr. at 26:11-14 (Clark).  The Plaintiff adds: "So had there been witnesses, it certainly seems that the Santa Fe County Sheriff's Department would have made a note of it, talked to them, and figure out if they were involved . . . . But . . . that's not a part of this case at this time."  May 23 Tr. at 26:23-27:4 (Clark).

The Defendants respond, stating: "What we do is look at what a reasonable officer in that circumstance would have known.  They wouldn't have known that he wasn't still armed.  Even if they knew that gun was there  . . . they don't know that he doesn't have another one, that he doesn't have a knife."  May 23 Tr. at 27:20-28:1 (Huss).  The Defendants assert that the officers "wouldn't have known that he still didn't pose a danger, that he wasn't still armed, and that he wasn't going to flee and take hostages, or do something else."  May 23 Tr. at 28:19-23 (Huss).  The Court states: "I guess my experience has been that -- I don't get many cases, criminal or civil -- where a guy is carrying two firearms."  May 23 Tr. at 29:17-19 (Court).  The Defendants next agree that, as to the officer in the "7:00" position, that officer "would have been in a position to see" the BB gun hit the ground, but the officers in the 4:00, 5:00, or 6:00 positions, would not have seen the BB gun hit the ground.  May 23 Tr. at 30:8-15 (Huss).  Accordingly, the Defendants argue, "at a minimum, those two officers shouldn't go to a jury trial."  Tr. at 30:20-21 (Huss).

Continuing the discussion regarding the sequence of events, the Plaintiff asserts that, as to the first volley, the officer in the 7:00 position begins firing, but as to the second volley, the firing is "simultaneous."  May 23 Tr. at 32:9-15 (Clark).  The Court proposes, preliminarily, that the two officers who could not see that the BB gun is on the ground may be entitled to qualified immunity, but the officer who could see that the BB gun is on the ground may not be entitled to qualified

immunity.  See May 23 Tr. at 33:14-20 (Court).  The Plaintiff responds by stating that "that would probably require some deposition testimony of the officers, on when exactly they realized this man was unarmed."  May 23 Tr. at 33:21-24 (Clark).

The Court concludes the hearing by stating: "I'm a little reluctant to take you up on being able to consider these tapes as part of your motion to dismiss.  So I'm leaving the bench thinking I probably can't do that."  May 23 Tr. at 35:3-6 (Court).  Additionally, the Court states: "I take it that nobody wants me to convert this into a summary judgment, neither the defendants or the plaintiff, so I won't do that."  May 23 Tr. at 35:7-8 (Court).  Finally, the Court states: "It seems to me that at least one officer should be able to see what we see, and that is that the man is not armed."  May 23 Tr. at 35:20-22 (Court).

## LAW REGARDING RULE 12(B)(6)

Rule 12(b)(6) authorizes a court to dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true."  Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994)(Brorby, J.).  The complaint's sufficiency is a question of law, and, when considering a rule 12(b)(6) motion, a court must accept as true all of the complaint's well-pled factual allegations, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor.  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007)("[O]nly if a reasonable person could not draw . . . an inference [of plausibility] from the alleged facts would the defendant prevail on a motion to dismiss.");  Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009)(Briscoe, J.)("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all well-pleaded factual allegations in a complaint and view these allegations in

the light most favorable to the plaintiff." (citing <u>Moore v. Guthrie</u>, 438 F.3d 1036, 1039 (10th Cir. 2006)(McKay, J.)).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient. <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009)(citing <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 554, 555 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." <u>Ashcroft v. Iqbal</u>, 556 U.S. at 678. "Factual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. at 555 (citing 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, at 235-36 (3d ed. 2004)).

To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face. <u>See</u> <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. at 570; <u>Mink v. Knox</u>, 613 F.3d 995, 1000 (10th Cir. 2010). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Ashcroft v. Iqbal</u>, 556 U.S. at 678 (citing <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. at 556). "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." <u>Ridge at Red Hawk, LLC v. Schneider</u>, 493 F.3d 1174, 1177 (10th Cir. 2007)(Kelly, J.)(emphasis in original). The Tenth Circuit states:

"[P]lausibility" in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line

> from conceivable to plausible." [Bell Atl. Corp. v. Twombly, 550 U.S.] at [570].
> The allegations must be enough that, if assumed to be true, the plaintiff plausibly
> (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(McConnell, J.)(quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570).

Although defendants generally must plead affirmative defenses in their answers, and not argue them on a motion to dismiss, see Fed. R. Civ. P. 8(c), there are exceptions. First, a defendant can argue an affirmative defense on a motion to dismiss where the defendant asserts an immunity defense; the courts handle these cases differently than other motions to dismiss. See Robbins v. Oklahoma, 519 F.3d at 1247; Glover v. Gartman, 899 F. Supp. 2d 1115, 1137-39, 1141 (D.N.M. 2012)(Browning, J.)(citing Pearson v. Callahan, 555 U.S. 223 (2009)). Second, the defendant can raise the defense on a motion to dismiss where the facts establishing the affirmative defense are apparent on the complaint's face. See Miller v. Shell Oil Co., 345 F.2d 891, 893 (10th Cir. 1965)(Hill, J.)("Under Rule 12(b), a defendant may raise an affirmative defense by a motion to dismiss for the failure to state a claim. If the defense appears plainly on the face of the complaint itself, the motion may be disposed of under this rule."). The defense of limitations is the affirmative defense that the complaint's uncontroverted facts is most likely to establish. See 5 C. Wright & A. Miller, Federal Practice & Procedure § 1277, at 643 (3d ed. 2004). If a complaint sets forth dates that appear to fall outside of the statutory limitations period, then a defendant may move for dismissal under rule 12(b)(6). See Rohner v. Union P. R. Co., 225 F.2d 272, 273-75 (10th Cir. 1955)(Wallace, J.); Gossard v. Gossard, 149 F.2d 111, 113 (10th Cir. 1945)(Phillips, J.); Andrew v. Schlumberger Tech. Co., 808 F. Supp. 2d 1288, 1292 (D.N.M. 2011)(Browning, J.).

A plaintiff may counter this motion with an assertion that a different statute of limitations or an equitable tolling doctrine applies to bring the suit within the statute. The Tenth Circuit has

not clarified whether this assertion must be pled with supporting facts in a complaint or may be merely argued in response to the motion.[7]  Cf. Kincheloe v. Farmer, 214 F.2d 604 (7th Cir. 1954)(Major, J.)(holding that, once a plaintiff has pled facts in a complaint indicating that the statute of limitations is a complete or partial bar to an action, the plaintiff must plead facts establishing an exception to the affirmative defense).  It appears that, from case law in several Courts of Appeals, a plaintiff may avoid this problem altogether -- at least at the motion-to-dismiss stage -- by refraining from pleading specific or identifiable dates.  See, e.g., Goodman v. Praxair, Inc., 494 F.3d 458, 465-66 (4th Cir. 2007)(Niemeyer, J.); Hollander v. Brown, 457 F.3d 688, 691 n.1 (7th Cir. 2006)(Ripple, J.).  Although the Tenth Circuit has not addressed this practice squarely, the Court has permitted this practice.  See Anderson Living Tr. v. WPX Energy Prod., LLC, 27 F. Supp. 3d 1188, 1207 (D.N.M. 2014)(Browning, J.).

---

[7]The Tenth Circuit views a claim based on a statute of limitations as an "affirmative defense," which "[a] plaintiff need not anticipate in the complaint" as "it is the defendant's burden to plead an affirmative defense." Fernandez v. Clean House, LLC, 883 F.3d 1296, 1298-99 (10th Cir. 2018)(citing Gomex v. Toledo, 446 U.S. 635, 640 (1980)).  See United States v. Titterington, 374 F.3d 453, 456 (6th Cir. 2004)("[T]he Supreme Court has held that a statute-of-limitations claim falls on the affirmative-defense side of the line.")(citing United States v. Cook, 84 U.S. 168 (1872)).  The Plaintiffs are not required to "plead against affirmative defenses" and, accordingly, a motion to dismiss cannot be sustained on factors of an affirmative defense the plaintiff was not required to anticipate.  Asebedo v. Kan. State Univ., 559 F. App'x. 668, 671-72 (10th Cir. 2014)(holding that a dismissal based on a plaintiff omitting a claim of reasonableness in his or her complaint is invalid when reasonableness is an element of an affirmative defense and thus not required in the complaint).  Accordingly, "[t]he statute of limitations . . . is not at issue until it is raised," and "[o]nly then does it become incumbent upon the plaintiff to meet the allegations or face dismissal of [their] complaint." Cutsinger v. Cullinan, 72 Ill. App. 3d 527, 531-32 (Ill. App. 1979).  The Court thus concludes that a plaintiff is not required to include facts to support an assertion that a different statute of limitations or an equitable tolling doctrine applies in their initial complaint as this would effectively be requiring the plaintiff to plead against an affirmative defense.

## LAW REGARDING DOCUMENTS OUTSIDE THE PLEADINGS ON A MOTION TO DISMISS

Generally, a complaint's sufficiency must rest on its contents alone.  See Casanova v. Ulibarri, 595 F.3d 1120, 1125 (10th Cir. 2010).  Emphasizing this point, the Tenth Circuit, in Carter v. Daniels, 91 F. App'x. 83 (10th Cir. 2004)(unpublished), states: "When ruling on a Rule 12(b)(6) motion, the district court must examine only the plaintiff's complaint. The district court must determine if the complaint alone is sufficient to state a claim; the district court cannot review matters outside of the complaint."  91 F. App'x. at 85.  Instead, a court must convert a motion to dismiss into a motion for summary judgment if "matters outside the pleading are presented to and not excluded by the court," and "all parties . . . [are] given reasonable opportunity to present all material made pertinent to such a motion by Rule 56."  Fed. R. Civ. P. 12(d).

There are, however, certain limited categories of documents that a district court can consider on a motion to dismiss without converting it into a motion for summary judgment.  See Cuervo v. Sorenson, 112 F.4th 1307, 1312 (10th Cir. 2024)("When the district court considers documents outside the pleadings without a valid exception, it must convert the motion to summary judgment."); Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007)("Tellabs"). First, the court can consider documents that the complaint incorporates by reference.  See Tellabs, 551 U.S. at 322 (citing 5 B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (3d ed. 2004 and Sup. 2007)).  See also Jacobsen v. Deseret Book Co., 287 F.3d 936, 941 (10th Cir. 2002)(the court can consider "documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity.").  This category also includes written documents that are attached to the complaint as exhibits.  See Hall v. Bellmon, 935 F.2d 1106, 1112 (10th Cir. 1991)("A written document that

is attached to the complaint as an exhibit is considered part of the complaint and may be considered in a Rule 12(b)(6) dismissal."). Second, the court can consider "matters of which a court may take judicial notice." Tellabs, 551 U.S. at 322. "[T]he court is permitted to take judicial notice of its own files and records, as well as facts which are a matter of public record." Van Woudenberg v. Gibson, 211 F.3d 560, 568 (10th Cir. 2000), abrogated on other grounds by McGregor v. Gibson, 248 F.3d 946, 955 (10th Cir. 2001).

In contrast to these limited categories, it is improper for a court ruling on a motion to dismiss to rely on documents to which the parties cite in their motions. For example, in Gee v. Pacheco, 627 F.3d 1178 (10th Cir. 2010), the defendants "supported their motion with numerous documents, and the district court cited portions of those motions in granting the [motion to dismiss]." 627 F.3d at 1186 (Court adds brackets). The Tenth Circuit holds that "[s]uch reliance was improper" and that, even if "the district court did not err initially in reviewing the materials, the court improperly relied on them to refute Mr. Gee's factual assertions and effectively convert the motion to one for summary judgment." Gee v. Pacheco, 627 F.3d at 1186-87 (Court adds brackets).

The Court previously has held that in ruling on a motion to dismiss where the issue was whether to toll a statute of limitations in a fraud action, the Court may not use in its ruling interviews and letters attached to the motion evincing that a plaintiff was aware of the defendant's alleged fraud before the statutory period expired. See Great Am. Co. v. Crabtree, No. CIV 11-1129 JB/KBM, 2012 WL 3656500, at *3, *22-23 (D.N.M. Aug. 23, 2012)(Browning, J.). The Court determines that the documents do not fall within any of the Tenth Circuit's exceptions to the general rule that a complaint must rest on the content's sufficiency alone, as the complaint does not incorporate the documents by reference or refer to the documents. See Great Am. Co. v.

Crabtree, 2012 WL 3656500, at *22-23.  See also Mocek v. City of Albuquerque, No. CIV 11-1009, 2013 WL 312881, at *50 (D.N.M. 2013)(Browning, J.)(refusing to consider statements that are not "central to [the plaintiff's] claims").

On the other hand, in a securities class action, the Court holds that a defendant's operating certification to which the plaintiffs refer in their complaint and is central to whether the plaintiffs' adequately allege a loss falls within an exception to the general rule, and the Court may consider the operating certification when ruling on the defendant's motion to dismiss without converting the motion into one for summary judgment.  See Genesee Cnty. Emps.' Retirement Sys. v. Thornburg Mortg. Secs. Tr. 2006-3, 825 F. Supp. 2d 1082, 1150-51 (D.N.M. 2011)(Browning, J.). See also Mata v. Anderson, 760 F. Supp. 2d 1068, 1101 (D.N.M. 2009)(Browning, J.)(relying on documents outside of the complaint because they were "documents that a court can appropriately view as either part of the public record, or as documents upon which the Complaint relies, and the authenticity of which is not in dispute"); Gallegos v. Bernalillo Cnty. Bd. of Cnty. Comm'rs, 278 F. Supp. 3d 1245, 1259-60 (D.N.M. 2017)(Browning, J.).

## LAW REGARDING JUDICIAL NOTICE

Rule 201 of the Federal Rules of Evidence allows a court to, at any stage of the proceeding, take notice of "adjudicative" facts that fall into one of two categories: (i) facts that are "generally known within the territorial jurisdiction of the trial court;" or (ii) facts that are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b), (f).  "Adjudicative facts are simply the facts of the particular case."  United States v. Wolny, 133 F.3d 758, 764 (10th Cir. 1998)(quoting Advisory Committee Notes to rule 201).  A court has discretion to take judicial notice of such facts, regardless whether requested. See Fed. R. Evid. 201(c).

On the other hand, if a party requests that the court take judicial notice of certain facts, and supplies the necessary information to the court, judicial notice is mandatory.  See Fed. R. Evid. 201(d).  Also, if the parties timely request an opportunity to be heard, the Court must grant such an opportunity "as to the propriety of taking judicial notice and the tenor of the matter noticed." Fed. R. Evid. 201(e).  That judicial notice may be taken during any stage of the judicial proceeding includes the motion to dismiss stage.  See 21 B C. Wright & K. Graham, Jr., Fed. Prac. & Proc. Evid. § 5110, at 294 & n.17 (2d ed. 2005).  Moreover, while ordinarily, a motion to dismiss must be converted to a motion for summary judgment when the court considers matters outside the Complaint, see Fed. R. Civ. P. 12(d), matters that are judicially noticeable do not have that effect, see Duprey v. Twelfth Judicial Dist. Court, 760 F. Supp. 2d 1180, 1193 (D.N.M. 2009)(Browning, J.)(citing Grynberg v. Koch Gateway Pipeline Co., 390 F.3d 1276, 1279 n.1 (10th Cir. 2004)). Also, when considering a motion to dismiss, "the court is permitted to take judicial notice of its own files and records, as well as facts which are a matter of public record."  Van Woudenberg v. Gibson, 211 F.3d 560, 568 (10th Cir. 2000) abrogated on other grounds by McGregor v. Gibson, 248 F.3d 946, 955 (10th Cir. 2001).  The documents judicially noticed, however, should not be considered for the truth of the matters asserted therein.  See Tal v. Hogan, 453 F.3d 1244, 1265 n.24 (10th Cir. 2006).  The Court has previously judicially noticed news publications and public filings with the Securities and Exchange Commission.  See S.E.C. v. Goldstone, 952 F. Supp. 2d at 1219-20; In re Thornburg Mortg., Inc. Sec. Litig., 2009 WL 5851089, at *3-4.  See also Gallegos v. Bernalillo Cnty. Bd. of Cnty. Comm'rs, 278 F. Supp. 3d 1245 (D.N.M. 2017)(Browning, J.)(ruling that the Court may take judicial notice of State court orders); A.M ex rel. Youngers v. N.M. Dep't of Health, 117 F. Supp. 3d 1220, 1232 n.6 (D.N.M. 2015)(Browning, J.).

**LAW REGARDING SUMMARY JUDGMENT**

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant bears the initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's case.'" Herrera v. Santa Fe Pub. Schs., 956 F. Supp. 2d 1191, 1221 (D.N.M. 2013)(Browning, J.)(quoting Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991)(alteration in Herrera v. Santa Fe Pub. Schs.)). See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)("Celotex").

> Before the court can rule on a party's motion for summary judgment, the moving party must satisfy its burden of production in one of two ways: by putting evidence into the record that affirmatively disproves an element of the nonmoving party's case, or by directing the court's attention to the fact that the non-moving party lacks evidence on an element of its claim, "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 323-25. On those issues for which it bears the burden of proof at trial, the nonmovant "must go beyond the pleadings and designate specific facts to make a showing sufficient to establish the existence of an element essential to his case in order to survive summary judgment." Cardoso v. Calbone, 490 F.3d 1194, 1197 (10th Cir. 2007)(internal quotations and brackets omitted).

Plustwik v. Voss of Nor. ASA, No. 11-0757, 2013 WL 1945082, at *1 (D. Utah May 9, 2013)(Sam, J.)(emphasis added). "If the moving party will bear the burden of persuasion at trial, that party must support its motion with credible evidence -- using any of the materials specified in Rule 56(c) -- that would entitle it to a directed verdict if not controverted at trial." Celotex, 477 U.S. at 331 (Brennan, J., dissenting)(emphasis in original).[8] Once the movant meets this burden,

---

[8]Although the Honorable William J. Brennan, Jr., then-Associate Justice of the Supreme Court, dissented in Celotex, this sentence is widely understood to be an accurate statement of the law. See 10A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2727, at 470 (3d ed. 1998)("Although the Court issued a five-to-four decision, the majority and dissent both agreed as to how the summary-judgment burden of proof operates; they disagreed as to how

rule 56 requires the nonmoving party to designate specific facts showing that there is a genuine issue for trial.  See Celotex, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)("Liberty Lobby").  In American Mechanical Solutions, LLC v. Northland Piping, Inc., 184 F. 3d 1030 (D.N.M. 2016)(Browning, J.), the Court granted summary judgment for the defendant when the plaintiff did not offer expert evidence supporting causation or proximate causation in its breach-of-contract or breach-of-the-implied-warranty-of-merchantability claims.  See 184 F. 3d at 1075-78.  The Court reasoned that the plaintiff could prove neither the breach-of-contract claim's causation requirement nor the breach-of-the-implied-warranty-of-merchantability claim's proximate-causation requirement with mere common knowledge, see 184 F. Supp. 3d at 1073, and so New Mexico law required that the plaintiff bolster its arguments with expert testimony, see 184 F. Supp. 3d at 1067, which the plaintiff had not provided, see 184 F. Supp. 3d at 1075.  The Court determined that, without the requisite evidence, the plaintiff failed to prove "an essential element of the nonmoving party's case . . . render[ing] all other facts immaterial."  Am. Mech. Sol., LLC v. Northland Piping, Inc., 184 F. Supp. 3d at 1075 (quoting Plustwik v. Voss of Nor. ASA, No. 11-00757, 2013 WL 1945082, at *1 (D. Utah 2013)(Sam, J.)).

Thus, if a plaintiff has the burden of proof, and the plaintiff has no competent evidence, the defendant, even without any competent evidence itself, may secure summary judgment by pointing out the plaintiff's lack of competent evidence.  See Celotex, 477 U.S. at 323-25 (providing that summary judgment is proper where a plaintiff lacks evidence on an essential element of its case); Am. Mech. Sols., LLC v. Northland Piping, Inc., 184 F. Supp. 3d at 1075 (granting summary

---

the standard was applied to the facts of the case.").

judgment because plaintiff lacked evidence on causation); Morales v. E.D. Entyre & Co., 382 F. Supp. 2d 1252, 1272 (D.N.M. 2005)(Browning, J.)(granting summary judgment because plaintiff lacked competent evidence that the defendants defectively manufactured an oil distributor).  A conclusory assertion that the plaintiff lacks evidence is insufficient, however, to secure summary judgment; the defendant must make some evidentiary showing that the plaintiff lacks competent evidence.  See Halley v. Huckaby, 902 F.3d 1136, 1143 (10th Cir. 2018)(stating that summary judgment may be warranted if the movant notes a lack of evidence for an essential element of the claim).  See also 11 James Wm. Moore et al., Moore's Federal Practice § 56.40[1][b][iv], at 56-109 to -111 (3d ed. 2018).

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).  See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." (citing Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d at 1241)).  Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ."  Fed. R. Civ. P. 56(c)(1)(A).  It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleadings." Liberty Lobby, 477 U.S. at 259.  See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson

v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("[O]nce a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried." (quoting Coleman v. Darden, 595 F.2d 533, 536 (10th Cir. 1979)).

A party cannot "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." Colony Nat'l Ins. v. Omer, No. 07-2123, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(Robinson, J.)(citing Fed. R. Civ. P. 56(e); Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006)(McConnell, J.)). "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'" Colony Nat'l Ins. v. Omer, No. 07-2123-JAR, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)). To deny a motion for summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Liberty Lobby, 477 U.S. at 250. A mere "scintilla" of evidence will not avoid summary judgment. Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Liberty Lobby, 477 U.S. at 248). Rather, there must be sufficient evidence on which the fact finder could reasonably find for the nonmoving party. See Liberty Lobby, 477 U.S. at 251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. (14 Wall.) 442, 448 (1871)("Schuylkill")); Vitkus v. Beatrice Co., 11 F.3d at 1539.

> [T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. [First Nat. Bank of Ariz. v.] Cities Service,[] 391 U.S. [253], 288-[89] . . . . If the evidence is merely colorable, Dombrowski v. Eastland, 387 U.S. 82, 87 . . . (per curiam), or is not significantly probative, Cities Service, . . . at 290 . . . summary judgment may be granted.

Liberty Lobby, 477 U.S. at 249.  Where a rational trier of fact, considering the record as a whole, cannot find for the nonmoving party, "there is no 'genuine issue for trial.'"  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)(quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 289 (1968)).

When reviewing a motion for summary judgment, the court should keep in mind certain principles.  First, the court's role is not to weigh the evidence but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial.  See Liberty Lobby, 477 U.S. at 249.  Second, the ultimate standard of proof is relevant for purposes of ruling on a summary judgment, such that, when ruling on a summary judgment motion, the court must "bear in mind the actual quantum and quality of proof necessary to support liability."  Liberty Lobby, 477 U.S. at 254.  Third, the court must resolve all reasonable inferences and doubts in the nonmoving party's favor and construe all evidence in the light most favorable to the nonmoving party.  See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999); Liberty Lobby, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970)); Tolan v. Cotton, 572 U.S. 650, 651 (2014).  Fourth, the court cannot decide any credibility issues.  See Liberty Lobby, 477 U.S. at 255.

There are, however, limited circumstances in which the court may disregard a party's version of the facts.  In Scott v. Harris, 550 U.S. 372, the United States Supreme Court concludes that summary judgment is appropriate where video evidence clearly contradicted the plaintiff's version of the facts.  See 550 U.S. at 378-81.  The Supreme Court explains:

> At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts.  Fed. Rule Civ. Proc. 56(c).  As we have emphasized, "[w]hen the moving

party has carried its burden under Rule 56(c), its opponent must do more than
simply show that there is some metaphysical doubt as to the material facts . . . .
Where the record taken as a whole could not lead a rational trier of fact to find for
the nonmoving party, there is no 'genuine issue for trial.'"    Matsushita Elec.
Industrial Co. v. Zenith Radio Corp., 475 U.S. [at] 586-587 . . . (footnote omitted).
"[T]he mere existence of some alleged factual dispute between the parties will not
defeat an otherwise properly supported motion for summary judgment; the
requirement is that there be no genuine issue of material fact." Anderson v. Liberty
Lobby, Inc., 477 U.S. [at] 247-248 . . . .   When opposing parties tell two different
stories, one of which is blatantly contradicted by the record, so that no reasonable
jury could believe it, a court should not adopt that version of the facts for purposes
of ruling on a motion for summary judgment.

      That was the case here with regard to the factual issue whether respondent
was driving in such fashion as to endanger human life.  Respondent's version of
events is so utterly discredited by the record that no reasonable jury could have
believed him.  The Court of Appeals should not have relied on such visible fiction;
it should have viewed the facts in the light depicted by the videotape.

Scott v. Harris, 550 U.S. at 380-81 (alterations in Scott v. Harris)(emphasis in Liberty Lobby).

The Tenth Circuit applies this doctrine in Thomson v. Salt Lake County, 584 F.3d 1304 (10th Cir.

2009), and explains:

      [B]ecause at summary judgment we are beyond the pleading phase of the litigation,
a plaintiff's version of the facts must find support in the record: more specifically,
"[a]s with any motion for summary judgment, '[w]hen opposing parties tell two
different stories, one of which is blatantly contradicted by the record, so that no
reasonable jury could believe it, a court should not adopt that version of the
facts[.]'" York v. City of Las Cruces, 523 F.3d 1205, 1210 (10th Cir. 2008)(quoting
Scott, 550 U.S. at 380); see also Estate of Larsen ex rel. Sturdivan v. Murr, 511
F.3d 1255, 1258 (10th Cir. 2008).

Thomson v. Salt Lake Cty., 584 F.3d at 1312 (second alteration in Thomson v. Salt Lake Cty.,

third and fourth alterations in York v. City of Las Cruces).  "The Tenth Circuit, in Rhoads v. Miller,

[352 F. App'x 289 (10th Cir. 2009),] explained that the blatant contradictions of the record must

be supported by more than other witnesses' testimony." Lymon v. Aramark Corp., 728 F. Supp. 2d

1222, 1249 (D.N.M. 2010)(Browning, J.), aff'd, 499 F. App'x 771 (10th Cir. 2012).

Parties may allege new claims in motions for summary judgment.   See Evans v. McDonald's Corp., 936 F.2d 1087, 1090-91 (10th Cir. 1991).  When a party raises a new claim in a motion for summary judgment, a court treats the motion for summary judgment as a request to amend the complaint pursuant to rule 15 of the Federal Rules of Civil Procedure.  See Viernow v. Euripides Dev. Corp., 157 F.3d 790 n.9 (10th Cir. 1998).  The Tenth Circuit states:

> [A]s a general rule, a plaintiff should not be prevented from pursuing a valid claim just because she did not set forth in the complaint a theory on which she could recover, "provided always that a late shift in the thrust of the case will not prejudice the other party in maintaining his defense upon the merits."

Evans v. McDonald's Corp., 936 F.2d at 1090-91 (quoting 4 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1219, at 94 (4th ed. 2021)("Wright & Miller")).  While the purpose of "fact pleading" is to give defendants fair notice of claims against them "without requiring the plaintiff to have every legal theory or fact developed in detail before the complaint is filed and the parties have opportunity for discovery," plaintiffs may not "wait until the last minute to ascertain and refine the theories on which they intend to build their case."  Evans v. McDonald's Corp., 936 F.2d at 1091.

## LAW REGARDING QUALIFIED IMMUNITY

Government officials performing "discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  Qualified immunity "protects federal and state officials from liability for discretionary functions, and from 'the unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit.'"  Roybal v. City of Albuquerque, No. CIV 08-0181 JB/LFG,

2009 WL 1329834, at *10 (D.N.M. Apr. 28, 2009)(Browning, J.)(quoting <u>Siegert v. Gilley</u>, 500 U.S. 226, 232 (1991)).

Section 1983 creates a cause of action for a plaintiff to seek money damages from State officials who have violated his or her constitutional or statutory rights.  <u>See</u> 42 U.S.C. § 1983. Additionally, pursuant to <u>Bivens v. Six Unknown Agents of Federal Bureau of Narcotics</u>, 403 U.S. 388, 397 (1971)("<u>Bivens</u>"), a plaintiff may seek money damages from federal officials who have violated his or her constitutional rights.[9]  The Supreme Court, however, deems it "untenable to draw a distinction for purposes of immunity law between suits brought against state officials under § 1983 and suits brought directly under the Constitution against federal officials."  <u>Butz v. Economou</u>, 438 U.S. 478, 504 (1978).  Officials may assert qualified immunity to ensure that fear of liability will not "unduly inhibit officials in the discharge of their duties." <u>Anderson v. Creighton</u>, 483 U.S. 635, 638, (1987).  <u>See</u> <u>Green v. Padilla</u>, 484 F. Supp. at 1129 (explaining that qualified immunity protects government officials who perform discretionary functions if there is no prior, well established case law which would have put them on fair notice of their potential liability).

---

[9]<u>Bivens</u> has been extended, however, to only a handful of constitutional rights.  <u>See</u> <u>Davis v. Passman</u>, 442 U.S. 228, 248 (1979)(finding an implied cause of action for violations of the equal protection principles enmeshed within the due process clause of the Fifth Amendment to the United States Constitution, U.S. Const. amend V); <u>Carlson v. Green</u>, 446 U.S. 14 (1980)(extending <u>Bivens</u> to allow for damages for violations of the cruel-and-unusual punishment clause of the Eighth Amendment to the United States Constitution).  The Supreme Court has expressed hesitation about federal courts extending <u>Bivens</u> into new contexts.  <u>See</u> <u>Hernandez v. Mesa</u>, 589 U.S. 93, 113 (2020)("When evaluating whether to extend <u>Bivens</u>, the most important question 'is "who should decide" whether to provide for a damages remedy, Congress or the courts?' The correct 'answer most often will be Congress.'" (first quoting <u>Ziglar v. Abbasi</u>, 582 U.S. 120, 134 (2017); and then quoting <u>Bush v. Lucas</u>, 462 U.S. 367, 380 (1983))).

If a government official has not violated a "clearly established" right, the official is shielded from personal liability.  Harlow v. Fitzgerald, 575 U.S. 800, 818 (1982).  Qualified immunity therefore "provides ample protection to all but the plainly incompetent or those who knowingly violate the law."  Malley v. Briggs, 475 U.S. 335, 341 (1986).  Qualified immunity protects officers who have "reasonable, but mistaken beliefs" and operate at the sometimes "hazy border" of the laws.  Saucier v. Katz, 533 U.S. 194, 205 (2001).  A court

> can often avoid ruling on the plaintiff's claim that a particular right exists.  If prior case law has not clearly settled the right, and so given officials fair notice of it, the court can simply dismiss the claim for money damages.  The court need never decide whether the plaintiff's claim, even though novel or otherwise unsettled, in fact has merit.

Camreta v. Greene, 563 U.S. 692, 705 (2011).  A series of policy considerations guide the Tenth Circuit's qualified-immunity analysis: "(1) protecting against 'unwarranted timidity on the part of public officials;' (2) ensuring 'that talented candidates are not deterred by the threat of damages suits from entering public service;' and (3) guarding against employees being distracted from their duties."  Estate of Jensen by Jensen v. Clyde, 989 F.3d 848, 856 (10th Cir. 2021)(citing Richardson v. McKnight, 521 U.S. 399, 408 (1997)).

Qualified immunity shields government officials from liability, therefore, when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Pearson v. Callahan, 555 U.S. 223, 231 (2009)(quoting Harlow v. Fitzgerald, 457 U.S. at 818).  When a defendant asserts qualified immunity, it "creates a presumption that they are immune from suit" and not a presumption that they are immune from liability.  Perea v. Baca, 817 F.3d 1198, 1202 (10th Cir. 2016).  When a defendant asserts qualified immunity, therefore, the plaintiff must demonstrate: (i) that the defendant's actions violated his or her federal Constitutional or statutory rights; and (ii) that the right was clearly established at the

time of the alleged misconduct, such that "every reasonable officer would have understood" as much.  Estate of Smart by Smart v. City of Wichita, 951 F.3d 1161, 1178 (10th Cir. 2020).  See Riggins, 572 F.3d at 1107.  See also Pueblo of Pojoaque v. New Mexico, 214 F. Supp. 3d 1028, 1079 (D.N.M. 2016)(Browning, J.)(requiring that the plaintiff must demonstrate both prongs of the qualified immunity analysis to overcome a defendant's qualified immunity defense).

> ### 1.     The Procedural Approach to Qualified Immunity.

The Supreme Court has clarified the proper procedure for lower courts to evaluate a qualified immunity defense.  Before the Supreme Court's decision in Pearson v. Callahan, 555 U.S. 223 (2009), the Supreme Court directed lower courts to decide, first, whether the facts alleged or shown by the plaintiff make out a Constitutional violation, and, if the plaintiff makes that showing, then decide whether the right at issue was clearly established at the time of the alleged violation.  See Saucier v. Katz, 533 U.S. 194, 200 (2001).  The Supreme Court's decision in Pearson v. Callahan, however, makes the so-called "Saucier two-step" advisory rather than mandatory, noting that Saucier v. Katz' "rigid order of battle" had faced criticism from lower courts on "practical, procedural, and substantive grounds."  Pearson v. Callahan, 555 U.S. at 234 (quoting Pierre N. Leval, Judging Under the Constitution: Dicta About Dicta, 81 N.Y.U. L. Rev. 1249, 1275, 1277 (2006)).  Although the Supreme Court recognizes that the Saucier rule is "beneficial" and "often appropriate," lower courts are now permitted to exercise their "sound discretion" when deciding "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  Pearson v. Callahan, 555 U.S. at 236-37.

In rejecting the prior mandatory approach, the Supreme Court recognizes that "[t]here are cases in which it is plain that a constitutional right is not clearly established but far from obvious

whether in fact there is such a right," and that such an approach burdens district courts and Courts of Appeals with "what may seem to be an essentially academic exercise." Pearson v. Callahan, 555 U.S. at 237. The Supreme Court explains that the prior mandatory approach "departs from the general rule of constitutional avoidance and runs counter to the 'older, wiser judicial counsel 'not to pass on questions of constitutionality unless such adjudication is unavoidable.''" Pearson v. Callahan, 555 U.S. at 241 (quoting Scott v. Harris, 550 U.S. at 388; then quoting Spector Motor Service, Inc. v. McLaughlin, 323 U.S. 101, 105 (1944)). See Reichle v. Howards, 566 U.S. 658, 664 (2012)(affirming Pearson v. Callahan's procedure and noting that deciding qualified immunity issues on the basis of a right being not "clearly established" by prior caselaw "comports with our usual reluctance to decide constitutional questions unnecessarily").

The Supreme Court recognizes seven circumstances where district courts "should address only"[10] qualified immunity's clearly established prong: when (i) the first, Constitutional violation question "is so fact bound that the decision provides little guidance for future cases"; (ii) "it appears that the question will soon be decided by a higher court"; (iii) deciding the Constitutional question requires "an uncertain interpretation of state law"; (iv) "qualified immunity is asserted at

---

[10]In Camreta v. Greene, the Supreme Court states that there are seven circumstances in which the district courts "should address only" the clearly established prong, but, in the same sentence, notes that deciding the violation prong is left "to the discretion of the lower courts." Camreta v. Greene, 563 U.S. at 707. In Kerns v. Bader, 663 F.3d 1173 (10th Cir. 2011), then-Judge Gorsuch, writing for the Tenth Circuit, interprets Camreta v. Greene to mean that district courts are restricted from considering the violation prong in seven particular circumstances. See Kerns v. Bader, 663 F.3d at 1180-81. The Supreme Court, however, has not stressed the seven circumstances as mandatory. Instead, it has recently reaffirmed only that lower courts "should think hard, and then think hard again before addressing both qualified immunity and the merits of an underlying constitutional claim." District of Columbia v. Wesby, 138 S. Ct. 577, 589 n.7 (2018). This language suggests that the inquiry is still discretionary, although the court should exercise its discretion carefully.

the pleading stage," and "the precise factual basis for the . . . claim . . . may be hard to identify";

(v) tackling the first element "may create a risk of bad decision making," because of inadequate

briefing; (vi) discussing both elements risks "bad decision making," because the court is firmly

convinced that the law is not clearly established and is thus inclined to give little thought to the

existence of the Constitutional right; or (vii) the doctrine of "constitutional avoidance" suggests

the wisdom of passing on the first Constitutional question when "it is plain that a constitutional

right is not clearly established but far from obvious whether in fact there is such a right."  Kerns

v. Bader, 663 F.3d 1173, 1180-81 (10th Cir. 2011)(Gorsuch, J.)(quoting Pearson v. Callahan, 555

U.S. at 236-42).  Regarding the last of these seven circumstances, the Supreme Court has clarified

that courts may "avoid avoidance" and address the first prong before the second prong in cases

involving a recurring fact pattern, where guidance on the Constitutionality of the challenged

conduct is necessary, and the conduct is likely to face challenges only in the qualified immunity

context.  Camreta v. Greene, 563 U.S. at 706-707.  See Kerns v. Bader, 663 F.3d at 1181.[11]

---

[11]In Kerns v. Bader, the Tenth Circuit reverses the Court's decision that an officer is not entitled to qualified immunity, noting that the Court "analyzed both aspects of the qualified immunity test before agreeing" with the plaintiff that the qualified immunity defense does not protect the officer.  663 F.3d at 1183.  In reversing, then-Judge Gorsuch states:

> Because we agree with Sheriff White on the latter (clearly established law) question, we reverse without addressing the former (constitutional violation) question.  And we pursue this course because doing so allows us to avoid rendering a decision on important and contentious questions of constitutional law with the attendant needless (entirely avoidable) risk of reaching an improvident decision on these vital questions.

663 F.3d at 1183-84.  The Tenth Circuit does not analyze whether the officer violates the plaintiff's constitutional rights and states that guidance on the particular Constitutional issue would be more appropriate in a case not involving qualified immunity:  "Neither do we doubt that the scope of the Constitution's protection for a patient's hospital records can be adequately decided in future cases where the qualified immunity overlay isn't in play (e.g., through motions to suppress wrongly seized records or claims for injunctive or declaratory relief)."  663 F.3d at 1187 n.5.  On

remand, the Court states:

> While the Court must faithfully follow the Tenth Circuit's decisions and opinions, the Court is troubled by this statement and the recent trend of the Supreme Court's hesitancy in § 1983 actions to address constitutional violations. A Reconstruction Congress, after the Civil War, passed § 1983 to provide a civil remedy for constitutional violations. See Mitchum v. Foster, 407 U.S. 225, 238-39 (1972). In Mitchum v. Foster, the Supreme Court explained:
>
> > Section 1983 was originally § 1 of the Civil Rights Act of 1871 . . . and was enacted for the express purpose of "enforc(ing) the Provisions of the Fourteenth Amendment." The predecessor of § 1983 was thus an important part of the basic alteration in our federal system wrought in the Reconstruction era through federal legislation and constitutional amendment.
>
> 407 U.S. at 238-39. Congress did not say it would remedy only violations of "clearly established" law, but that
>
> > [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.
>
> 42 U.S.C. § 1983. The Supreme Court established the qualified immunity defense in Pierson v. Ray, 386 U.S. 547 (1967), and held that officials are not liable for Constitutional violations where they reasonably believe that their conduct is Constitutional. See E. Clarke, Safford Unified Sch. Dist. No. 1 v. Redding: Why Qualified Immunity is a Poor Fit in Fourth Amendment School Search Cases, 24 B.Y.U. J. Pub. L. 313, 329 (2010). The Supreme Court first introduced the "clearly established" prong in reference to an officer's good faith and held that a compensatory award would be appropriate only if an officer "acted with such an impermissible motivation or with such disregard of the [individual's] clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith." Wood v. Strickland, 420 U.S. 308, 322 (1975). In Harlow v. Fitzgerald, when the Supreme Court moved to an objective test, the clearly established prong became a part of the qualified

immunity test.  See 457 U.S. at 818 ("We therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights.").  It seems ironic that the federal courts would restrict a congressionally mandated remedy for constitutional violations -- presumably the rights of innocent people -- and discourage case law development on the civil side -- and restrict case law development to motions to suppress, which reward only the guilty and is a judicially created, rather than legislatively created, remedy.  Commentators have noted that, "[o]ver the past three decades, the Supreme Court has drastically limited the availability of remedies for constitutional violations in" exclusionary rule litigation in a criminal case, habeas corpus challenges, and civil litigation under § 1983.  J. Marceau, The Fourth Amendment at a Three-Way Stop, 62 Ala. L. Rev. 687, 687 (2011).  Some commentators have also encouraged the courts to drop the suppression remedy and the legislature to provide more -- not less -- civil remedies for constitutional violations. See Christopher Slobogin, Why Liberals Should Chuck the Exclusionary Rule, 1999 U. Ill. L. Rev. 363, 390-91 (1999)("Behavioral theory suggests that the exclusionary rule is not very effective in scaring police into behaving. . . .  These theories also suggest that a judicially administered damages regime . . . would fare significantly better at changing behavior at an officer level."); Hon. Malcolm R. Wilkey, Constitutional Alternatives to the Exclusionary Rule, 23 S. Tex. L.J. 531, 539 (1982)(criticizing the exclusionary rule and recommending alternatives).  In Hudson v. Michigan, 547 U.S. 586 (2006), the Supreme Court noted that civil remedies were a viable alternative to a motion to suppress when it held that the exclusionary rule was inapplicable to cases in which police officers violate the Fourth Amendment when they fail to knock and announce their presence before entering.  See 547 U.S. at 596-97.  Rather than being a poor or discouraged means of developing constitutional law, § 1983 seems the better and preferable alternative to a motion to suppress.  It is interesting that the current Supreme Court and Tenth Circuit appear more willing to suppress evidence and let criminal defendants go free, than have police pay damages for violations of innocent citizens' civil rights.  It is odd that the Supreme Court has not adopted a clearly established prong for suppression claims; it seems strange to punish society for police violating unclear law in criminal cases, but protect municipalities from damages in § 1983 cases.

Kerns v. Bd. of Comm'rs, 888 F. Supp. 2d 1176, 1224 n.36 (D.N.M. 2012)(Browning, J.), abrogated on other grounds as recognized by Ysasi v. Brown, No. 13-0183, 2014 WL 936835, at *9 n.24 (D.N.M. Feb. 28, 2014)(Browning, J.).  See Richard E. Myers, Fourth Amendment Small Claims Court, 10 Ohio St. J. Crim. L. 571, 590-97 (2013)(arguing that municipalities should establish small-claims courts to adjudicate police officers' Fourth Amendment violations and award monetary judgments).  It is odd to suggest that the deficit of constitutional law should occur

According to the Supreme Court, lower courts "should think carefully before expending 'scarce judicial resources' to resolve difficult and novel questions of constitutional or statutory interpretation that will 'have no effect on the outcome of the case.'" Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011)(quoting Pearson v. Callahan, 555 U.S. at 236-37).[12]  See Camreta v. Greene, 563

_____

in the sphere of a factually shaky judge-made exclusionary rule and discourage Constitutional law at the cost of a Congressionally passed statute.

[12]The appellate courts have little appreciation for how hard it is to do a clearly established prong review first without looking -- closely and thoroughly -- at whether there is a Constitutional right and whether there is a violation.  It is difficult to review the facts, rights, and alleged violations in the comparative cases without looking at the facts, rights, and alleged violations on the merits in the case before the Court.  Pearson v. Callahan sounds like a good idea in theory, but it does not work well in practice.  The clearly established prong is a comparison between the case before the Court and previous cases, and Pearson v. Callahan suggests that the Court can compare before the Court fully understands what it is comparing.  In practice, Saucier v. Katz works better.
    The "Saucier two-step" encourages courts to articulate the Constitutional rights at issue.  Before Pearson v. Callahan made the "Saucier two-step" discretionary, it faced criticism from numerous Supreme Court members.  Associate Justice Stephen Breyer writes, before Pearson v. Callahan, that he "would end the failed Saucier experiment now."  Morse v. Frederick, 551 U.S. 393, 432 (2007)(Breyer, J., concurring in the judgment and dissenting in part).  Joined by Associate Justices Ruth Bader Ginsburg and Stephen Breyer, Associate Justice John Paul Stevens criticizes Saucier v. Katz, because it is an "unwise judge-made rule under which courts must decide whether the plaintiff has alleged a constitutional violation before addressing the question whether the defendant state actor is entitled to qualified immunity."  Bunting v. Mellen, 541 U.S. 1019, 1019 (2004).  Joined by Chief Justice of the United States William Rehnquist, Associate Justice of the United States Supreme Court Antonin Scalia writes: "We should either make clear that constitutional determinations are not insulated from our review . . . or else drop any pretense at requiring the ordering in every case."  Bunting v. Mellen, 541 U.S. at 1025 (Scalia, J., dissenting from the denial of certiorari)(emphasis in original).
    Judicial resources are valuable and scarce, but they should not be conserved at the expense of protecting Constitutional rights.  In addition to being easier in practice, Saucier v. Katz also increases the frequency and depth with which courts articulate Constitutional law.  See Nancy Leong, The Saucier Qualified Immunity Experiment, An Empirical Analysis, 36 Pepp. L. Rev. 667 (2009).  Chief Justice Rehnquist opines that "[d]eciding the constitutional question before addressing the qualified immunity question also promotes clarity in the legal standards for official conduct, to the benefit of both the officers and the general public."  Wilson v. Layne, 526 U.S. 603, 609 (1999).  The evidence to support Chief Justice Rehnquist's assertion, however, is mixed. See Paul W. Hughes, Not a Failed Experiment: Wilson-Saucier Sequencing and the Articulation of Constitutional Rights, 80 U. Colo. L. Rev. 401, 404 (2009)("[T]he proof of the pudding is in the eating; levels of constitutional articulation increased dramatically following the Court's

U.S. at 707 ("In general, courts should think hard, and then think hard again, before turning small cases into large ones.").  The Tenth Circuit will remand a case to the district court for further consideration when the district court has given only cursory treatment to qualified immunity's clearly established prong.  See Kerns v. Bader, 663 F.3d at 1182.  See also Pueblo of Pojoaque v. New Mexico, 214 F. Supp. 3d 1028, 1082-83 (D.N.M. 2016)(Browning, J.).

**2.      Clearly Established Rights.**

A right is "clearly established" when it is "sufficiently clear that every reasonable official employee would have understood that what he is doing violates that right."  Mullenix v. Luna, 577 U.S. 7, 11 (2015)(quoting Reichle v. Howards, 566 U.S. at 664).  A clearly established right is "generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be 'indisputable' and 'unquestioned.'"  Lobozzo v. Colorado Dep't of Corr., No. 10-1396, 429 F. App'x 707, 710 (10th Cir. 2011)(quoting Zweibon v. Mitchell, 720 F.2d 162, 172-73 (D.C. Cir. 1983)).  "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"  Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1186 (alteration in Holland ex rel. Overdorff v. Harrington, but not in Saucier v. Katz)(quoting Saucier v. Katz, 533 U.S. at 202).  A court should inquire "whether the

_____

development of the Wilson-Saucier sequencing doctrine.").  See also Leong, 36 Pepp. L. Rev. at 670 (finding that mandatory sequencing "leads to the articulation of more constitutional law, but not the expansion of constitutional rights"); Greg Sobolski & Matt Steinberg, Note, An Empirical Analysis of Section 1983 Qualified Immunity Actions and Implications of Pearson v. Callahan, 62 Stan. L. Rev. 523 (2010).  The bottom line is that a trial court often -- if not frequently -- needs to decide whether the Constitutional right is violated before deciding if it is clearly established.

law put officials on fair notice that the described conduct was unconstitutional" rather than engage in "a scavenger hunt for cases with precisely the same facts."  Pierce v. Gilchrist, 359 F.3d 1279, 1298 (10th Cir. 2004).  In other words, existing precedent must have placed the constitutional or statutory question "beyond debate."  Ashcroft v. al-Kidd, 563 U.S. at 741.

The Supreme Court requires that courts not define the constitutional right at issue "'at a high level of generality.'"  White v. Pauly, 580 U.S. 73, 79 (2017)(quoting Ashcroft v. al-Kidd, 563 U.S. at 742).  The Supreme Court refers to this principle as a "longstanding principle."  White v. Pauly, 580 U.S. at 79.  Nevertheless, the clearly established law must be "particularized" to the case's facts.  Anderson v. Creighton, 483 U.S. at 640.  If the clearly established law at issue is not sufficiently particularized, the "[p]laintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights."  Anderson v. Creighton, 483 U.S. at 639.  "[G]eneral statements of the law" are not "inherently incapable" of clearly establishing a right, because they can sometimes give "fair and clear warning" to officers.  United States v. Lanier, 520 U.S. 259, 271 (2017).  See White v. Pauly, 580 U.S. at 79 (reiterating this principle).  Importantly, the "unlawfulness must be apparent." Anderson v. Creighton, 483 U.S. at 640.  See Brosseau v. Haugen, 543 U.S. 194, 199 (2004)("Of course, in an obvious case, these standards can 'clearly establish' the answer, even without a body of relevant case law.")(citing Hope v. Pelzer, 536 U.S. 730, 738 (2002)(noting that, in a case where the Eighth Amendment violation is "obvious," there need not be a materially similar case for the right to be clearly established)).  A court therefore must "inquire whether clearly established law makes improper the actions that the officer took in the case's circumstances."  City of Escondido v. Emmons, 586 U.S. 38, 42 (2019).

In the Tenth Circuit, until recently, this rule meant that a right is clearly established only when there is a factually similar "Supreme Court or Tenth Circuit decision on point, or if the clearly established weight of authority from other courts shows that the right must be as the plaintiff maintains." Truman v. Orem City, 1 F. 4th 1227, 1235 (10th Cir. 2021)(quoting Thomas v. Kaven, 765 F.3d 1183, 1194 (10th Cir. 2014)). Although a plaintiff asserting a violation of a clearly established right must in most circumstances point to a case that is sufficiently factually similar, the Supreme Court recently has stated that this closeness is not always required. See Taylor v. Riojas, 592 U.S. 7, 9 (2020)("Taylor"). The Supreme Court, in a short per curiam opinion, suggests an objective, "no reasonable correctional officer" standard when it holds that "no reasonable correctional officer could have concluded that, under the extreme circumstances of this case, it was constitutionally permissible to house [the plaintiff] in such deplorably unsanitary conditions for such an extended period of time." Taylor, 592 U.S. at 8. In Taylor, corrections officers house an inmate in "shockingly unsanitary cells." 592 U.S. at 8. One cell is covered "nearly floor to ceiling, in 'massive mounts' of feces: all over the floor, the ceiling, the window, the walls, and even 'packed inside the water faucet.'" Taylor, 592 U.S. at 8 (quoting Taylor v. Stevens, 946 F.3d 211, 218 (5th Cir. 2019)). Correctional officers confine the plaintiff in this cell for four days, but the plaintiff does not eat or drink, because he fears that his food and water are contaminated. See 592 U.S. at 8. Correctional officers then move the plaintiff to a second cell that is "frigidly cold" and is equipped with "only a clogged drain in the floor to dispose of bodily wastes." 592 U.S. at 8. The plaintiff holds his bladder for more than twenty-four hours before finally involuntarily relieving himself, which causes the clogged drain to overflow and "raw sewage to spill across the floor." 592 U.S. at 8. Because the plaintiff is not provided a bed and is confined without clothes, the plaintiff is "left to sleep naked in sewage." Taylor, 592 U.S. at 8.

The United States Court of Appeals for the Fifth Circuit holds that these confinement conditions violated the Eighth Amendment's ban on cruel-and-unusual punishment, but it grants the corrections officers qualified immunity because the law was not clearly established.  See Taylor, 592 U.S. at 8 (citing Taylor v. Stevens, 946 F.3d at 222).  The Fifth Circuit concludes that the corrections officials did not have "fair warning" that confining the plaintiff in these conditions would be unconstitutional.  Taylor v. Stevens, 946 F.3d at 222 (quoting Hope v. Pelzer, 536 U.S. at 741).  The Supreme Court reverses, holding that the Fifth Circuit errs when it grants qualified immunity on this basis.  See Taylor, 592 U.S. at 9.  Although the plaintiff could not identify a case on point, the Supreme Court notes that -- even in the absence of a case clearly establishing the law -- "no reasonable correctional officer could have concluded that, under the extreme circumstances of this case, it was constitutionally permissible to house [the plaintiff] in such deplorably unsanitary conditions for such an extended period of time."  Taylor, 592 U.S. at 8.  See Truman v. Orem City, 1 F. 4th at 1240 (summarizing the Supreme Court's conclusion and stating that the Supreme Court "made clear that [the plaintiff] did not have to" identify a case on point).

For decades, lower courts have tried diligently and faithfully to follow the unwritten signals of superior courts.[13]  One such unwritten signal is, or at least was, that "a nigh identical case must exist for the law to be clearly established."  Caldwell, 510 F.Supp. 3d at 1031 n.14.[14]  As numerous

---

[13]As former Tenth Circuit judge, and now Stanford law school professor, Michael McConnell, notes, much of what lower courts do is read the implicit, unwritten signs that the superior courts send them through their opinions.  See Michael W. McConnell, Address at the Oliver Seth American Inn of Court: How Does the Supreme Court Communicate Its Intentions to the Lower Courts: Holdings, Hints and Missed Signals (Dec. 17, 2014).

[14]The Court notes, as it has elsewhere, see, e.g., Caldwell, 510 F.Supp.3d at 1031 n.14, that qualified immunity is a problematic doctrine.  This problem is particularly true of the Supreme Court's approach before Taylor.  "Factually identical or highly similar factual cases are not . . . the way the real world works."  Caldwell, 510 F.Supp.3d at 1031 n.14.

Many cases have so many facts that are unlikely to ever occur again in a significantly similar way. See York v. City of Las Cruces, 523 F.3d 1205, 1212 (10th Cir. 2008)("However, [the clearly established prong] does not mean that there must be a published case involving identical facts; otherwise we would be required to find qualified immunity wherever we have a new fact pattern."). The Supreme Court's obsession with the clearly established prong assumes that officers are routinely reading Supreme Court and Tenth Circuit opinions in their spare time, carefully comparing the facts in these qualified immunity cases with the circumstances they confront in their day-to-day police work. It is hard enough for the federal judiciary to embark on such an exercise, let alone likely that police officers are endeavoring to parse opinions. It is far more likely that, in their training and continuing education, police officers are taught general principles, and, in the intense atmosphere of an arrest, police officers rely on these general principles, rather than engaging in a detailed comparison of their situation with a previous Supreme Court or published Tenth Circuit case. It strains credulity to believe that a reasonable officer, as he is approaching a suspect to arrest, is thinking to himself: "Are the facts here anything like the facts in York v. City of Las Cruces?" Thus, when the Supreme Court grounds its clearly established jurisprudence in the language of what a reasonable officer or a "reasonable official" would know, Kisela v. Hughes, 584 U.S. 100, 105 (2018), yet still requires a highly factually analogous case, it either has lost sight of reasonable officer's experience or is using that language to mask an intent to create "an absolute shield for law enforcement officers," Kisela v. Hughes, 584 U.S. at 121 (Sotomayor, J. dissenting). The Court concludes that the Supreme Court is doing the latter, crafting its recent qualified immunity jurisprudence to eliminate effectively § 1983 claims against State actors in their individual capacities by requiring an indistinguishable case and by encouraging courts to go straight to the clearly established prong. See Saenz v. Lovington Mun. Sch. Dist., 105 F. Supp. 3d 1271, 1297 n.4 (D.N.M. 2015)(Browning, J.).

In most circumstances, a prior plaintiff must have been subjected to almost identical treatment, and a court must have found that law to have been clearly established for a subsequent plaintiff to get around the obstacle that qualified immunity creates. See Stephen R. Reinhardt, The Demise of Habeas Corpus and the Rise of Qualified Immunity: The Court's Ever Increasing Limitations on the Development and Enforcement of Constitutional Rights and Some Particularly Unfortunate Consequences, 113 Mich. L. Rev. 1219, 1245 (2015)("[T]he Court has through qualified immunity created such powerful shields for law enforcement that people whose rights are violated, even in egregious ways, often lack any means of enforcing rights."). See also White v. Pauly, 580 U.S. at 79 (criticizing the Tenth Circuit below, because it "failed to identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment). In most of those situations, officials can escape liability for violating someone's statutory or constitutional rights, because a prior court has not addressed the issue. As United States Circuit Judge for the Court of Appeals for the Fifth Circuit Don Willett notes, this situation creates a Catch-22. See Zadeh v. Robinson, 902 F.3d 483, 499 (5th Cir. 2018)(Willett, J. concurring in part and dissenting in part)(opinion withdrawn on rehearing). The plaintiffs "must produce precedent even as fewer courts are producing precedent. Important constitutional questions go unanswered precisely because those questions are yet unanswered. Courts then rely on that judicial silence to conclude there's no equivalent case on the books." Zadeh v. Robinson, 902 F.3d at 499. In short, "[n]o precedent = no clearly established law = no liability. An Escherian Stairwell. Heads defendants win, tails plaintiffs lose." Zadeh v. Robinson, 902 F.3d at 499.

The Court disagrees with the Supreme Court's approach. The most conservative, principled decision is to minimize the expansion of the judicially created clearly established prong, so that it does not eclipse the Congressionally enacted § 1983 remedy. As the Cato Institute notes in an amicus brief, "qualified immunity has increasingly diverged from the statutory and historical framework on which it is supposed to be based." Pauly v. White, No. 17-1078 Brief of the Cato Institute as Amicus Curiae Supporting Petitioners at 2 (U.S. Supreme Court, filed March 2, 2018)("Cato Brief"). "The text of 42 U.S.C. § 1983 . . . makes no mention of immunity, and the common law of 1871 did not include any across-the-board defense for all public officials." Cato Brief at 2. "With limited exceptions, the baseline assumption at the founding and throughout the nineteenth century was that public officials were strictly liable for unconstitutional misconduct. Judges and scholars alike have thus increasingly arrived at the conclusion that the contemporary doctrine of qualified immunity is unmoored from any lawful justification." Cato Brief at 2. See generally William Baude, Is Qualified Immunity Unlawful?, 106 Cal. L. Rev. 45 (2018)(arguing that the Supreme Court's justifications for qualified immunity are incorrect). Further, as Justice Clarence Thomas has argued, because the Supreme Court's qualified immunity analysis "is no longer grounded in the common-law backdrop against which Congress enacted [§ 1983], we are no longer engaged in 'interpret[ing] the intent of Congress in enacting' the Act." Ziglar v. Abbasi, 582 U.S. 120, 158 (2017)(Thomas, J., concurring)(quoting Malley v. Briggs, 475 U.S. 335, 342 (1986)). "Our qualified immunity precedents instead represent precisely the sort of 'freewheeling policy choice[s]' that we have previously disclaimed the power to make." Ziglar v. Abbasi, 582 U.S. at 159-60 (Thomas, J., concurring)(quoting Rehberg v. Paulk, 566 U.S. 536, 363 (2012)). The judiciary should be true to § 1983 as Congress wrote it.

Moreover, in a day when police shootings and excessive force cases are in the news, there should be a remedy when there is a Constitutional violation, and jury trials are the most democratic expression of what police action is reasonable and what action is excessive. If the citizens of New Mexico decide that State actors use excessive force or deliberately are indifferent, the verdict should stand, and not be set aside because the parties could not find an indistinguishable Tenth Circuit or Supreme Court decision. Finally, always to decide the clearly established prong first and then always to say that the law is not clearly established could be stunting the development of Constitutional law. See Aaron L. Nielson & Christopher J. Walker, The New Qualified Immunity, 89 S. Cal. L. Rev. 1, 6 (2015). And while the Tenth Circuit -- with the exception of now-Justice Gorsuch, see Shannon M. Grammel, Justice Gorsuch on Qualified Immunity, Stan. L. Rev. Online (2017) -- seems to be in agreement with the Court, see, e.g., Casey, 509 F.3d at 1286, the Supreme Court's per curiam reversals appear to have the Tenth Circuit stepping lightly around qualified immunity's clearly established prong, see, e.g, Perry v. Durborow, 892 F.3d 1116, 1123-27 (10th Cir. 2018); Aldaba v. Pickens, 844 F.3d 870, 874 (10th Cir. 2016); Rife v. Jefferson, No. 17-7037 , 742 F. App'x 377 (10th Cir. 2018); Malone v. Bd. of Cty. Comm'rs for Cty. of Dona Ana, No. 16-2222, 707 Fed.App'x. 552 (10th Cir. 2017); Brown v. City of Colo. Springs, No. 16-1206, 709 Fed.App'x. 906, 909 (10th Cir. 2017), and willing to reverse district court decisions should the district court conclude that the law is clearly established, but see Matthews v. Bergdorf, 889 F.3d 1136, 1149-50 (10th Cir. 2018)(Baldock, J.)(holding that a child caseworker was not entitled to qualified immunity, because a caseworker would know that "child abuse and neglect allegations might give rise to constitutional liability under the special relationship exception"); McCoy v. Meyers, 887 F.3d 1034, 1052-53 (10th Cir. 2018)(Matheson, J.)(concluding that there was clearly

Courts of Appeals have recently noted, however, Taylor clarifies that it is no longer the case that an almost-identical case must exist.  See Truman v. Orem City, 1 F. 4th at 1241 ("Just like any reasonable corrections officer should have understood the inmate in Taylor's conditions . . . offended the Constitution, so too should any reasonable prosecutor understand that providing a medical examiner fabricated evidence and then putting him on the stand to testify based on that false information offends the Constitution."); Moderwell v. Cuyahoga County, 997 F.3d 653, 660 (6th Cir. 2021)(explaining that the Supreme Court holds in Taylor that "there does not need to be a case directly on point" when no reasonable officer could conclude that the challenged action is constitutional); Taylor v. Ways, 999 F.3d 478, 492 (7th Cir. June 2, 2021)(noting that Taylor reaffirms that "the Supreme Court does not demand a case directly on point"); Roque v. Harvel, 993 F.3d 325, 335 (5th Cir. 2021)(citing Taylor for the proposition that, "'in an obvious case,' general standards 'can clearly establish the answer, even without a body of relevant case law" (quoting Brosseau v. Haugen, 543 U.S. 194, 199 (2004))).  See also Joanna C. Schwartz, Qualified Immunity and Federalism All the Way Down, 109 Geo. L.J. 305, 351 (2020)("The Court's decision in Taylor sends the signal to the lower courts that they can deny qualified immunity without a prior case on point."); Lawrence Rosenthal, Defending Qualified Immunity, 72 S.C.L. Rev. 547, 593 & n.193 (2020)("More recently, however, the Court has stressed that on egregious facts, qualified immunity should be denied regardless whether there are factually similar precedents.").

---

established law even though the three decisions invoked to satisfy that prong were not "factually identical to this case," because those cases "nevertheless made it clear that the use of force on effectively subdued individuals violates the Fourth Amendment").

There are, therefore, two possible interpretations of <u>Taylor</u>.  First, <u>Taylor</u> could be clarifying that the holding in <u>Hope v. Pelzer</u>, 536 U.S. at 741 -- that identifying an earlier case with "'fundamentally similar' facts can provide especially strong support for a conclusion that the law is clearly established," but that it is "not necessary to such a finding" -- is still good law even though it has fallen out of favor among lower courts.  This reading of <u>Taylor</u> would mean there is a narrow exception to the standard requirement that a plaintiff identify an earlier case on point that applies in cases only with "extreme circumstances" or "particularly egregious" facts.  Second, <u>Taylor</u> could mean that a court now must ask whether the conduct is particularly egregious such that no reasonable officer could have concluded that their actions are Constitutional, and, if the conduct is egregious, then there does not need to be a case clearly establishing the law.

Most Courts of Appeals have adopted the second interpretation.  Nonetheless, there is confusion both between and within the Courts of Appeals about <u>Taylor</u>'s scope.[15]  Since <u>Taylor</u>,

---

[15]Cases from the United States Court of Appeals for the Ninth Circuit illustrate the confusion within the Courts of Appeals about <u>Taylor</u>'s scope.  Compare, for example, <u>O'Doan v. Sanford</u>, 991 F.3d 1027 (9th Cir. March 19, 2021), with <u>Rico v. Ducart</u>, 980 F.3d 1293 (9th Cir. 2020)(Silver, J., concurring in part and dissenting in part).  <u>O'Doan v. Sanford</u> noted that for law to be clearly established, "the right must be sufficiently clear that every reasonable official would [have understood] that what he is doing violates the right.  In other words, existing precedent must have placed the statutory or constitutional question beyond debate."  991 F.3d at 1036-37 (quoting <u>Reichle v. Howards</u>, 566 U.S. 658, 664 (2012)).  The Ninth Circuit points to the importance of factually analogous precedential cases, stating that: "the Supreme Court has reminded lower courts that "[u]se of excessive force is an area of the law 'in which the result depends very much on the facts of each case' and thus police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue."  <u>O'Doan v. Sanford</u>, 991 F.3d at (first citing <u>Kisela v. Hughes</u>, 584 U.S. at 104; then quoting <u>Mullenix v. Luna</u>, 577, U.S. 7, 13 (2015)(per curiam)).  The Ninth Circuit concludes that the plaintiff has not identified any precedent case law that has clearly established a right and emphasizes the importance of specificity over general or categorical statements of Constitutional violations in qualified immunity cases.  <u>See O'Doan v. Sanford</u>, 991 F.3d at 1044 (describing limits applying to the obviousness principle and distinguishing <u>O'Doan</u> from <u>Taylor</u> because of situational ambiguity.)  Finally, the Ninth Circuit reiterates that "the obviousness principle [is] an exception to the specific-case requirement [and] is especially problematic in the Fourth Amendment context."  <u>O'Doan v. Sanford</u>, 991 F.3d at

courts have asked not just whether the law was clearly established through a factually similar case from that Court of Appeals or from the Supreme Court, but also whether the conduct at issue was "particularly egregious" such that "no reasonable correctional officer could have concluded that" their actions were constitutionally permissible.  Taylor, 592 U.S. at 8.  See Truman v. Orem City, 1 F. 4th at 1240.  In other words, in addition to asking whether the officer is theoretically on notice that they are acting unlawfully,[16] the court also must ask whether the conduct at issue is

_____

1044 (quoting Sharp v. County of Orange, 871 F.3d 901, 912 (9th Cir. 2017)).

On the other hand, the Honorable Judge Leslie E. Silver's concurrence in Rico v. Ducart, 980 F.3d at 1305, restates that the second prong of qualified immunity asks whether a reasonable official would have known that his or her actions were unconstitutional.  See Rico v. Ducart, 980 F.3d at 1305.  Judge Silver then notes that requiring plaintiffs to show exceedingly specific and existing case law that addresses the alleged misconduct's lawfulness, narrows the second prong in a way that the Supreme Court rejects in Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011).  See Rico v. Ducart, 980 F.3d at 1306 (explaining that determining whether there is precedent addressing "the lawfulness of creating noise while conducting court-ordered suicide-prevention welfare checks in a maximum-security facility built of concrete, metal, and steel" is functionally equivalent to necessitating a case on point).  The concurrence's crux is that, while specificity is necessary when considering a case's context and the alleged violative conduct, courts should not require unreasonable specificity when obvious issues such as "basic and clearly necessary requirements" arise in the context of qualified immunity.  See Rico v. Ducart, 980 F.3d at 1306. (stating that "[b]asic and clearly necessary requirements, such as sleep" are established beyond debate both because a reasonable official would know that depriving an inmate of sleep obviously violates an inmate's rights and because "[t]he right to adequate sleep, a well-recognized human need, is also established by persuasive authority").

[16]The Court notes that one of the most basic premises of the law of qualified immunity -- that an officer is aware either actually or potentially that his or her conduct is unlawful because the officer knows the holdings of both watershed Constitutional decisions and the lower court decisions that apply them -- does not hold up to empirical scrutiny.  See Joanna C. Schwartz, Qualified Immunity's Boldest Lie, 88 U. Chi. L. Rev. 605, 610 (2021)(finding that, although police departments regularly inform officers about "watershed" decisions, officers are "not regularly informed about court decisions interpreting those decisions in different factual scenarios -- the very types of decisions that are necessary to clearly establish the law about the constitutionality of uses of force").  The Court previously has noted:

> It is far more likely that, in their training and continuing education, police officers are taught general principles, and, in the intense atmosphere of an arrest, police officers rely on these general principles, rather than engaging in a detailed

"particularly egregious" -- an objective question.  McCoy v. Alamu, 141 S. Ct. 1364, 1364

(2021)(vacating and remanding in light of Taylor even though the conduct at issue was likely not

"particularly egregious").[17]

The United States Court of Appeals for the Third Circuit, for example, notes that Taylor

does not affect whether three State legislators who took a public stand against the sale of State-

owned property and then tried to pass a law divesting the State's ability to sell it are entitled to

qualified immunity, because the legislators' actions are "not so outrageous that 'no reasonable . .

. officer could have concluded' they were permissible under the Constitution."  HIRA Educ. Servs.

---

comparison of their situation with a previous Supreme Court or published Tenth
Circuit case. It strains credulity to believe that a reasonable officer, as he is
approaching a suspect to arrest, is thinking to himself: "Are the facts here anything
like the facts in York v. City of Las Cruces?" Thus, when the Supreme Court
grounds its clearly-established jurisprudence in the language of what a reasonable
officer or a "reasonable official" would know, Kisela v. Hughes, 138 S. Ct. 1148,
1153 (2018), yet still requires a highly factually analogous case, it has either lost
sight of reasonable officer's experience or it is using that language to mask an intent
to create "an absolute shield for law enforcement officers," Kisela v. Hughes, 138
S. Ct. at 1162 (Sotomayor, J. dissenting).

Manzanares v. Roosevelt Cnty. Adult Detention Center, 331 F. Supp.3d 1260, 1294 n.10 (D.N.M.
2018)(Browning, J.).

[17]Professor Colin Miller of the University of South Carolina School of Law notes that there
are only two likely interpretations of the Supreme Court's summary disposition of McCoy v.
Alamu: (i) that the Supreme Court remands so that the Fifth Circuit could consider whether the
case involves "extreme circumstances" or "particularly egregious facts" like those in Taylor; and
(ii) that the Supreme Court remands so that the Fifth Circuit can reconsider without looking for
analogous prior precedent and instead "determine whether any reasonable officer should have
realized" that the conduct violated the plaintiff's constitutional rights.  Colin Miller, The End of
Comparative Qualified Immunity, 99 Texas. L. Rev. Online 217, 224 (2021)("Miller, The End of
Comparative Qualified Immunity").  Miller argues that this second interpretation is more likely to
be correct, because it "would be difficult to characterize" the officer's conduct as "'particularly
egregious' without making a similar finding about most other unconstitutional behavior by
government officers who seek qualified immunity."  Miller, The End of Comparative Qualified
Immunity, at 224 (no citation for quotation).

N. Am. v. Augustine, 991 F.3d 180, 191 n.7 (3d Cir. 2021)(quoting Taylor, 592 U.S. at 8). The

United States Court of Appeals for the Seventh Circuit, too, concludes that Taylor means an officer

is not entitled to qualified immunity if his or her conduct was "particularly egregious." Lopez v.

Sheriff of Cook Cnty., 993 F.3d 981, 991 (7th Cir. 2021). In Lopez v. Sheriff of Cook County,

the Seventh Circuit holds that an off-duty correctional officer who shoots and then uses as a human

shield a man who fires his gun into the air near a crowd after a scuffle does not act "so egregious[ly]

that any reasonable officer would know they [are] violating the Constitution notwithstanding the

lack of an analogous decision."[18] 993 F.3d at 991. The United States Court of Appeals for the

Ninth Circuit also distinguishes Taylor on the basis of the conduct's severity. See Rico v. Ducart,

---

[18]The Court does not agree with the Seventh Circuit's conclusion. An off-duty officer using someone he has just shot multiple times as a human shield to "ward off" someone else with a gun -- the individual the officers uses as a human shield had moments earlier fired a gun into the air near a crowd -- is particularly egregious such that any reasonable officer should have realized that it violates someone's constitutional rights. Lopez v. Sheriff of Cook Cnty., 993 F.3d 992. Even if the officer is trying to protect himself and the public, firing a gun near a crowd does not justify being used as a flesh shield to protect an off-duty officer who shoots that shield moments earlier. Numerous provisions of international law and the laws of war, see, e.g., Rome Statute of the International Criminal Court, art. 8(2)(b)(xxiii)(July 17, 1998)(including in the definition of "war crimes" "[u]tilizing the presence of a civilian or other protected person to render certain points, areas or military forces immune from military operations"), prohibit such conduct. A police officer need not be familiar with international law to know that such conduct is improper, nor should someone else have been used as a human shield previously and a Court of Appeals concluded that conduct to have violated clearly established law for a subsequent human shield to overcome the burden of qualified immunity. The Seventh Circuit holds that the situation is "too fast-moving, too unpredictable, and too volatile" for an officer to know that using as a human shield the person he has just shot multiple times is a violation that is "so egregious that any reasonable officer would know they are violating the Constitution notwithstanding the lack of an analogous decision." 993 F.3d at 992. Instead, the Seventh Circuit appears to require the officer theoretically to be on notice that this conduct is a law violation because a prior officer must have done the same thing and an earlier court -- most likely the Seventh Circuit itself -- must have found that the use of human shields violates some clearly established law. If human shields are banned in war, they should not be allowed on the Chicago's streets. Any reasonable officer should know this conduct is not acceptable conduct under the Constitution.

980 F.3d 1292, 1300 n.9 (9th Cir. 2020).   In <u>Rico v. Ducart</u>, the Ninth Circuit holds that correctional officers who perform inmate-welfare checks that, because of the design of the prison, creates loud noises every forty-five minutes are entitled to qualified immunity, because the facts are not "as extreme as those present in" <u>Taylor</u>.  980 F.3d at 1300 n.9.  Similarly, the Ninth Circuit also has decided that <u>Taylor</u> "only highlights the level of blatantly unconstitutional conduct necessary to satisfy the obviousness principles."  <u>O'Doan v. Sanford</u>, 991 F.3d at 1044 (9th Cir. 2021).

The other Courts of Appeals, however, have characterized <u>Taylor</u> as only reaffirming an "extreme-circumstances" or "obvious-clarity" exception.  The Fifth Circuit, for example, has distinguished <u>Taylor</u>, noting that it "involved a factually distinct claim involving unsanitary prison conditions," so it does not apply to a case about mental healthcare in prison.  <u>Landry v. Laborde-Lahoz</u>, 852 Fed. App'x 123, at *129 (5th Cir. Apr. 19, 2021).[19]  The Fifth Circuit, however, like other Courts of Appeals, has not adopted a consistent approach to <u>Taylor</u>.  The Fifth Circuit also notes that "it would have been 'obvious' to a reasonable officer that" several officers using their body weight to apply pressure to an unarmed man who does not resist arrest while the man is in the "maximal-restraint" position for five-and-a-half minutes so that the man stops breathing and his lips turn blue -- while officers nearby "milled around"-- constitutes "such a severe tactic against this particular person would be constitutionally proscribed," and that the officer would "have no

---

[19]The Court does not agree with the Fifth Circuit's reasoning on this point, although it does not disagree with the case's result.  The Fifth Circuit reasons that <u>Taylor</u> does not support the plaintiff's argument that County officials acted with deliberate indifference in violation of the Eighth Amendment, because it is "factually distinct."  <u>Landry v. Laborde-Lahoz</u>, No. 20-20365, 852 Fed.App'x. at 129.  That <u>Taylor</u> is factually distinct has no bearing on the merits of a deliberate-indifference claim, but impacts its applicability to the qualified immunity question.

recourse to qualified immunity."  Aguirre v. City of San Antonio, 995 F.3d 395, 403-04, 424 (5th

Cir. 2020)(Jolly, J., concurring).  The Fifth Circuit further cites Taylor to support its assertion that,

"'in an obvious case,' general standards 'can clearly establish the answer, even without a body of

relevant law.'"  Roque v. Harvel, 993 F.3d 325, 335 (5th Cir. 2021)(quoting Brousseau v. Haugen,

542 U.S. 194, 199 (2004)).  In Roque v. Harvel, however, the Fifth Circuit does not say what those

"general standards" might be, from where they might come, or where a court might look for them,

and then proceeds to characterize qualified immunity law as requiring a case on point in almost all

circumstances.  993 F.3d at 335.[20]  More recently, however, the Fifth Circuit acknowledges that

Taylor excuses a plaintiff from "their obligation to identify an analogous case in 'extreme

circumstances' where the constitutional violation is 'obvious.'"  Cope v. Cogdill, 3 F.4th 198, 206

(5th Cir. 2021)(quoting Taylor, 592 U.S. at 8).  The Fifth Circuit stresses, however, that this hurdle

is a "high standard," because the facts must be "'particularly egregious.'"  Cope v. Cogdill, 3 F.4th

at 206 (quoting Taylor, 592 U.S. at 9).

---

[20]The Fifth Circuit's treatment of Taylor and the clearly established analysis is not consistent.  In Tucker v. City of Shreveport, 998 F.3d 165 (5th Cir. 2021), the Fifth Circuit does not cite Taylor, but writes that "'[q]ualified immunity is justified unless no reasonable officer could have acted as [the defendant officers] did here, or every reasonable officer faced with the same facts would not have [acted as the defendant officers did].'" (quoting Mason v. Faul, 929 F.3d 752, 764 (5th Cir. 2019, cert. denied, 141 S. Ct. 116, 207 (2020)(citing District of Columbia v. Wesby, 583 U.S. 48, 63 (2018).  Tucker v. City of Shreveport, 998 F.3d at 176-77.  The Fifth Circuit's analysis in Tucker v. City of Shreveport confuses the reasonableness of the officers' behavior with the clarity of the precedent that clearly establishes the law.  See 998 F.3d 165.  As Taylor suggests, an officer can act particularly egregiously and not be entitled to qualified immunity even if no precedent clearly establishes the law.  See Ramirez v. Guadarrama, 2 F.4th 506, 523 (5th Cir. 2021)(mem.)(Willett, J., dissenting from the denial of rehearing en banc)("The Supreme Court's reliance on Taylor [in McCoy v. Alamu, 141 S. Ct. 1364 (2021)(mem.)] confirms that the Court does not consider that case an anomaly, but instead a course correction signaling lower courts to deny immunity for clear misconduct, even in cases with unique facts.").

Most relevant here, the Tenth Circuit also has not given Taylor consistent treatment.  For example, the Tenth Circuit treats Taylor as an example of the rule of United States v. Lanier, 520 U.S. 259 (1997), that a "general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful," if it gives "fair and clear warning" that the conduct violates the plaintiff's constitutional rights.  United States v. Lanier, 520 U.S. at 271.  See Routt v. Howry, No. 19-6187, 835 F. App'x. 379, 382 (10th Cir. 2020).  This treatment of Taylor asks about the relationship between a "general constitutional rule already identified in the decisional law" and the "conduct in question," and asks whether that rule applies with "obvious clarity."  United States v. Lanier, 520 U.S. at 271 (emphasis added).  Elsewhere, the Tenth Circuit states: "It suffices that 'the alleged unlawfulness [is] apparent in light of preexisting law.' That is, 'a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question.'" Huff v. Reeves, 996 F.3d 1082, 1088 (10th Cir. 2021)(quoting Riggins, 572 F.3d at 1101; and Taylor, 592 U.S. at 9).

In Frasier v. Evans, 992 F.3d 1003, 1015 (10th Cir. 2021), however, the Tenth Circuit writes that "under certain 'extreme circumstances' general constitutional principles established in the caselaw may give reasonable government officials fair warning that their conduct is constitutionally or statutorily unlawful."  Frasier v. Evans, 992 F.3d at 1015 (quoting Taylor, 592 U.S. at 9).  The Tenth Circuit continues by noting that the situation before it -- several police officers surround a man who asks one of the officers for a statement about the force the officer has just used on a "uncooperative suspect," and then one of the officers grabs the tablet and searches it for a video of the encounter -- is "not such a rare case" as Taylor or Hope v. Pelzer, 536 U.S. 730 (2002).  Frasier v. Evans, 992 F.3d at 1021-22.  In other words, rather than having to point to

an existing case with sufficiently analogous facts, a plaintiff instead can defeat an assertion of qualified immunity by meeting Taylor's "extreme circumstances" or "particularly egregious" standard.  Frasier v. Evans, 992 F.3d at 1015.

More recently, the Tenth Circuit holds that, even without a prior precedent clearly establishing the law, it is "obvious" that a prosecutor providing materially false information to a medical examiner that influences his expert opinion whether a homicide occurred -- and then putting that medical examiner on the stand to testify about that false information -- is "obviously egregious." Truman v. Orem City, 1 F. 4th at 1240 (first quoting District of Columbia v. Wesby, 583 U.S. 48, 63 (2018); and then quoting Pierce v. Gilchrist, 359 F.3d 1279, 1298 (10th Cir. 2004)). The Tenth Circuit, in Truman v. Orem City, comparing the facts in that case directly to those in Taylor, continues: "Just like any reasonable correctional officer should understand the inmate in Taylor's conditions of confinement offended the Constitution, so too should any reasonable prosecutor understand that providing a medical examiner fabricated evidence and then putting him on the stand to testify based on that false information offends the Constitution."  1 F. 4th at 1240. In reaching its conclusion in Truman v. Orem City, the Tenth Circuit reiterates that its qualified immunity analysis is "'not a scavenger hunt for prior cases with precisely the same facts, and a prior case need not be exactly parallel to the conduct here for the officials to have been on notice of clearly established law.'"  Truman v. Orem City, 1 F. 4th at 1235 (quoting Reavis v. Frost, 967 F.3d 978, 992 (10th Cir. 2020)).  Because the Tenth Circuit concludes that "the right not to be deprived of liberty as a result of the fabrication of evidence by a government officer was clearly established at the time of the prosecutor's conduct," 1 F. 4th at 1236, it determines that the plaintiff had alleged plausibly a fabrication-of-evidence claim against the prosecutor, 1 F. 4th at 1237.  This treatment of Taylor does not ask only about the relationship between a "general constitutional rule

- 60 -

already identified in the decisional law" and whether it applies with "obvious clarity" to the conduct, Routt v. Howry, 835 F. App'x at 382 (quoting United States v. Lanier, 520 U.S. at 271), but instead focuses on the objective "particularly egregious" standard, which applies even without any general Constitutional principles that courts have promulgated already, because "no reasonable [] officer" could have concluded the conduct to be lawful, Taylor, 592 U.S. at 8.

The Court does its best to follow diligently and faithfully the unwritten signals of superior courts, but, here, the signals are not clear.[21]  The Court therefore will proceed with both lines of analysis.  An officer is entitled to qualified immunity unless a plaintiff can demonstrate: (i) that the defendant's actions violated his or her federal Constitutional or statutory rights; and (ii) that the right was clearly established either (a) by a factually similar Supreme Court or Tenth Circuit case on point, see Thomas v. Kaven, 765 F.3d 1183, at 1194, or, in rare cases, by "general constitutional principles," Routt v. Howry, 835 F. App'x. at 382 -- at the time of the alleged misconduct, or (b) because the conduct was "particularly egregious" such that "any reasonable

---

[21]The Court agrees with the Tenth Circuit's treatment of Taylor in Truman v. Orem City, 1 F.4th 1227, that Taylor marginally expands the standard in United States v. Lanier, and in Hope v. Pelzer, and stands for the proposition that an officer is not entitled to qualified immunity when his or her conduct is "particularly egregious" such that "any reasonable [] officer should have realized" that his or her conduct offends the Constitution.  Taylor, 592 U.S. at 8.  See Moderwell v. Cuyahoga County, 997 F.3d 653, 660 (6th Cir. 2021)("[W]hen 'no reasonable correctional officer could have concluded' that the challenged action was constitutional, the Supreme Court has held that there does not need to be a case directly on point." (quoting Taylor, 592 U.S. at 8)).  The Court concludes this treatment to be correct, especially in light of the Supreme Court's summary disposition in McCoy v. Alamu, 141 S. Ct. 1364, 1364 (mem)(2021).  See Ramirez v. Guadarrama, 2 F.4th at 523-24 (Willett, J., dissenting from the denial of rehearing en banc)("The Supreme Court's reliance on Taylor [in McCoy v. Alamu] confirms that the Court does not consider that case an anomaly, but instead a course correction signaling lower courts to deny immunity for clear misconduct, even in cases with unique facts."); Miller, The End of Comparative Qualified Immunity, at 222-23.  On the other hand, given the Court's view on qualified immunity, the Court hopes that the lower courts make this new hole in the qualified immunity defense so wide that the nation can run a truck through it.

officer should have realized" it was unlawful, Taylor, 141 S. Ct. at 54.  See Estate of Smart by Smart v. City of Wichita, 951 F.3d 1161, 1178 (10th Cir. 2020); Riggins, 572 F.3d at 1107 ("When a defendant asserts qualified immunity at summary judgment . . . the plaintiff [must] . . . demonstrate on the facts alleged both that the defendant violated his constitutional or statutory rights, and that the right was clearly established at the time of the alleged unlawful activity."); Pueblo of Pojoaque v. New Mexico, 214 F. Supp. 3d at 1079.

The Court has applied previously the "particularly egregious" standard to cases concerning sexual assault in prison.  See Ortiz v. New Mexico, 550 F.Supp.3d 1020, 1175 (D.N.M. 2021)(Browning, J.).  In Ortiz v. New Mexico, the Court concludes that any reasonable correctional officer should understand that sexually assaulting an inmate or "knowingly allowing [the sexual assault] to happen despite being aware that it was prohibited by State law and prison policy . . . 'offends the Constitution.'"  550 F. Supp. at 1175 (quoting Truman v. Orem City, 1 F.4th at 1240).  The behavior that the correctional officer exhibited is particularly egregious, because any reasonable officer would conclude that they are violating the Constitution.  See Ortiz v. New Mexico, 550 F. Supp. 3d at 1175 (citing Taylor, 592 U.S. at 8).  Under the "particularly egregious" standard, the Court concludes that the correctional officers are not entitled to qualified immunity.  See Ortiz v. New Mexico, 550 F. Supp. 3d at 1175.  The Court has applied the "particularly egregious" standard to several other cases as well.  See Howes v. New Mexico Dept. of Health, No. CIV 21-0256, 2023 WL 1419832, at *78 (D.N.M. Jan. 31, 2023)(Browning, J.)(concluding that a doctor's allegations of violations of his liberty interest in his reputation were not "particularly egregious" such that a reasonable officer would have realized the conduct was unlawful); Copar Pumice Co., Inc. v. Morris, No. CIV 07-79, 2008 WL 2323488, at *28 (D.N.M. 2008)(Browning, J.)(concluding that an official's conduct is not objectively reasonable if he or she

enforces an ordinance in a "particularly egregious manner or in a manner which a reasonable officer would recognize exceed the bounds of the ordinance" (quoting Mimics, Inc. v. Village of Angel Fire, 394 F.3d 836, 846-47 (2005)).

## LAW REGARDING FOURTH AMENDMENT SEIZURES

The Fourth Amendment protects individuals from unreasonable seizures. See U.S. Const. amend. IV. "A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, 'by means of physical force or show of authority,' terminates or restrains his freedom of movement." Brendlin v. California, 551 U.S. 249, 254 (2007)(quoting Florida v. Bostick, 501 U.S. 429, 434 (1991)). See United States v. Roberson, 864 F.3d 1118, 1121 (10th Cir. 2017). "[W]hen an officer does not apply physical force to restrain a subject, a Fourth Amendment seizure occurs only if (a) the officer shows his authority; and (b) the citizen 'submits to the assertion of authority.'" United States v. Salazar, 609 F.3d at 1064 (quoting California v. Hodari D., 499 U.S. 621, 626 (1991)). "'[T]he test for existence of a show of authority is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person.'" United States v. Salazar, 609 F.3d at 1064 (quoting California v. Hodari D., 499 U.S. at 628). "'If a reasonable person would feel free to terminate the encounter, then he or she has not been seized.'" United States v. Ojeda-Ramos, 455 F.3d 1178, 1183 (10th Cir. 2006)(quoting United States v. Drayton, 536 U.S. 194, 201 (2002)). See California v. Hodari D., 499 U.S. at 627-28 ("[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." (quoting United States v. Mendenhall, 446 U.S. 544, 554 (1980))). The standard for submission is also objective, see United States v. Salazar, 609 F.3d at 1064 (citing

United States v. Cardoza, 129 F.3d 6, 14 n.4 (1st Cir. 1997)), but "[s]ubmission 'requires, at minimum, that a suspect manifest compliance with police orders,'" United States v. Roberson, 864 F.3d at 1122 (quoting United States v. Mosley, 743 F.3d 1317, 1326 (10th Cir. 2014)). For purposes of analyzing Fourth Amendment seizures, the Tenth Circuit has divided interactions between police and citizens into three categories: (i) consensual encounters; (ii) investigative stops; and (iii) arrests. See United States v. Samilton, 56 F.4th 820 (10th Cir. 2022); Oliver v. Woods, 209 F.3d 1179, 1186 (10th Cir. 2000).

### 1.    **Consensual Encounters.**

A consensual encounter occurs when a police officer approaches a person to ask questions under circumstances where a reasonable person would feel free to refuse to answer and to end the encounter. See Oliver v. Woods, 209 F.3d at 1186. For example, officers generally may "go to a person's home to interview him." United States v. Daoust, 916 F.2d 757, 758 (1st Cir. 1990). "It is not improper for a police officer to call at a particular house and seek admission for the purpose of investigating a complaint or conducting other official business." 1 Wayne LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 2.3(b), at 769 (6th ed. 2020)("LaFave").

### 2.    **Investigative Stops.**

In United States v. King, 990 F.2d 1552 (10th Cir. 1993), the Tenth Circuit notes: "Terry was the first case to recognize that 'the Fourth Amendment governs "seizures" of the person . . . [other than] arrests' and created a 'narrowly drawn' exception to the probable cause requirement for lesser government intrusions into an individual's liberty." United States v. King, 990 F.2d at 1557 (first quoting Terry v. Ohio, 392 U.S. 1, 16 (1968), and then quoting Terry v. Ohio, 392 U.S. at 27). The Tenth Circuit recognizes that, in Terry v. Ohio, the Supreme Court identifies two police actions: (i) an investigative detention -- a "stop"; and (ii) a protective search -- a "frisk." United

States v. King, 990 F.2d at 1557 (citing United States v. Sokolow, 490 U.S. 1, 7 (1989); Adams v.

Williams, 407 U.S. 143, 147-48 (1972)).  The Tenth Circuit explains:

> Terry has come to stand for two distinct propositions -- an investigative detention ("stop") in which a police officer, for the purpose of investigation, may briefly detain a person on less than probable cause,  . . .  and a protective search ("frisk") which permits an officer, in the course of an investigative detention, to conduct a limited search for weapons for his or her own protection.

United States v. King, 990 F.2d at 1557.  When evaluating either of these actions, a court asks

whether the action was reasonable under the Fourth Amendment.  See United States v. Wilson, 96

F. App'x 640, 643 (10th Cir. 2004); United States v. King, 990 F.2d at 1557.

### a.    Investigative Detentions and Reasonable Suspicion.

A police-citizen encounter that is not consensual may be a Constitutional investigative

detention.  See Dorato v. Smith, 108 F. Supp. 3d at 1118.  An investigative detention occurs when

an officer stops and briefly detains a person "'in order to determine his identity or to maintain the

status quo momentarily while obtaining more information.'"  Oliver v. Woods, 209 F.3d at 1186

(quoting Adams v. Williams, 407 U.S. at 146).  Such brief investigative detentions must meet two

distinct requirements to be "reasonable" under the Fourth Amendment.  Dorato v. Smith, 108

F. Supp. 3d at 1118.  First, the officer "'must have a particularized and objective basis for

suspecting the particular person stopped of criminal activity.'"  Oliver v. Woods, 209 F.3d at 1186

(quoting United States v. Cortez, 449 U.S. 411, 417-18 (1981)).  Second, the investigative

detention that follows the stop must be "reasonably related in scope to the circumstances" which

justifies the stop in the first place, Terry v. Ohio, 392 U.S. at 20, because the Fourth Amendment

imposes "limitations on both the length of the detention and the manner in which it is carried out,"

United States v. Holt, 264 F.3d 1215, 1229 (10th Cir. 2001).

"For reasonable suspicion to exist, an officer 'need not rule out the possibility of innocent

conduct'; he or she simply must possess 'some minimal level of objective justification' for making the stop." United States v. Winder, 557 F.3d 1129, 1134 (10th Cir. 2009)(quoting United States v. Vercher, 358 F.3d 1257, 1261 (10th Cir. 2004)).  Information "falling 'considerably short' of a preponderance standard" will meet the standard for reasonable suspicion.  United States v. Winder, 557 F.3d at 1134 (quoting United States v. Arvizu, 534 U.S. 266, 274 (2002)).  See Illinois v. Wardlow, 528 U.S. 119, 123 (2000)(noting that "'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence").

**b.    Frisks.**

A "frisk" is "a protective search . . . which permits an officer, in the course of an investigative detention, to conduct a limited search for weapons for his or her own protection." United States v. King, 990 F.2d at 1557 (citing Adams v. Williams, 407 U.S. at 147-48)).  An officer may "stop and frisk" an individual under the Fourth Amendment if a reasonably prudent person "in the circumstances would be warranted in the belief that his safety or that of others was in danger." Terry v. Ohio, 392 U.S. at 27.  "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." Terry v. Ohio, 392 U.S. at 27.  A frisk "must  . . .  be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." Terry v. Ohio, 392 U.S. at 29.  In evaluating the validity of the stop-and-frisk, a court should consider the totality of the circumstances.  See Florida v. Bostick, 501 U.S. 429, 436 (1991).

**c.    Traffic Stops.**

"'A traffic stop is a seizure within the meaning of the Fourth Amendment  . . . .'" United

States v. Holt, 264 F.3d at 1220 (quoting United States v. Hunnicutt, 135 F.3d 1345, 1348 (10th Cir. 1998)).  "'For the duration of a traffic stop,  . . .  a police officer effectively seizes everyone in the vehicle, the driver and all passengers.'"  United States v. White, 584 F.3d 935, 945 (10th Cir. 2009)(quoting Arizona v. Johnson, 555 U.S. 323, 327 (2009)).  "This seizure implicates a passenger's Fourth Amendment interests to the same degree as the driver's."  United States v. Wilson, 96 F. App'x at 643 (citing United States v. Erwin, 875 F.2d 268, 270 (10th Cir. 1989)).  "Therefore, both the driver and passenger have standing to challenge the constitutionality of the initial stop."  United States v. White, 584 F.3d at 945.  See United States v. Wilson, 96 F. App'x at 643 ("Wilson does not assert any such interest in the truck or its contents[;] [n]evertheless, Wilson may, as he does here, 'contest the lawfulness of his own detention and seek to suppress evidence found in the vehicle as the fruit of the illegal detention.'" (quoting United States v. Nava-Ramirez, 210 F.3d at 1131; and citing United States v. Gama-Bastidas, 142 F.3d 1233, 1239 (10th Cir. 1998); United States v. Shareef, 100 F.3d 1491, 1500 (10th Cir. 1996))).  The Tenth Circuit "reject[s] any notion that a vehicular stop detains for Fourth Amendment purposes only the driver simply because the passenger may be free to depart."  United States v. Erwin, 875 F.2d at 270.

The Terry v. Ohio framework applies whether the traffic stop is based on probable cause or reasonable suspicion.  See United States v. Holt, 264 F.3d at 1230.  "[B]ecause 'the ultimate touchstone of the Fourth Amendment is reasonableness,'" Kentucky v. King, 563 U.S. at 459 (quoting Brigham City v. Stuart, 547 U.S. at 403), courts

> assess the reasonableness of a routine traffic stop under the principles laid out for investigative detentions in Terry v. Ohio, 392 U.S. 1 (1968), considering "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place."

United States v. Wilson, 96 F. App'x at 643 (quoting United States v. Holt, 264 F.3d at 1220).  A

court must examine "both the length of the detention and the manner in which it is carried out," United States v. Holt, 264 F.3d at 1230, "keeping in mind that an officer may extend the duration and scope of the initial detention based on 'an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring,'" United States v. Wilson, 96 F. App'x at 643 (quoting United States v. Caro, 248 F.3d 1240, 1244 (10th Cir. 2001)).  "When the stop is extended based on reasonable suspicion, the further detention must, like the original traffic stop, 'be temporary, lasting no longer than necessary to effectuate the purpose of the [further] detention, and the scope of the [further] detention must be carefully tailored to its underlying justification.'" United States v. Wilson, 96 F. App'x at 644 (quoting United States v. Wood, 106 F.3d 942, 945 (10th Cir. 1997))(brackets in United States v. Wilson, but not in United States v. Wood).  "A traffic stop is justified at its inception if an officer has . . . reasonable articulable suspicion that a particular motorist has violated any of the traffic . . . regulations of the jurisdiction." United States v. Winder, 557 F.3d at 1134.

### 3.    **Arrests.**

An arrest is a seizure that is "characterized by highly intrusive or lengthy search or detention," Oliver v. Woods, 209 F.3d at 1186 (quoting United States v. Cooper, 733 F.2d 1360, 1363 (10th Cir. 1984)), that is "reasonable only if supported by probable cause," United States v. Hammond, 890 F.3d 901, 904 (10th Cir. 2018).  A police-citizen encounter that goes beyond the limits of a stop under Terry v. Ohio is an arrest.  See United States v. Perdue, 8 F.3d 1455, 1462 (10th Cir. 1993)("An encounter between police and an individual which goes beyond the limits of a Terry stop, however, may be constitutionally justified only by probable cause or consent.").  The general rule is that "the use of firearms, handcuffs, and other forceful techniques" is sufficiently

intrusive to signal that a person has been placed under arrest.[22]  United States v. Melendez-Garcia, 28 F.3d 1046, 1052-53 (10th Cir. 1994).  See Florida v. Royer, 460 U.S. 491, 499 (1983).

"Inasmuch as an arrest exceeds an investigative stop's limited scope or duration, it must be supported by probable cause."  United States v. Rodriguez, 836 F. Supp. 2d 1258, 1288 (D.N.M. 2011)(Browning, J.).    See  Wilson  v.  Jara,  866  F.  Supp. 2d  1270,  1292  (D.N.M. 2011)(Browning, J.)("Probable cause must support an arrest, 'characterized by highly intrusive or lengthy  search  or  detention.'"  (quoting  Oliver v. Woods, 209 F.3d at 1185)), aff'd, 512 F. App'x 841 (10th Cir. 2013)(unpublished).  "Probable cause to arrest exists only when the 'facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed.'"  United States v. Valenzuela, 365 F.3d 892, 896-97 (10th Cir. 2004)(quoting United States v. Edwards, 242 F.3d 928, 934 (10th Cir. 2001))(citing Draper v. United States, 358 U.S. 307, 313 (1959)).  Although "[p]robable cause does not require facts sufficient for a finding of guilt  . . . , it does require 'more than mere suspicion.'"  United States v. Morris, 247 F.3d 1080, 1088 (10th Cir. 2001)(quoting United States v. Vazquez-Pulido, 155 F.3d 1213, 1216 (10th Cir. 1998)).  The Supreme Court has made the following distinction between reasonable suspicion, which is sufficient for an investigatory stop under Terry v. Ohio,

---

[22]The use of handcuffs, however, does not always elevate a detention into an arrest. See United States v. Albert, 579 F.3d 1188, 1195 (10th Cir. 2009)("[W]e have approved the use of handcuffs in the context of a Terry stop."); Pierre-Louis v. Schake, No. CIV 12-0527, 2014 WL 1954783, at *44-49 (D.N.M. April 30, 2014)(Browning, J.)(concluding that the defendant police officer acted reasonably in handcuffing the plaintiff, whom he suspected had recently assaulted a person on the side of the road by threatening him with a gun); United States v. Reyes-Vencomo, 866 F. Supp. 2d 1304, 1330 (D.N.M. 2012)(Browning J.)("The use of handcuffs  . . .  does not always elevate a detention into an arrest.").

and probable cause, which is required before an arrest can be made:

> Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.

Alabama v. White, 496 U.S. 325, 330 (1990).

Probable cause is measured against an objective standard.  See Beck v. Ohio, 379 U.S. 89, 96 (1964).  "The subjective belief of an individual officer as to whether there was probable cause for making an arrest is not dispositive."  United States v. Valenzuela, 365 F.3d at 896-97 (citing Florida v. Royer, 460 U.S. at 507 and United States. v. Treto-Haro, 287 F.3d 1000, 1006 (10th Cir. 2002)).  Thus, the primary consideration is "whether a reasonable officer would have believed that probable cause existed to arrest the defendant based on the 'information possessed by the [arresting] offic[er].'"  Olsen v. Layton Hills Mall, 312 F.3d 1304, 1312 (10th Cir. 2002) (quoting Romero v. Fay, 45 F.3d 1472, 1476 (10th Cir. 1995))(alterations in Olsen v. Layton Hills Mall).

### a.    **When a Detention Becomes an Arrest.**

The Tenth Circuit has held that a police-citizen encounter which goes beyond an investigative stop's limits is an arrest that probable cause or consent must support to be valid.  See United States v. Perdue, 8 F.3d at 1462 ("An encounter between police and an individual which goes beyond the limits of a Terry stop, however, may be constitutionally justified only by probable cause or consent.").  "Terry stops must be limited in scope to the justification for the stop . . . [and] the intrusiveness of a search or seizure will be upheld if it was reasonable under the totality of the circumstances."  United States v. Perdue, 8 F.3d at 1462.  "The government has the burden of demonstrating 'that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure.'"

United States v. Perdue, 8 F.3d at 1462 (quoting Florida v. Royer, 460 U.S. at 500).

The Court has also engaged in the balancing act of deciding when a detention becomes an arrest. In United States v. Perea, 374 F. Supp. 2d 961 (D.N.M. 2005)(Browning, J.), aff'd sub nom. United States v. Burciaga-Burciaga, 147 F. App'x 725 (10th Cir. 2005)(unpublished), the Court determines whether the police transformed the investigative detention into an arrest by drawing their weapons on the suspect, handcuffing him, and placing him in the back of a police car. See United States v. Perea, 374 F. Supp. 2d at 976. In that case, the Court determines that such measures are appropriate and do not elevate the investigative detention to the level of an arrest. See 374 F. Supp. 2d at 976. The Court recognizes that, "[i]n 'most scenarios,' when officers effectuate what would otherwise be considered a Terry stop by pointing guns at a suspect, that stop is elevated to an arrest, which requires probable cause." 374 F. Supp. 2d at 974 (quoting United States v. Perdue, 8 F.3d at 1463). See United States v. Gama-Bastidas, 142 F.3d at 1240 ("[T]he use of firearms, handcuffs, and other forceful techniques are justified only by probable cause or when 'the circumstances reasonably warrant such measures.'")(quoting United States v. Perdue, 8 F.3d at 1462); United States v. Burciaga-Burciaga, 147 F. App'x at 730 (affirming the Court's determination in United States v. Perea that the officers have reasonable suspicion to believe that the suspect might be armed and dangerous, justifying the officers' use of firearms and not transforming the vehicle stop into a formal arrest requiring probable cause).

There "exist[s], however, a limited set of circumstances in which officers may draw their guns at a suspect without transforming the stop into an arrest. 'The use of guns in connection with a stop is permissible where the police reasonably believe the weapons are necessary for their protection.'" United States v. Perea, 374 F. Supp. 2d at 974 (quoting United States v. Perdue, at 1462). See United States v. Merkley, 988 F.2d 1062, 1064 (10th Cir. 1993)(upholding

reasonableness of a stop when officers detains the defendant at gunpoint, and place him in handcuffs where suspect had threatened to kill someone and was pounding interior of truck with his fists); United States v. Lechuga, 925 F.2d 1035, 1040 (7th Cir. 1991)(holding that the officer's "drawing his gun but keeping it pointed to the street" is not "unreasonably intrusive"); United States v. Alexander, 907 F.2d 269, 272-73 (2d Cir. 1990)(holding that the law enforcement officers do not convert the stop into an arrest by "unholstering their guns and frisking" the defendant when they suspect that the defendant has "just completed a narcotics purchase," there were a number of "innocent bystanders on the crowded city street," and stopping a vehicle "is especially hazardous and supports the need for added safeguards"). Similarly, there are circumstances in which a seizure is not an arrest merely because the subject of the detention is placed in handcuffs. See United States v. Merkley, 988 F.2d at 1064; United States v. Miller, 974 F.2d 953, 957 (8th Cir. 1992)("Numerous cases have held that a police officer's use of handcuffs can be a reasonable precaution during a Terry stop."); United States v. Hastamorir, 881 F.2d 1551, 1557 (11th Cir. 1989)("The handcuffing of Hastamorir constituted a Terry stop, and was a reasonable action designed to provide for the safety of the agents."). United States v. Perea was one of those unique cases, because the police had reasonable cause to believe that the person whom they were detaining was the suspect whom they sought to arrest -- a man wanted for murder who, it was believed, might be armed and dangerous. See 374 F. Supp. 2d at 976. The Tenth Circuit affirms the Court's determination that the stop was not an arrest:

> The officers' conduct during the felony stop was appropriate in relation to the perceived threat. The measures taken during a Terry stop must be "reasonably related in scope to the circumstances which justified the interference in the first place" and may not go beyond what is necessary for officer safety. United States v. King, 990 F.2d 1552, 1563 (10th Cir. 1993)(quoting Terry v. Ohio, 392 U.S. 1, 20 . . . (1968)). The felony stop was justified by suspicion that someone in the Escalade might have a gun, or at least was dangerous. The officers displayed their

weapons only as long as necessary to ensure that the vehicle and its occupants posed no threat. The officers put their guns away as soon as they handcuffed Mr. Burciaga, placed him in the back of a police car, and confirmed that no one else was in the car.

United States v. Burciaga-Burciaga, 147 F. App'x at 730.

> **b.      Officers Have a Duty to Investigate Easily Accessible Evidence Before Making an Arrest.**

"[T]he Fourth Amendment requires officers to reasonably interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire if a crime has been committed at all before invoking the power of warrantless arrest and detention." Romero v. Fay, 45 F.3d at 1476-77. Police officers "may not ignore easily accessible evidence and thereby delegate their duty to investigate [to others]." Baptiste v. J.C. Penney Co., 147 F.3d 1252, 1259 (10th Cir. 1998). However, "[o]nce probable cause is established, an officer is not required to continue to investigate for exculpatory evidence before arresting a suspect." Garcia v. Casuas, No. CIV 11-0011, 2011 WL 7444745, at *49 (D.N.M. December 8, 2011)(Browning, J.)(citing Cortez v. McCauley, 478 F.3d 1108, 1121 n.18 (10th Cir. 2007)).

## LAW REGARDING EXCESSIVE FORCE

An excessive force claim "must . . . be judged by reference to the specific constitutional standard which governs that right, rather than to some generalized 'excessive force' standard." Graham v. Connor, 490 U.S. at 394. The Supreme Court has long held that all claims of excessive force in the context of an arrest or detention should be analyzed under the Fourth Amendment's reasonableness standard. See Graham v. Connor, 490 U.S. at 395 ("[A]ll claims that law enforcement officers have used excessive force -- deadly or not -- in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard . . . ."). The Supreme Court recognizes that "police

officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation." Graham v. Connor, 490 U.S. at 397.  Consequently, "the reasonableness of the officer's belief as to the appropriate level of force should be judged from that on-scene perspective." Saucier v. Katz, 533 U.S. at 205.  When an officer moves for qualified immunity on an excessive-force claim, "a plaintiff is required to show that the force used was impermissible (a constitutional violation) and that objectively reasonable officers could not have thought the force constitutionally permissible (violates clearly established law)."  Cortez v. McCauley, 478 F.3d 1108, 1128 (10th Cir. 2007).

1.    **Relevant Factors in Determining Whether Officers' Actions Were Objectively Reasonable.**

The Tenth Circuit has provided lists of non-exclusive factors that courts consider when determining whether force was objectively reasonable.  In Estate of Larsen v. Murr, 511 F.3d 1255 (10th Cir. 2008), the Tenth Circuit stated:

> In assessing the degree of threat facing officers, then, we consider a number of non-exclusive factors.  These include (1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect.

511 F.3d at 1260.  In Weigel v. Broad, 544 F.3d at 1143, the Tenth Circuit also provided:

> Reasonableness is evaluated under a totality of the circumstances approach which requires that we consider the following factors: the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

544 F.3d at 1151-52 (citations omitted).  The court assesses "objective reasonableness based on whether the totality of the circumstances justified the use of force, and pay[s] careful attention to

- 74 -

the facts and circumstances of the particular case."   Estate of Larsen v. Murr, 511 F.3d at 1260

(internal quotation marks omitted).

### 2.    Least- or Less-Forceful Alternatives in Excessive-Force Cases.

To avoid a "Monday morning quarterback" approach, the Fourth Amendment does not

require the use of the least, or even a less, forceful or intrusive alternative to gain custody, so long

as the use of force is reasonable under Graham v. Connor.   The Fourth Amendment requires only

that the defendant officers chose a "reasonable" method to end the threat that the plaintiff posed

to the officers in a force situation, regardless the availability of less intrusive alternatives. Graham

v. Connor, 490 U.S. at 397.

In Michigan Department of State Police v. Sitz, 496 U.S. 444, 450-51 (1990), the Supreme

Court examined a case addressing the constitutionality of highway sobriety checkpoints and stated

that Brown v. Texas, 443 U.S. 47 (1979),

> was not meant to transfer from politically accountable officials to the courts the
> decision as to which among reasonable alternative law enforcement techniques
> should be employed to deal with a serious public danger.  Experts in police science
> might disagree over which of several methods of apprehending drunken drivers is
> preferable as an ideal.  But for purposes of Fourth Amendment analysis, the choice
> among such reasonable alternatives remains with government officials who have a
> unique understanding of, and a responsibility for, limited public resources,
> including a finite number of police officers.

496 U.S. at 453-54.  See Illinois v. Lafayette, 462 U.S. 640, 647 (1983)("[T]he reasonableness of

any particular government activity does not necessarily turn on the existence of alternative 'less

intrusive' means.").

In United States v. Sokolow, 490 U.S. 1 (1989), the Supreme Court examined the Terry[23]

stop of a suspected drug courier in an airport.  The Supreme Court rejected Sokolow's contention

---

[23]Terry v. Ohio, 392 U.S. 1 (1968).

that the arresting officers were "obligated to use the least intrusive means available to dispel their suspicions that he was smuggling narcotics."  490 U.S. at 11.  Instead, the Supreme Court held: "The reasonableness of the officer's decision to stop a suspect does not turn on the availability of less intrusive investigatory techniques.  Such a rule would unduly hamper the police's ability to make swift, on-the-spot decisions . . . and require courts to indulge in unrealistic second guessing." United States v. Sokolow, 490 U.S. at 11 (internal quotations and citations omitted).  Similarly, in United States v. Sharpe, 470 U.S. 675, 686-87 (1985), the Supreme Court stated that

> a creative judge engaged in post hoc evaluation of police conduct can almost always imagine some alternative means by which the objectives of police might have been accomplished.  But "[t]he fact that the protection of the public might, in the abstract, have been accomplished by less intrusive means does not, by itself, render the search unreasonable."

470 U.S. at 686-87 (quoting Cady v. Dombrowski, 413 U.S. 433, 447 (1973)).

In Marquez v. City of Albuquerque, 399 F.3d 1216 (10th Cir. 2005), the Tenth Circuit discussed when a police dog's use is objectively reasonable and whether the defendant Lehocky's actions violated "well established law enforcement standards."  It rejected the plaintiff's argument that certain testimony "should have been admitted since it would have been helpful to the jury in determining whether Lehocky used a reasonable amount of force."  399 F.3d at 1222.  In so holding, the Tenth Circuit explained:

> As the district court correctly noted, the Fourth Amendment "do[es] not require [police] to use the least intrusive means in the course of a detention, only reasonable ones."  United States v. Melendez-Garcia, 28 F.3d 1046, 1052 (10th Cir.1994). Similarly, "violations of state law and police procedure generally do not give rise to a 1983 claim" for excessive force.  Romero v. Bd. of County Comm'rs, 60 F.3d 702, 705 (10th Cir. 1995); see also Wilson v. Meeks, 52 F.3d 1547, 1554 (10th Cir. 1995)(holding that "violation of a police department regulation is insufficient for liability under section 1983" for excessive force).  Both of these principles of our Fourth Amendment jurisprudence stem from the proper perspective from which to evaluate the conduct of a police officer -- that "of a reasonable officer on the scene,

- 76 -

acknowledging that the officer may be forced to make split-second judgments in certain difficult circumstances." Olsen [v. Layton Hills Mall], 312 F.3d [1304,] 1314 [(10th Cir. 2002)]. Together, they prevent the courts from engaging in "unrealistic second guessing of police officer's decisions." [United States v.] Melendez-Garcia, 28 F.3d at 1052

Here, the only issue before the jury was whether Lehocky acted as a "reasonable officer" when he ordered his police dog to apprehend Marquez. In making this determination, the issues of whether Lehocky used the minimum amount of force to apprehend Marquez and whether Lehocky violated some "well established police procedure" are only tangentially related. This is because even if it found Lehocky used more than the minimum amount of force necessary and violated police procedure, the jury could nonetheless find he acted reasonably. [United States v.] Melendez-Garcia, 28 F.3d at 1052; Romero [v. Bd. of Cty. Comm'rs of Cty. Lake], 60 F.3d at 705].

Marquez v. City of Albuquerque, 399 F.3d at 1222.

In United States v. Melendez-Garcia, 28 F.3d 1046 (10th Cir. 1994), the Tenth Circuit stated: "We must avoid unrealistic second guessing of police officers' decisions in this regard and thus do not require them to use the least intrusive means in the course of a detention, only a reasonable ones." 28 F.3d at 1052 (internal quotations omitted). See Medina v. Cram, 252 F.3d 1124, 1133 (10th Cir. 2001)(stating that "the reasonableness standard does not require that officers use alternative less intrusive means" (internal quotation marks omitted)(citation omitted)); Dickerson v. McClellan, 101 F.3d 1151, 1160 (6th Cir. 1996)("[T]he Fourth Amendment does not require officers to use the best technique available as long as their method is reasonable under the circumstances."); Schulz v. Long, 44 F.3d 643, 649 (8th Cir. 1995)("[T]he Fourth Amendment inquiry focuses not on what the most prudent course of action may have been or whether there were other alternatives available, but instead whether the seizure actually effectuated falls within the range of conduct which is objectively 'reasonable' under the Fourth Amendment."); Scott v. Henrich, 39 F.3d 912, 915 (9th Cir. 1994)("Requiring officers to find and choose the least intrusive alternative would require them to exercise superhuman judgment . . . . Officers thus need not avail

themselves of the least intrusive means of responding to an exigent situations; they need only act within that range of conduct we identify as reasonable."); Menuel v. City of Atlanta, 25 F.3d 990, 996-97 (11th Cir. 1994)("[T]he Fourth Amendment does not require officers to use the least intrusive alternatives in search and seizure cases. The only test is whether what the police officers actually did was reasonable."); Plakas v. Drinski, 19 F.3d 1143, 1149 (7th Cir. 1994)("We do not believe the Fourth Amendment requires the use of the least or even a less deadly alternative so long as the use of force is reasonable under Garner v. Tennessee [sic] and Graham v. Connor.").

"Thus, the clearly established law in the Tenth Circuit holds that the Fourth Amendment does not require an officer to use the least or a less forceful alternative." Jonas v. Bd. of Comm'rs of Luna Cty., 699 F. Supp. 2d 1284, 1296 (D.N.M. 2010)(Browning, J.). See, e.g., Blossom v. Yarbrough, 429 F.3d at 968 (quoting Medina v. Cram, 252 F.3d at 1133)("It is well settled that 'the reasonableness standard does not require that officers use alternative, less intrusive means' when confronted with a threat of serious bodily injury."); Jiron v. City of Lakewood, 392 F.3d 410, 414 (10th Cir. 2004)(stating that, in police-shooting case, officers are not required to use alternative, less intrusive means if their conduct is objectively reasonable). See also Roy v. Inhabitants Lewiston, 42 F.3d 691, 695 (1st Cir. 1994)("[I]n close cases, a jury does not automatically get to second guess these life and death decisions, even though plaintiff has an expert and a plausible claim that the situation could better have been handled differently."); Diaz v. Salazar, 924 F. Supp. 1088, 1100 (D.N.M. 1996)(Hansen, J.). Moreover, the reasonableness standard does not require that officers use "alternative 'less intrusive' means." Illinois v. Lafayette, 462 U.S. at 647-48. The Court has also rejected the consideration of a less intrusive alternative to end a threat. See Chamberlin v. City of Albuquerque, No. CIV 02-0603, 2005 WL

2313527, at *2 (D.N.M. July 31, 2005)(Browning, J.)(precluding the plaintiff's police procedures expert from testifying at trial regarding alternative less intrusive means).

## ANALYSIS

The Court denies the Second MTD.[24]  First, the Court explains that it cannot take judicial notice of the videos that the parties lodge with the Court.  Second, the Court evaluates the First Amended Complaint's sufficiency and concludes that, notwithstanding the qualified immunity defense, it states a claim.  Finally, because the parties both ask the Court to view the videos, the Court discusses its perception of what the videos depict and analyzes the Constitutional issue in light of the videos.  This discussion does not factor into the Court's resolution of the motion to dismiss.

---

[24]This opinion's analysis focuses on the Second MTD, because the Complaint and the First Amended Complaint make similar factual allegations.  The Complaint states: "10. The chase culminated in Corporal Christopher Zook, Deputy Jacob Martinez and Deputy Leonardo Guzman discharging their firearms and striking and killing Jason Roybal.  11. The fatal shot and or shots were discharged as Mr. Roybal was unarmed and fleeing law enforcement on foot."  Complaint ¶¶ 10-11, at 3.  In comparison, the First Amended Complaint states:

> 14.    The chase culminated when Defendants Corporal Christopher Zook, Deputy Jacob Martinez and Deputy Leonardo Guzman, and each of them unholstered their guns and deliberately discharged their guns separately, killing Jason Roybal.

> 15.    The fatal shots were discharged by each of the individual Defendants as Mr. Roybal was unarmed and fleeing the Defendant Deputies on foot.

First Amended Complaint ¶¶ 14-15, at 3-4.  The Plaintiff revised slightly his original Complaint's language, which he filed, at first, in State court, to better conform to federal pleading standards, but the factual allegations remain substantively the same.  Accordingly, the qualified immunity analysis focuses on the operative complaint, which is the First Amended Complaint.

## I.    THE COURT CANNOT TAKE JUDICIAL NOTICE OF THE VIDEOS.

Contrary to the Defendants' position, the Court cannot, and does not, take judicial notice of the parties' lodged videos.  The Defendants urge the Court to consider their lodged videos without converting their motion to dismiss into a motion for summary judgment.  According to the Defendants, the Court may consider the videos at the rule 12 stage, even though they are not attached to the First Amended Complaint, and even though the First Amended Complaint does not reference them, because the videos are public records, and the Court may take judicial notice of public records.  See Second MTD Reply at 2.  The Defendants' position lacks legal and logical support.  First, the Defendants' proffered cases are inapposite and do not offer guidance on the situation here involving police videos.  Second, the judicial-notice doctrine does not apply here. The Court discusses each of these arguments in turn.

First, a careful look at the Defendants' cases in the Second MTD reveals that none of them support the proposition that district courts may take judicial notice of body camera footage at the motion-to-dismiss stage, even when the videos are publicly available.  The Second MTD cites three Tenth Circuit cases: Grynberg v. Koch Gateway Pipeline Co., 390 F.3d 1276, 1278 n.1 (10th Cir. 2004)("Grynberg"), United States v. Bagby, 696 F.3d 1074, 1083 n.7 (10th Cir. 2012)("Bagby"), and Van Woudenberg  ex rel. Foor v. Gibson, 211 F.3d 560, 568 (10th Cir. 2000)("Van Woudenberg"), abrogated by McGregor v. Gibson, 248 F.3d 946, 955 (10th Cir. 2001).  Grynberg's footnote offers no judicial-notice analysis and merely recites the rule that "facts subject to judicial notice may be considered without converting a motion to dismiss into a motion for summary judgment."  390 F.3d at 1278 n.1.  Moreover, the opinion's substance above-the-line has nothing to do with judicial notice.  Similarly, the Bagby footnote addresses the Tenth Circuit's ability to take judicial notice of a State record documenting "an individual's correctional history."

696 F.3d at 1083 n.7.  While the record was not part of the record on appeal, the Tenth Circuit

concludes that it could take judicial notice of the record.  See 696 F.3d at 1083 n.7.  In so

concluding, the Tenth Circuit cites out-of-Circuit authority holding that "a certified penitentiary

packet is admissible as a self-authenticating public record under" rule 902(2) of the Federal Rules

of Evidence.  696 F.3d at 1083 n.7 (citing United States v. Watson, 650 F.3d 1084, 1089-91 (8th

Cir. 2011); United States v. Weiland, 420 F.3d 1062, 1073 (9th Cir.2005); and United States v.

Dancy, 861 F.2d 77, 79 (5th Cir.1988)).  Bagby does not, however, address body camera footage.

Finally, as to Van Woudenberg, this case does not advance the Defendants' argument; it states,

without much further discussion, that "the court is permitted to take judicial notice of its own files

and records, as well as facts which are a matter of public record."  211 F.3d at 568.

Notwithstanding the Defendants' unhelpful Tenth Circuit cases, the Court conducts its own

independent research and does not find any Tenth Circuit case allowing a district court to take

judicial notice of body cam and dash cam videos.  The Court finds, however, out-of-Circuit

authority rejecting the Defendants' position.  In Freeman v. Town of Hudson, 714 F.3d 29 (1st

Cir. 2013)(Howard, J.)("Freeman"), the United States Court of Appeals for the First Circuit

addresses the plaintiffs' argument that "any document held in a public repository," in this case,

911-call transcripts and police reports, falls within the category of extrinsic materials" that a

district court may consider at the motion-to-dismiss stage.  714 F.3d at 36.  The First Circuit rejects

this argument, distinguishing "documents in the possession of public agencies" from "official

records, such as birth or death certificates and other similar records of vital statistics."  714 F.3d

at 36.  According to the First Circuit, in the motion-to-dismiss context, "official public records" is

coextensive with "documents or facts subject to judicial notice under Federal Rule of Evidence

201."  714 F.3d at 36.  The First Circuit then examines cases from various Courts of Appeals that

use "public records" to describe State administrative proceedings, State court dockets, federal statutes, and "statewide curricular standards."  714 F.3d at 36-37.  These categories are far narrower, concludes the First Circuit, than the plaintiffs' proposed rule.  See 714 F.3d at 37.

The Court agrees with the First Circuit that the Defendants' "label" -- public records -- is "too broad a term to rely on"; calling the videos public records does not persuade the Court to treat public-agency video footage the same as official-statistics documents or State court records.  714 F.3d at 37.  A birth certificate is not the same as a body cam video.  If the parties agree that a birth certificate is genuine, the document settles the issue: the parties can no longer fight over when or where someone was born.  Here, however, the video footage, even though the parties agree it is genuine, presents questions.  Both parties ask the Court to review the footage because both parties think it helps their case.  The video footage does not convey, however, a "fact that is not subject to reasonable dispute," as rule 201(b) of the Federal Rules of Evidence requires, because the "facts" from the video -- which officers shot Roybal, when they shot him, and why they shot him -- cannot "be accurately and readily determined."  Fed. R. Evid. 201(b)(2).  The video does not answer the parties' questions and end the litigation.

As an example, the Court and the Defendants agree that the video shows that Roybal "steps out; the gun falls to the ground.  He takes a couple of steps away, and you have volley 2."  May 23 Tr. at 14:10-15 (Huss).  The Court's law clerks, however, watched the video, and think that at least two of the officers fire at Roybal as soon as he exits the truck and before he drops the BB gun.  The bottom line is that the parties' videos do not convey a set of uncontroverted "facts" in the same way that a State court docket entry or a birth certificate conveys a set of uncontroverted facts.  The video still has to be interpreted: making sense of the video requires the Court to exercise its own judgment about what it depicts.  Exercising judgment in this fashion is the antithesis of

- 82 -

how judicial notice works and counsels against relying on the videos at the motion-to-dismiss stage.[25]

Second, rule 201 of the Federal Rules of Evidence does not apply here. Rule 201 permits courts to notice judicially a "fact that is not subject to reasonable dispute because" the fact "can be accurately and readily determined." Fed. R. Evid. 201(b). This rule allows a court to take judicial notice of two kinds of facts. The first category, 201(b)(1), is one that is unique to the trial court's locality: for example, what the speed limit is on a street, where a mountain is in a town, and the name of a high school in town. The second category, 201(b)(2), is what is called almanac facts: whether the moon was full on a particular date, through what States the Rio Grande flows, and who is the forty-fifth president. The rule is conjunctive. The "fact that is not subject to reasonable dispute," Fed. R. Evid. 201(b), must fit into one of the categories.

The Defendants collapse the rule into one inquiry: whether the fact is not subject to reasonable dispute, and never analyze into which category the evidence fits. That inquiry is not the way rule 201 works. A fact is not a fact that may be judicially noticed, because it is not subject to reasonable dispute; it is not subject to reasonable dispute because it fits in one of the two categories.

---

[25]Secondary sources confirm the limited categories that fall within the judicial-notice doctrine. Weinstein's Federal Evidence, for example, lists the following categories: "Court records and actions . . . [;] Geographical facts . . . [;] Historical facts . . .[ ;] Political facts . . .[ ;] Scientific and medical facts . . .[ ;] Banking and financial facts . . .[ ;] Business and industry facts . . .[ ;] Economic facts . . .[ ;] Sociological facts . . .[ ;] Religious facts . . .[ ;] Government records and actions . . .[ ;] Miscellaneous facts . . . ." 1 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 201.12 (2d ed. 2025). Moreover, Saltzberg cautions that "[t]he categories of indisputable adjudicative facts are limited and intentionally so. The point of going to trial is to give both parties a chance to examine each other's evidence and to present all sides to the trier of fact. Our system disfavors short-cutting the trial process." Stephen Saltzberg, Michael Martin, Daniel Capra, & Jessica Berch, Federal Rules of Evidence Manual, § 201.02 (13th ed. 2025).

The Defendants do not identify what category they are trying to invoke and ultimately, that failure is fatal. It is unlikely that the videos are facts that are "generally known," Fed. R. Evid. 201(b)(1), in New Mexico; it is the event that is important, not the name of the street. Similarly, what occurs on the video is not an almanac fact; how a common man dies is not the same as whether an eclipse occurred one night. Thus, the facts on video -- even if they are "not subject to reasonable dispute," Fed. R. Evid. 201(b) -- a leap itself -- are not of a kind that a trial court may judicially notice.

The Defendants' confusion comes from the fact that they think that, because the videos are publicly available, they may be judicially noticed. Judicial notice does not depend on whether the information is publicly available, as most facts that are judicially noticed are publicly available. If, however, the Court were able to judicially notice every fact that is publicly available, courts could begin to take judicial notice of an enormous amount of evidence and skip the rest of the rules of evidence. Almost all of the record in a case is "publicly available," but not all of the publicly available evidence is admissible. If evidence is not admissible, the Court should not be taking judicial notice of that fact. For these reasons, rule 201 does not permit the Court to take judicial notice of the videos' contents at the motion-to-dismiss stage.

## II.    THE FIRST AMENDED COMPLAINT ALLEGES PLAUSIBLY THAT THE DEFENDANTS VIOLATE ROYBAL'S FOURTH AMENDMENT RIGHTS, NOTWITHSTANDING THE QUALIFIED IMMUNITY DEFENSE.

The First Amended Complaint alleges plausibly a Fourth Amendment violation. After Bell Atlantic Corp. v. Twombly ("Twombly"), the plaintiffs' complaints must "give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." Ridge at Red Hawk, L.L.C. v. Schneider, 493 F.3d at 1177 (emphasis in original). In evaluating the First Amended Complaint, the Court, of course, takes its allegations as true and

draws all reasonable inferences in the Plaintiff's favor.  See Thornton v. Kroger Co., No. CIV 20-

1040 JB/JFR, 2022 WL488932, *105 (D.N.M. Feb. 17, 2022)(Browning, J.)("Thornton").

The First Amended Complaint's factual allegations regarding the Constitutional violation

are:

> 12.    Upon information and belief on June 24, 2021, Corporal Christopher Zook, Deputy Jacob Martinez and Deputy Leonardo Guzman were involved in an automobile pursuit in Santa Fe County in which they were pursuing Jason Roybal.
>
> 13.    During the course of their investigations, Defendants Corporal Christopher Zook, Deputy Jacob Martinez and Deputy Leonardo Guzman's investigation [sic] they learned that Jason Roybal had active warrants and was in possession of a stolen motor vehicle.
>
> 14.    The chase culminated when Defendants Corporal Christopher Zook, Deputy Jacob Martinez and Deputy Leonardo Guzman, and each of them unholstered their guns and deliberately discharged their guns separately, killing Jason Roybal.
>
> 15.    The fatal shots were discharged by each of the individual Defendants as Mr. Roybal was unarmed and fleeing the Defendant Deputies on foot.

First Amended Complaint ¶¶ 12-15, at 3-4.  The Second MTD attacks the First Amended

Complaint in three ways.  First, the Second MTD contends that the lodged videos contradict the

First Amended Complaint's allegations, and, consequently, that the Court need not credit those

allegations in light of the videos.  See Second MTD at 2.  Next, the Second MTD asserts that

federal courts hold that officers are entitled to qualified immunity "in similar situations where the

plaintiff has done far less to threaten" the officers' safety.  Second MTD at 12.  Finally, the Second

MTD contends that the Plaintiff "cannot illustrate clearly established law that would have placed

them on notice that their actions were unconstitutional at the time of the incident."  Second MTD

at 14.

Each of these attacks shares the same problem: they assume that the Court will go beyond

the First Amended Complaint's allegations and will look at the videos.  As the Court discusses in the preceding section, the Court cannot take judicial notice of the videos at this stage.  The Defendants, moreover, do not want the Court to convert their motion into a summary judgment motion.  Accordingly, whatever benefit the videos bestow on the Defendants is not available to them at this stage.  The First Amended Complaint's four corners control here, and the Court will not engage with the Defendants' facts that do not appear in the First Amended Complaint.  See Thornton, 2022 WL 488932 at *105 ("The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true.")(quoting Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994)).  Accordingly, the Defendants' first argument -- that the videos contradict the First Amended Complaint's allegations -- lacks support in the applicable legal framework at this stage.

As to the second and third arguments, which correspond to the two qualified immunity prongs, the First Amended Complaint's allegations also control here.  On a motion to dismiss, the qualified immunity analysis centers on the complaint's allegations.  See Truman v. Orem City, 1 F.4th 1227, 1235 (10th Cir. 2021)("Specifically, the court analyzes 'the defendant's conduct as alleged in the complaint.'")(quoting Thomas v. Kaven, 765 F.3d 1183, 1194 (10th Cir. 2014))(emphasis in Truman v. Orem City and Thomas v. Kaven).  This standard is a demanding one for the defendant to meet.  See Truman v. Orem City, 1 F.4th at 1235 ("'[A]sserting a qualified immunity defense via a Rule 12(b)(6) motion  . . . subjects the defendant to a more challenging standard of review than would apply on summary judgment.'")(quoting Peterson v. Jensen, 371 F.3d 1199, 1201 (10th Cir. 2004)).

Here, the First Amended Complaint plausibly alleges that, when the officers shoot Roybal, they violate the Fourth Amendment's prohibition on unreasonable seizures.  See First Amended

Complaint ¶¶ 12-15, at 3-4. According to the First Amended Complaint, after an automobile chase during which they discover that Roybal is driving a stolen car and has active warrants, each officer individually discharges his weapon and shoots Roybal as Roybal is unarmed and fleeing on foot. See First Amended Complaint ¶¶ 14-15, at 3-4. By alleging that each officer individually discharges his weapon and shoots Roybal while Roybal is fleeing, the First Amended Complaint complies with rule 12(b)(6)'s requirement, in the § 1983 context, that "the complaint make clear exactly who is alleged to have done what to whom," Truman v. Orem City, 1 F.4th at 1235 (quoting Wilson v. Montano, 715 F.3d 847, 852 (10th Cir. 2013)): each Defendant shoots Roybal while he is unarmed and running away from them. This allegation plausibly states a claim pursuant to Tennessee v. Garner, 471 U.S. 1 (1985)("Garner"), which holds that the police "may not seize an unarmed, nondangerous suspect by shooting him dead." 471 U.S. at 11-12.

It is true that the Supreme Court, in a case reversing the Tenth Circuit's denial of qualified immunity, states that "Garner . . . do[es] not by [itself] create clearly established law outside 'an obvious case.'" White v. Pauly, 580 U.S. 73, 80 (2017)(per curiam)(quoting Brosseau v. Haugen, 543 U.S. 194, 199 (2004)(per curiam)). The First Amended Complaint, however, describes an obvious case, because the officers' alleged actions -- shooting a fleeing, unarmed suspect -- violate the Garner rule. The First Amended Complaint omits the important fact that Roybal fires a BB gun at the officers before he flees. Nonetheless, this decision is the Plaintiff's to make. The plaintiff does not have to plead the defendant's version of the facts, or a version of the facts that guarantees dismissal. A "complaint need not recite 'detailed factual allegations,'" so long the "pleaded facts . . . establish that the claim is plausible." Truman v. Orem City, 1 F.4th at 1235 (quoting Twombly, 550 U.S. at 444). The plaintiff, moreover, can allege, subject to the ethical and professional requirements of rule 11 of the Federal Rules of Civil Procedure, his version of

the evidence.  This complaint is what exists here.

With regards to the clearly established prong, <u>Garner</u> does the work there, too.  <u>Garner</u> makes the unlawfulness of the officers' actions, as alleged in the First Amended Complaint, "apparent."  <u>Anderson v. Creighton</u>, 483 U.S. at 640.  <u>Garner</u>'s "general statement of the law" -- shooting a fleeing, nondangerous suspect violates the Constitution -- is not "inherently incapable of giving fair and clear warning" that shooting a fleeing and unarmed suspect also violates the Constitution.  <u>United States v. Lanier</u>, 520 U.S. 259, 271 (1997).  Moreover, other Tenth Circuit cases applying <u>Garner</u> reinforce the conclusion that the officers' actions in the First Amended Complaint violate clearly established law.  In <u>Carr v. Castle</u>, 337 F.3d 1221, 1227 (10th Cir. 2003)(Shadur, J.)("<u>Carr</u>"), the Tenth Circuit affirms the district court's holding that officers violate clearly established law when they shoot an unarmed suspect who "was not advancing on the officers, and had his head near the ground with his buttocks slightly elevated," even though the suspect initially "assaulted the officers and fled, and, once cornered against a fence, had thrown a four-inch piece of concrete at the officers."  <u>Easter v. Cramer</u>, 785 Fed. App'x 602, 608 (10th Cir. 2019)(Carson, J.)(unpublished)(citing <u>Carr</u>, 337 F.3d at 1224-8 & n.6).[26]  Similarly, here, the First

_____

[26]<u>Easter v. Cramer</u> is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit states:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored . . . .  However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

<u>United States v. Austin</u>, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court concludes that <u>Easter v. Cramer</u> and <u>Estate of Harmon v. Salt Lake City</u> have persuasive value with respect to a material issue and will assist the Court in its disposition of this Memorandum Opinion and Order.

Amended Complaint alleges that the three officers shoot Roybal who is unarmed and is "not advancing on the officers." Easter v. Cramer, 785 Fed. App'x at 608. Unlike in Carr, the First Amended Complaint does not allege that Roybal is lying on the ground when the officers shoot him, but the Tenth Circuit does "not require a case directly on point"; instead, it requires an "existing precedent" that "placed the statutory or constitutional question beyond debate." Sanchez v. Guzman, 105 F.4th 1285, 1293 (10th Cir. 2024)(quoting Mullenix v. Luna, 577 U.S. at 12). Carr holds that shooting an unarmed, prone, suspect who is not advancing on officers -- even though that suspect has just hurled a projectile at officers -- violates the Constitution. See Carr, 377 F.3d at 1227-28. This holding is sufficient to put a reasonable officer on notice that shooting an unarmed, fleeing-on-foot suspect who is not advancing on officers -- even though that suspect has led the officers on a car chase -- also violates the Constitution. In sum, Garner and Carr establish clearly that the officers' actions that the First Amended Complaint describes violate Roybal's Fourth Amendment rights. Accordingly, the Court denies the motion to dismiss and holds that the officers are not, at this stage, entitled to qualified immunity.[27]

---

[27]The Defendants argue that Roybal runs towards a civilian car as he exits the truck, and, therefore, the officers are justified in shooting him, because he poses a threat to the people in the car. See First MTD Reply at 2. This argument is inapposite at the motion-to-dismiss stage, where the Court takes the First Amended Complaint's facts as true. The First Amended Complaint does not mention the civilian car. Accordingly, this argument does not factor into the Court's motion-to-dismiss analysis.

With regards to the analysis' final section, where the Court discusses what it sees on the videos and how it would resolve the qualified immunity issue at summary judgment, if the record does not change, the "running-toward-a-civilian-car" argument similarly lacks force. The Plaintiff likely will dispute that Roybal is running towards a car, and the videos do not clearly contradict the Plaintiff's version of the facts, such that the Court would be obligated, under Scott v. Harris, to rely on the videos. See Harmon II, 2025 WL 1163268 at * 2 (noting that if video recordings do not "clearly depict" an action, courts should "credit" the plaintiff's version of events)(quoting Scott v. Harris, 550 U.S. at 380-81). Here, the car has stopped because of the police presence. The

III.    **THE COURT WOULD CONCLUDE BASED ON THE VIDEOS THAT ZOOK AND MARTINEZ -- BUT NOT GUZMAN -- VIOLATE ROYBAL'S FOURTH AMENDMENT RIGHTS WHEN THEY SHOOT HIM AFTER HE DROPS THE BB GUN.**

The Court once again emphasizes that it knows it cannot and should not make findings of fact when ruling on a motion to dismiss. The Court is not certain what to do with this motion, when all parties want the Court to look at the videos, but also cannot agree to convert the motion to a motion for summary judgment. In this final section, the Court will say what it sees, and say how it would apply summary judgment principles in the excessive-force context to what the videos depict.

At summary judgment, the Plaintiff must show that the Defendants violated his Constitutional rights that were clearly established at the time of the violation. See Estate of Harmon v. Salt Lake City, -- F.4th --, 2025 WL 1163268, *2 (10th Cir. 2025)(Bacharach, J.)("Harmon II"). The Court views the evidence in the light most favorable to the Plaintiff. See Harmon II, 2025 WL 1163268 at *2. When, as here, the record includes video evidence, "[i]f the events are conclusively shown in the recordings," the Court "rel[ies] on the recordings to determine the facts." Harmon II, 2025 WL 1163268 at *2. If the videos do not depict clearly an action, however, "and the evidence can be reasonably interpreted to support either party's version of what happened," Baca v. Cosper, 128 F.4th 1319, 1324, (10th Cir. 2025), the Court "would need to

---

police open fire at Roybal almost immediately after he exits the truck. See Zook Dashcam at 3:31. A reasonable jury could conclude that the gunfire begins before the officers can predict that Roybal intends to approach a civilian car. It may be that the running toward the vehicle could justify continuing to shoot Roybal, but it is unlikely to justify the first shots after Roybal leaves the truck. Therefore, at the summary judgment stage, and on this same record, the Court is unlikely to adopt the Defendants' version of events, namely, that Roybal approaches a civilian vehicle as he attempts to flee from the truck.

credit" the Plaintiff's version, Harmon II, 2025 WL 1163268 at *2.

### A.   THE COURT DESCRIBES THE LEGAL PRINCIPLES GOVERNING EXCESSIVE FORCE CLAIMS.

When the three officers shoot Roybal, they seize him -- as the Fourth Amendment uses that term -- the moment the bullets strike him.   See Torres v. Madrid, 592 U.S. 306, 318 (2021)(Roberts, C.J.)("We therefore conclude that the officers seized Torres for the instant that the bullets struck her.").   The Fourth Amendment protects against unreasonable seizures.   See Harmon II, 2025 WL 1163268 at *1.   Accordingly, the legal issue in this case is whether the bullets that strike Roybal are reasonable seizures.   See Harmon II, 2025 WL 1163268, at *2 ("The constitutionality of the shooting turns on its reasonableness.")(citing Tenorio v. Pitzer, 802 F.3d 1160, 1164 (10th Cir. 2015)).

As to a Fourth Amendment seizure's reasonableness, Graham v. Connor, 490 U.S. 386 (1989)("Graham"), provides the governing legal principles.   Graham lists out three factors for courts to consider in determining whether the use of force to effectuate a seizure is excessive, and, therefore, unreasonable: (i) the severity of the defendant's crime; (ii) the "immediacy of a threat to the officers or others"; and (iii) the defendant's "resistance" or "effort[s] to flee."   Harmon II, 2025 WL 1163268 at *2 (citing Graham, 490 U.S. at 396-97).   The immediacy of the threat, factor two, "is undoubtedly the most important."   Harmon II, 2025 WL 1163268 at *2 (quoting Arnold v. City of Olathe, 35 F.45h 778, 789 (10th Cir. 2022)).   Tenth Circuit precedent breaks down factor two using more factors -- the so-called "Larsen considerations," named after the case Estate of Larsen ex rel. Sturdivan v. Murr, 511 F.3d 1255 (10th Cir. 2008)(Tymkovich, J.)("Larsen").   Harmon II, 2025 WL 1163268, at *2.   The four Larsen considerations are: (i) "whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands";

(ii) whether the suspect made any "hostile motions . . . with the weapon towards the officers"; (iii) "the distance separating the officers and the suspect"; and (iv) the suspect's "manifest intentions." Harmon II, 2025 WL 1163268 at *2 (quoting Larsen, 511 F.3d at 1260).

Both Graham and Larsen guide the answer, however, to one bottom-line question: would a reasonable officer in the Defendants' position have had "probable cause to believe that there was a threat of serious physical harm to themselves or to others"? Larsen, 511 F.3d at 1259 (quoting Jiron v. City of Lakewood, 392 F.3d 410, 414 (10th Cir. 2004))(emphasis in Larsen, but not in Jiron v. City of Lakewood). If a reasonable officer would have believed that this serious threat existed, deadly force is Constitutionally justified. See Larsen, 511 F.3d at 1259. Importantly, "even 'if an officer reasonably, but mistakenly, believed'" that a suspect posed a serious threat to the officer or others, "'the officer would be justified in using more force than in fact was needed.'" Larsen, 511 F.3d at 1259 (quoting Jiron v. City of Lakewood, 392 F.3d at 415). The reasonableness of an officer's mistake is a fact question and not a legal question. See Harmon II, 2025 WL 1163268 at *5 (citing Clerkley v. Holcomb, 121 F.4th 1359, 1364 (10th Cir. 2024)).

### B. THE GRAHAM FACTORS WEIGH AGAINST QUALIFIED IMMUNITY AS TO ZOOK AND MARTINEZ, BUT NOT AS TO GUZMAN.

Before analyzing the Graham factors, the Court clarifies which of the officers' actions it reviews for a Constitutional violation. If Roybal "hadn't posed an immediate threat to anyone," shooting him "would have violated the Constitution." Harmon II, 2025 WL 1163268 at *7. The Plaintiff does not contend that the first round of gunfire into the truck's cab, directly after Roybal pops out of the window and fires the BB gun, is unconstitutional. This case's dispute, therefore, focuses on what happens after the first round of gunfire, when Roybal exits the truck several seconds after the first volley's final gunshot. At this point, Roybal did not have to die, in the sense

that he could have taken certain actions that would have signaled objectively to the officers that he was no longer an immediate threat. For example, Roybal could have thrown the gun out the window, announced that he was surrendering, and stuck both of his hands out of the window. If Roybal had done these things, shooting him would be unconstitutional, because he objectively no longer posed a serious threat to the officers or to others. The point is that Roybal's decision to fire a BB gun at the police does not, from a Constitutional standpoint, automatically justify any and all deadly force that the officers use after their initial round of gunfire. See Reavis Estate of Coale v. Frost, 967 F.3d 978 (10th Cir. 2020)(McHugh, J.)(denying qualified immunity to an officer who shoots a truck's driver after the truck drives by the officer and nearly hits him). Accordingly, this case's facts rest in the grey area between two extremes: First, Roybal could have surrendered in such a way that makes shooting him unreasonable, as described above. Second, Roybal could have exited the truck and continued to fire at the police, which would make shooting him reasonable. With this framework in mind, the Court turns to the Graham factors.

## 1. The First and Third Graham Factors Weigh in Favor of Qualified Immunity.

The first and third Graham factors weigh in favor of the shooting's Constitutionality and require the least analysis. Factor one is the seriousness of Roybal's crime. In evaluating this factor, courts "consider any criminal act involved in the police encounter." Est. of Harmon v. Salt Lake City, No. 20-4085, 2021 WL 5232248, at *3 (10th Cir. Nov. 10, 2021)(Kelly, J.). Here, the First Amended Complaint alleges that, while pursuing Roybal, officers "learned that" Roybal "had active warrants and was in possession of a stolen motor vehicle." First Amended Complaint ¶ 13, at 3. The First Amended Complaint does not specify whether Roybal's warrants are felony warrants or misdemeanor warrants, but, notwithstanding this omission, possessing a stolen vehicle

is a New Mexico felony.  See N.M.S.A. § 30-16D-4(B)(setting out felony penalties for "[w]hoever commits receiving or transferring a stolen vehicle or motor vehicle").  Roybal also refuses to pull over for the police, which is a misdemeanor under New Mexico's evading-an-officer statute, N.M.S.A. § 30-22-1.  Finally, Roybal fires a BB gun at the police.  At the very least, this shooting constitutes assault upon a peace officer, a misdemeanor, in violation of N.M.S.A. § 30-22-21, and could constitute aggravated assault upon a peace officer, a felony, in violation of N.M.S.A. § 30-22-22 -- depending on whether a jury concludes that a BB gun is a deadly weapon under New Mexico law.  See State v. Fernandez, 2007-NMCA-091 ¶ 9, 142 N.M. 231, 233, 164 P.3d 112, 114 (holding that a jury must decide whether a BB gun constitutes a deadly weapon under N.M.S.A. § 30-1-12(B)).[28]  In sum, Roybal commits at least one and potentially two felonies, along with at least one misdemeanor; his criminal conduct, under Graham factor one, weighs in favor of the deadly force's reasonableness.

Next, the Court turns to the third Graham factor -- whether Roybal resists or evades arrest.  Roybal evades arrest when he drives the truck around Santa Fe after a police vehicle turns on its emergency lights.  Moreover, when he exits the truck, he turns away from the three squad cars and begins to run up the street.  These actions, leading up to and immediately preceding the shooting, both weigh in favor of the deadly force's reasonableness under Graham factor three.

---

[28]The Court predicts that the Supreme Court of New Mexico would agree with the Court of Appeals of New Mexico's analysis in State v. Fernandez, 2007-NMCA-091, 142 N.M. 231, 164 P.3d 112.  The Supreme Court of New Mexico, in a case analyzing whether a pocketknife is a deadly weapon under N.M.S.A. § 30-1-12(B), cites State v. Fernandez as an example of lower courts applying § 30-1-12(B) to "a broad range of offenses involving both use and possession of deadly weapons."  State v. Nick R., 2009-NMSC-050, ¶ 15, 147 N.M. 182, 185, 218 P.3d 868, 871.  The Court infers from the Supreme Court of New Mexico's favorable cite to State v. Fernandez that the Supreme Court of New Mexico approves of State v. Fernandez' holding and would adopt it were the opportunity to present itself.

2. **The Larsen Considerations Indicate That the Second Graham Factor Weighs Against Qualified Immunity as to Martinez and Zook, But Not as to Guzman.**

The remaining Graham factor is the most important: the threat's immediacy.  See Harmon II, 2025 WL 1163268, at *2.  Again, the Tenth Circuit breaks down this factor with the four Larsen considerations.  Additionally, the Tenth Circuit notes that "[a]nother important aspect of this inquiry is 'whether the officers were in danger at the precise moment that they used force.'" Thomson v. Salt Lake County, 584 F.3d 1304, 1315 (10th Cir. 2009)(quoting Phillips v. James, 422 F.3d 1075, 1083 (10th Cir. 2005)).  Although the "first two Larsen considerations assume that an officer sees the suspect with a weapon," the Tenth Circuit applies the considerations "even when the parties disagree over whether the officer saw a weapon."  Harmon II, 2025 WL 1163268 at *2.  Applying Larsen (i) and (ii), therefore, is appropriate here.

Larsen (i) is whether the officers order Roybal to drop his weapon.  Here, the officers do not order Roybal to drop his weapon between the first and second volleys, even though there is time to give that order.  Accordingly, this consideration weighs slightly in the Plaintiff's favor.[29]

---

[29]This consideration is not always the best fit for active-shooter situations.  It is logical that the law should encourage police to warn an armed suspect to drop his or her weapon before the police shoot them, because police warnings are one of the final chances to deescalate a tense encounter.  When a suspect initiates violence by firing first at the police, however, the notion that the police should warn the suspect before they return fire is less logically sound.  Once a suspect has fired upon the police, the die has been cast, Constitutionally, insofar as the police may immediately return fire to address the deadly threat.  See Waterhouse v. Direzza, 129 F.4th 1212, 1225 (10th Cir. 2025)("[I]t is clearly established that officers may act under exigent circumstances when they reasonably see an immediate need to protect the lives or safety of themselves or others.")(quoting Flores v. Henderson, 101 F.4th 1185, 1199 (10th Cir. 2024)).

This case's facts, however, counsel against discarding Larsen (i) in all active-shooter situations.  When, as here, there is a gap in time between the suspect's shots and the police's return fire, there is not much downside in encouraging the police to issue a warning or an exhortation to drop the weapon.  This tactic could deescalate the situation, once the suspect's initial moment of murderous rashness has passed, and the suspect's survival instinct has kicked in.  In sum, Larsen (i) maintains analytical value here, even though Roybal fires the BB gun first.

Larsen (ii) -- whether the suspect made any "hostile motions . . . with the weapon towards the officers," Larsen, 511 F.3d at 1260 -- also weighs in the Plaintiff's favor.  After the last shot of the three officers' initial return volley into the truck's cab, there is a five-second pause before Roybal exits the truck.  See FOF 20, supra, at 5.  As Roybal exits the truck, Martinez and Zook begin to fire again.  See FOF 23, supra, at 6.  This volley kills Roybal, and it is this volley that the First Amended Complaint contends is unconstitutional.  The hostile-motions analysis, therefore, focuses on Roybal's actions as he exits the truck as Martinez and Zook fire at him for the second time.

Roybal does not make any hostile motions with the BB gun as he exits the truck.  The sequence happens quickly.  Roybal opens the door and begins to run away up the street, in the opposite direction from Guzman and Martinez, who are behind his truck.  He also does not run towards Zook, whose police car is to the left and slightly behind the truck.  As he exits the door, moreover, Roybal faces away from Guzman and Martinez.

These actions, as a comparison to Tenth Circuit precedent demonstrates, are not hostile motions.  For example, in Thompson v. Salt Lake County, the Tenth Circuit notes that Larsen (ii) weighs in favor of reasonableness; in that case, a police officer shoots a suspect who "was moving his gun up and down quickly, including aiming it directly at the officers at one point."  Thompson v. Salt Lake County, 584 F.3d at 1318.  Similarly, in Waterhouse v. Direzza, the Tenth Circuit concludes that a suspect poses an immediate threat to officers when the suspect barricades himself in a basement, sets the basement on fire, and, as officers are evacuating up the basement stairs, bursts out of a basement bedroom and "rushed toward" officers.  129 F.4th at 1218.  In both of these cases, the suspect is facing officers, and either is brandishing a gun or is charging towards the police.  In contrast, Roybal never brandishes the BB gun -- and, in fact, drops it shortly after

exiting the car -- never faces towards the police, and runs away from them. Accordingly, <u>Larsen</u> (ii) weighs in the Plaintiff's favor.

<u>Larsen</u> (iii) is the distance between the officers and the suspect, and this consideration weighs in the Defendants' favor, but only slightly. The Aerial Photo shows that Roybal's truck is roughly two car lengths, or twenty feet, away from Guzman's car, the car closest to the truck. Martinez' car, moreover, is roughly thirty feet away from the truck, and Zook's car, parked across the street in a parking lot diagonal to the truck, is roughly fifty feet away from the truck. On the one hand, Roybal has a BB gun that may be capable of discharging a projectile that travels fifty feet.[30] Analyzing this factor with a focus on the weapon, therefore, leads to the conclusion that the distance between Roybal and the officers does not mitigate the weapon's potential threat.

The Court predicts, however, that, at the summary judgment phase, the parties will dispute whether each of the three officers sees the BB gun when it falls to the ground. If the parties dispute whether each of the three officers sees the BB gun fall, and the Court takes the Plaintiff's version of the facts -- as it must at summary judgment -- this consideration's analysis changes. At this stage, the Court is inclined to conclude that the videos demonstrate that Guzman could not have seen the BB gun fall, because he is moving around his car when it falls, and the car obstructs his view of Roybal. As to Martinez and Zook, if the summary judgment facts are that they both saw the BB gun fall, the distance between them and Roybal matters a great deal. Martinez and Zook are roughly thirty and fifty feet from Roybal, respectively. An unarmed man running away from them does not pose a threat to them at these distances. In sum, the Court anticipates that, at

---

[30]At this stage, the record lacks information about the BB gun's range, but the Court notes that some sources assert that BB guns can fire projectiles that travel fifty yards or more. <u>See</u> How Far Can A BB Gun Shoot?, https://www.buffalorifles.org/blog/how-far-can-a-bb-gun-shoot/ (last visited May 5, 2025).

summary judgment, this factor will weigh in the Plaintiff's favor as to Martinez and Zook, but not as to Guzman.

The fourth and final <u>Larsen</u> consideration asks the district court to consider the suspect's manifest intentions. Here, Roybal's actions demonstrate that he intends to flee. The Court acknowledges that, seconds earlier, before Roybal exits the truck and before the first volley of gunfire, Roybal fires his BB gun at the officers, an action demonstrating his intent to hurt or scare them. As the Court discusses earlier, however, Roybal's decision to fire the BB gun does not automatically foreclose his excessive-force claim. Roybal's actions -- exiting the truck, dropping the BB gun, and turning up the street to flee -- are not consistent with an intent to continue frightening or harming the police. See <u>Clerkley v. Holcomb</u>, 121 F.4th 1259, 1366 (10th Cir. 2024)(Moritz, J.)(holding that facts suggesting "an intent to evade the police" are "not enough to push this factor into" the police's "column"). This final consideration, therefore, weighs in the Plaintiff's favor, as to the two officers that may have seen Roybal drop the BB gun.

Once again, however, Guzman -- who could not have seen the BB gun drop -- requires a different analysis. A suspect who fires at the police and flees, but retains his gun, conveys a continued willingness to engage in violence. Perhaps the suspect fires behind him on the move. Perhaps the suspect hides in a dark corner, with his gun at the ready. Retaining the gun facilitates additional violence, even if the suspect considers that violence to be a last resort, if escape fails. Accordingly, from Guzman's perspective, by fleeing with his BB gun, Roybal intends not just to evade the police, but potentially to commit further violence in the course of fleeing. In conclusion, <u>Larsen</u> (iv) weighs in Guzman's favor.

Tallying up the <u>Larsen</u> consideration reveals the following. <u>Larsen</u> (i) -- the lack of a warning -- weighs in the Plaintiff's favor. <u>Larsen</u> (ii) -- hostile motions -- weighs in the Plaintiff's

favor. Larsen (iii) -- distance -- will likely weigh in the Plaintiff's favor, at summary judgment, as to Zook and Martinez, but not as to Guzman. Larsen (iv) -- manifest intentions -- weighs in the Plaintiff's favor as to Zook and Martinez, but not as to Guzman. Here is how the Court makes sense of these considerations, keeping in mind the guiding inquiry "'whether the officers were in danger at the precise moment that they used force.'" Thomson v. Salt Lake Cnty., 584 F.3d at 1315 (quoting Phillips v. James, 422 F.3d at 1083). At summary judgment, the facts in the light most favorable to the Plaintiff likely will be that Zook and Martinez see Roybal drop the BB gun. Consequently, if Zook and Martinez see that Roybal is unarmed, none of the Larsen considerations support the reasonableness of shooting him while he is running away. It follows that, overall, the second Graham factor also weighs against reasonableness as to Zook and Martinez.

As to Guzman, however, the situation is different. Guzman could not have known that Roybal drops the BB gun. This fact means that Guzman benefits from the distance consideration -- because a BB gun is a projectile weapon -- and, additionally, the manifest-intentions consideration. Given that the Larsen considerations are deadlocked, other principles have to break the tie, specifically, the notion that courts should defer to an officer's "split-second judgment, made in 'tense, uncertain, and rapidly evolving circumstances.'" Waterhouse v. Direzza, 129 F.4th at 1224 (quoting Thomson v. Salt Lake Cnty., 584 F.3d at 1318). Applying this principle to Guzman is apt: here, Guzman's car obstructs his view as he ducks behind it and, while he ducks, he hears his fellow officers open fire -- indicating that they perceive a threat. By the time Guzman can see Roybal again, Martinez and Zook's decision to shoot undoubtedly influences his own decision to fire his weapon.[31] In light of Guzman's uncertainty stemming from his inability to see

---

[31]The Court does not mean to suggest, with this observation, that Martinez and Zook's apparently unconstitutional decision to shoot Roybal, standing alone, justifies Guzman's actions

the BB gun, the Court concludes that the second <u>Graham</u> weighs in favor of the reasonableness of Guzman's actions.

    **3.**      **<u>At Summary Judgment, Without More Record Evidence, the Court Likely Would Hold That Guzman Is Entitled to Qualified Immunity, But Martinez and Zook Are Not Entitled to Qualified Immunity.</u>**

Because the second <u>Graham</u> factor is the most important factor, the Court's conclusions about this factor guide its overall conclusions regarding the shooting's Constitutionality.  First, the Court addresses the <u>Graham</u> factors as to Guzman.  Second, it addresses the <u>Graham</u> factors as to Martinez and Zook.

Each <u>Graham</u> factor weighs in Guzman's favor.  Guzman shoots Roybal after Roybal leads the police on a car chase, fires a BB gun at them, and attempts to flee.  When Guzman shoots Roybal, Guzman believes that Roybal has a gun, because he does not see Roybal drop the BB gun. The <u>Graham</u> factors counsel that shooting Roybal under these circumstances is reasonable. Accordingly, the Court would conclude, at summary judgment, and on this same record, that Guzman is entitled to qualified immunity, because he does not violate Roybal's Constitutional rights when he shoots him.

The <u>Graham</u> factors do not align so neatly, however, as to Martinez and Zook.  Factors one and three, the crime's severity and Roybal's flight, weigh in favor of reasonableness.  The Tenth Circuit states, however, that the second <u>Graham</u> factor, the threat's immediacy, "is the most

_____

and shields him from liability.  A reasonable police officer is obligated to evaluate a rapidly evolving situation using his or her own independent judgment.  <u>See</u> <u>Rice v. Morehouse</u>, 989 F.3d 1112, 1122 (9th Cir. 2021)(Paez, J.)(noting officers' "duty to independently evaluate a situation when they arrive").  Here, the other officers' decision to fire helps explain Guzman's decision to fire.  The reason, however, that Court likely will award qualified immunity to Guzman stems from Guzman's inability to see the BB gun drop.  This fact, coupled with the Roybal's initial decision to fire the BB gun in Guzman's direction, makes Guzman's subsequent shots Constitutionally reasonable.

important of the three." Harmon II, 2025 WL 1163268 at *7.  In Harmon II, for example, the Tenth Circuit holds that Graham factor two outweighs factors one and three.  See Harmon II, 2025 WL 1163268 at *7.  According to the Tenth Circuit, Graham factors one and three support the use of force's reasonableness, but, because Graham factor two shows that the suspect does not pose an immediate threat, the Tenth Circuit nevertheless concludes that shooting the suspect violates the Constitution.  See Harmon II, 2025 WL 1163268 at *7 (holding that, without an "immediate threat," the "shooting would have violated the Constitution").

        Here, following Harmon II, the second Graham factor proves dispositive and leads to the conclusion that Zook and Martinez violate the Constitution when they shoot Roybal.  As previously discussed, the parties are likely to dispute whether Zook and Martinez see Roybal drop the BB gun.  Moreover, if Zook and Martinez argue that they mistakenly believed that Roybal did not drop the BB gun, that mistake's reasonableness is a fact question for the jury.  See Harmon II, 2025 WL 1163268 at *5 ("The reasonableness of a mistake would entail a question of fact rather than a matter for the court to decide as a matter of law.")(citing Clerkley v. Holcomb, 121 F.4th at 1364).  At the summary judgment stage, taking what the Court predicts to be the Plaintiff's fact -- that Martinez and Zook see the BB gun drop -- the central legal issue is whether an unarmed man running away from the police "pos[es] an immediate threat to anyone," because, "[w]ithout such a threat, the shooting would have violated the Constitution."  Harmon II, 2025 WL 1163268 at *7 (citing Clerkley v. Holcomb, 121 F.4th at 1365).  As discussed above, at this stage, the Court concludes, using the Larsen considerations, that Roybal does not pose an immediate threat to anyone when he drops the BB gun and flees.  This conclusion leads to the Court's ultimate Constitutional holding: when Martinez and Zook shoot Roybal when they know that he is unarmed and fleeing, they violate his Fourth Amendment rights.

4.      **Martinez and Zook are Not Entitled to Qualified Immunity, Because It Was Clearly Established, at the Time of the Shooting, That Shooting An Unarmed and Fleeing Suspect Violates the Constitution.**

This final section outlines the Court's thinking, through the summary judgment lens, as to qualified immunity's second prong, is the Constitutional right clearly established. The "clearly established" test is fertile ground for fighting. Litigants -- and judges -- often disagree about the similarity required between a Tenth Circuit or Supreme Court precedent, and a case's facts. Caselaw that restates the rules for determining whether a right is clearly established reinforces the notion that the decision is ultimately a judicial judgment call. "Constitutional rights are clearly established when Tenth Circuit or Supreme Court precedent particularized to the case at issue exits." Shepherd v. Robbins, 55 F.4th 810, 815 (10th Cir. 2022). The Tenth Circuit remarks that "a right is clearly established when our precedent encompasses '"materially similar conduct"' or applies "with obvious clarity" to the conduct at issue.'" Shepherd v. Robbins, 55 F.4th at 815 (quoting Apodaca v. Raemisch, 864 F.3d 1071, 1076 (10th Cir. 2017)). The Tenth Circuit also declares that "we do not require plaintiffs to engage in a scavenger hunt for a prior case with identical facts." Shepherd v. Robbins, 55 F.4th at 815. Finally, there is the familiar Supreme Court recitation that qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Mullenix v. Luna, 577 U.S. at 12 (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)). With these principles in mind, the Court turns to the first step: identifying the right at issue.

In this case, the right at issue, and the right that is clearly established when Zook and Martinez shoot Robyal, is the Fourth Amendment protection against deadly force after it is clear to officers that a suspect no longer poses a threat. See Estate of Smart by Smart v. City of Wichita, 951 F.3d at 1175 ("Smart")(agreeing with the plaintiffs that a reasonable jury could find that the

officer-defendant "violated clearly established law" by shooting the suspect "after it became clear he posed no threat" and reversing the district court's grant of summary judgment on this point). At least two Tenth Circuit cases address "materially similar conduct," Shepherd v. Robbins, 55 F.4th at 815 (quoting Apodaca v. Raemisch, 864 F.3d at 1076) and establish clearly the violation here: Carr, 337 F.3d 1221, and Smart, 951 F.3d 1161. In Carr, police respond to a call about an assault at an apartment building. See 337 F.3d at 1224. They knock on Randall Carr's apartment door, but when they open the door and try to arrest Carr, Carr hits one officer in the head and kicks the other in the crotch before running away, out of the building. See 337 F.3d at 1224-25. Officers run after him; at one point during the pursuit, Carr emerges from hiding and rushes an officer, who pepper sprays him. See 337 F.3d at 1225. Eventually, Carr finds himself trapped: he has picked up a four-inch piece of concrete, and a fence blocks the way forward. See 337 F.3d at 1225. Carr throws the concrete at the officers, and the officers shoot him. See 337 F.3d at 1225. Each of the bullets that hit Carr enter through his back, which "could have occurred only if [Carr] had his head near the ground with his buttocks slightly elevated." 337 F.3d at 1225. On these facts, the Tenth Circuit affirms the denial of qualified immunity. See 337 F.3d at 1225.

Carr establishes clearly that officers violate the Constitution when they shoot a suspect "in the back" who, "at the time of the shooting, was unarmed, was not advancing on the officers, and had his head near the ground with his buttocks slightly elevated." Easter v. Cramer, 785 Fed. App'x at 608 (citing Carr, 337 F.3d at 1224-28 & n.6). Similarly here, Martinez and Zook shoot Roybal in the back, and, at the time of the shooting, Roybal is unarmed and is not advancing on officers. Additionally, in Carr, the suspect throws a piece of concrete at the officers before the officers shoot the suspect. See Carr, 337 F.3d at 1225. Likewise, in this case, Roybal fires a BB gun at officers from his truck, ducks beneath the window, and then runs away before the officers

shoot him.  Carr's facts are similar enough to this case's facts to establish clearly that shooting an unarmed suspect in the back who is not advancing on officers violates the Constitution, even if that suspect may have recently posed a threat.

The second case that establishes clearly this principle is Smart.  In Smart, police officers are monitoring the end-of-night crowd on a popular strip of bars and restaurants in Wichita when they hear gunshots.  See 951 F.3d at 1165.  One officer, Froese, sees Marquez Smart firing the gun into a crowd and begins to pursue him.  See Smart, 951 F.3d at 1166.  Froese chases Smart until Froese is five feet behind him; then, Froese shoots Smart four times.  See 951 F.3d at 1166.  Smart falls to the ground, face down, and another officer, Chaffee, arrives.  See 951 F.3d at 1166-67. Even though Smart is on the ground with outstretched arms and empty hands, Chaffee fires three more shots at Smart and kills him.  See 951 F.3d at 1167.  The Tenth Circuit states that Chaffee violates Smart's rights when Chaffee shoots Smart, because Chaffee "had the opportunity to perceive that any threat had passed by the time he fired his final shots."   951 F.3d at 1176. Regarding the clearly established prong, the Tenth Circuit states that Chaffee "violated clearly established law if he shot Mr. Smart after it would have been clear to a reasonable officer that the perceived threat had passed."  951 F.3d at 1176.  In arriving at this conclusion, the Tenth Circuit notes that "[f]orce justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated."  951 F.3d at 1176 (quoting McCoy v. Meyers, 887 F.3d 1034, 1050 n.19 (10th Cir. 2018))(emphasis in both Smart and McCoy v. Meyers).

Smart's facts are similar to this case's facts.  In Smart, Chaffee violates a suspect's clearly established rights by shooting him in the back when he is on the ground with his hands outstretched and empty, even though the officer believed that the suspect had recently fired a gun into a crowd.

See 951 F.3d at 1176; id. at 1166. Here, Martinez and Zook violate Roybal's clearly established rights when they shoot him in the back when he is running away with empty hands. These similarities demonstrate that Martinez and Zook would have been on notice that their decision to shoot Roybal as he flees, unarmed, violates the Constitution.

Having discussed the similarities between Carr and Smart's facts and this case's facts, Court acknowledges the two factual differences. In both Carr and Smart, the suspect is on the ground when the officers shoot him. By contrast, Roybal is on his feet running away when the officers shoot him. This difference is not so material that it defeats the clearly established prong. To hold otherwise would be to endorse the notion that, while a reasonable officer is on notice that shooting a prone unarmed suspect in the back violates the Constitution, a reasonable officer is not on notice that shooting a fleeing unarmed suspect in the back violates the Constitution. This distinction slices the facts too thin and flies in the face of the Tenth Circuit's statement that "we do not require plaintiffs to engage in a scavenger hunt for a prior case with identical facts." Shepherd v. Robbins, 55 F.4th at 815. The facts that do the work here are the facts that, in both Carr and Smart, the police violate clearly established law when they shoot a previously dangerous suspect who no longer has a weapon and is no longer threatening officers, whether that threat takes the form of a four-inch piece of concrete or a gun. These similarities outweigh the sole factual difference. Accordingly, the Court, at the summary judgment phase, and on this same record, likely would conclude that Martinez and Zook violate clearly established law when they shoot Roybal while he is unarmed and poses no threat.

**IT IS ORDERED** that: (i) Defendants Zook, Martinez, and Guzman's Motion to Dismiss in Lieu of an Answer, filed August 31, 2023 (Doc. 3), is denied; (ii) Defendants Zook, Martinez, and Guzman's Motion to Dismiss Plaintiff's First Amended Complaint in Lieu of an Answer, filed

November 30, 2023 (Doc. 24), is denied; and (iii) the Plaintiff's Motion to Amend Style of Case,

filed December 8, 2023 (Doc. 26), is granted.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Sam P. Ruyle
Clark, Jones & Ruyle, L.L.C.
Santa Fe, New Mexico

-- and --

Doug Perrin
The Perrin Law Firm
Santa Fe, New Mexico

  *Attorneys for the Plaintiff*

Brandon Huss
David Roman
Bree Barnett
The New Mexico Association of Counties
Santa Fe, New Mexico

  *Attorneys for the Defendants*